Michael R. Capps (Fed. Reg. No. 66142-509)
Federal Prison Camp - Florence
P. O. Box 5000
Florence, CO 81226

*Inmate, Pro Se*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>MICHAEL R. CAPPS,<br><br>*Defendant.* | Case No.      22-CR-10073-EFM<br><br>***SECOND MOTION FOR REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I)***<br><br>(*VERIFIED*) |

### I.      EXECUTIVE SUMMARY

Mr. Michael R. Capps seeks immediate conversion of his remaining sentence to supervised release due to a life-threatening cardiovascular crisis that has developed since this Court's February 2025 denial of his initial motion. Three critical developments compel relief:

**Medical Emergency**. Mr. Capps now faces hypertensive crisis with blood pressure readings of 188/122 mmHg—exceeding clinical thresholds requiring emergency intervention to prevent stroke or cardiac arrest. This crisis developed despite maximum pharmaceutical treatment and results from severe sleep apnea (AHI 129.1 events/hour, oxygen drops to 52%) that cannot be treated following destruction of his CPAP device and institutional barriers preventing replacement.

**Institutional Inadequacy**. FPC Florence has demonstrated systematic inability to provide specialized care required for Mr. Capps' service-connected conditions. In contrast, his VA

treatment progress documentation demonstrates comprehensive medical management and monitoring of these same conditions prior to incarceration (Exhibit 8). Recent federal court decisions at this facility (*United States v. Bovis*, March 2025; *United States v. Paradis*, January 2025) document a pattern of judicial intervention for inadequate medical care. Contemporary inmates report similar medical record falsification and diagnostic failures during the same timeframe as Mr. Capps' crisis.

**Minimal Punishment Impact**. Mr. Capps is already eligible for community custody as of April 26, 2025. The requested relief would not materially reduce his punishment but would ensure constitutionally adequate medical care through Department of Veterans Affairs coordination during his remaining sentence.

The objective medical evidence—documented cardiovascular deterioration from Stage 2 hypertension in March to crisis levels in June—satisfies U.S.S.G. § 1B1.13(b)(1)(C) requirements and § 3553(a) factors supporting relief.

# TABLE OF CONTENTS

I. EXECUTIVE SUMMARY .................................................................................. 1

II. PROCEDURAL BACKGROUND AND EXHAUSTION OF REMEDIES ........................... 4

III. LEGAL STANDARD ................................................................................. 4

IV. **EXTRAORDINARY AND COMPELLING CIRCUMSTANCES** ................................. 5

    A. Life-Threatening Medical Crisis Requiring Specialized Care ........................... 5

        1. Progressive Cardiovascular Deterioration ..................................... 6

        2. Medical Literature and Expert Standards ..................................... 6

        3. Institutional Inability to Provide Adequate Care ........................... 7

        4. Contrast with Pre-Incarceration Medical Management ..................... 8

    B. Institutional Inability to Provide Adequate Medical Care ........................... 8

        1. Operational Barriers to Effective Medical Care ........................... 8

        2. Recognition of Inadequate Care ............................................. 9

        3. Systemic Resource Constraints and Budget-Driven Constitutional Violations .............. 10

        4. Comparison with Proven Treatment Capabilities ........................... 12

        5. Institutional Acknowledgment of Limitations and Congressional Deception ............. 12

    C. Prison Falsification of Medical Records ........................................... 14

        1. Evidence of Medical Record Falsification .................................. 14

        2. Pattern of Administrative Record Tampering: The Payne Evidence ............... 14

        3. Legal Significance Under Constitutional Law ............................... 15

        4. Remedy Through Judicial Intervention ..................................... 16

    D. Other Factors Supporting Relief Under § 1B1.13(b)(5) ........................... 17

        1. Exceptional Rehabilitation Efforts and Programming Completion ............... 17

        2. Systematic Denial of Mental Health Treatment for Service-Connected PTSD ............. 18

        3. Institutional Acknowledgment of Inadequate PTSD Treatment ................. 18

        4. Systematic Violation of BOP Policy Requirements for Veteran-Specific Care ............. 20

        5. Dangerous Medication Withdrawal Without Medical Supervision ................. 21

        6. Synergistic Risks from Testosterone Withdrawal ........................... 22

        7. Combination of Circumstances Creating Urgent Need for Relief ................. 25

V. **CONSISTENCY WITH § 3553(a) SENTENCING FACTORS** ........................... 25

    A. Nature and Circumstances of the Offense and Defendant's Characteristics ................. 25

    B. Adequate Punishment and Deterrence Already Achieved ........................... 26

    C. Need to Provide Medical Care in the Most Effective Manner ....................... 27

    D. Public Safety Considerations ..................................................... 28

    E. Prevention of Disproportionate Punishment ....................................... 28

VI. CONCLUSION ................................................................................. 29

PRAYER FOR RELIEF ............................................................................. 31

EXHIBIT LIST ..................................................................................... 33

## II.    PROCEDURAL BACKGROUND AND
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Mr. Capps was sentenced on May 11, 2023, to 27 months' imprisonment followed by two years of supervised release. After exhausting his direct appeal, he surrendered to FPC Florence on December 31, 2024. On February 14, 2025, this Court properly denied his initial motion for compassionate release, finding insufficient evidence of extraordinary and compelling circumstances after just 45 days of incarceration.

Assuming *arguendo*, the prior exhaustion does not apply, Mr. Capps has satisfied the administrative exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A)(i). On March 25, 2025, he submitted a formal request for compassionate release to the Warden of FPC Florence, documenting the medical circumstances detailed in this motion. The Warden denied this request on April 7, 2025.

## III.    LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A), this Court may reduce a term of imprisonment upon finding: (1) extraordinary and compelling reasons warrant reduction; (2) such reduction is consistent with Sentencing Commission policy statements; and (3) reduction is consistent with § 3553(a) factors. *United States v. McGee*, 992 F.3d 1035, 1042-43 (10th Cir. 2021).

The recently amended and broadened  Sentencing Guidelines recognize circumstances as being extraordinary and compelling when a defendant is "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C). This provision addresses circumstances where institutional medical capabilities are insufficient to manage complex conditions requiring specialized intervention.

The statute also grants district courts broad discretion in fashioning appropriate relief, including conversion of remaining imprisonment to supervised release with appropriate conditions. 18 U.S.C. § 3582(c)(1)(A).

## IV.    EXTRAORDINARY AND COMPELLING CIRCUMSTANCES

### Application of U.S.S.G. § 1B1.13(b)(1)(C) Policy Statement

Mr. Capps' circumstances fall within the Sentencing Guidelines policy statement at U.S.S.G. § 1B1.13(b)(1)(C), which recognizes as extraordinary and compelling when a defendant is "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." This standard does ***not*** require that a defendant be terminally ill. The policy statement establishes a two-part test: (1) the defendant requires specialized medical care that is not being provided, and (2) without such care, the defendant faces risk of serious health deterioration. Both elements are satisfied here.

### A.  Life-Threatening Medical Crisis Requiring Specialized Care

Mr. Capps suffers from severe obstructive sleep apnea documented by sleep study results showing an Apnea-Hypopnea Index of 129.1 events per hour—a rate more than twenty times the threshold for severe sleep apnea (Exhibit 1). During these episodes, his oxygen saturation drops to 52%, creating repeated cycles of oxygen deprivation that place extraordinary stress on his cardiovascular system (Exhibit 1). This condition requires continuous positive airway pressure (CPAP) therapy to maintain adequate oxygenation during sleep.

The medical emergency began on March 12, 2025, when a corrections officer deliberately destroyed Mr. Capps' CPAP mask during a unit search (Exhibit 2, Exhibit 4, ¶¶25-27). Despite immediate requests for replacement equipment documented in multiple inmate request forms

(Exhibit 2), institutional barriers have prevented consistent CPAP therapy for over three months. The facility's medical sick call operates only during a restrictive 30-minute window (0700-0730 hours) on a first-come, first-served basis (Exhibit 26), creating insurmountable obstacles for inmates requiring urgent equipment replacement or complex medical consultation. To be clear: despite public representations, FPC Florence (with 311 inmates as of July 11, 2025) regularly offers only one sick call window, one time per week, for all inmates. BOP Health Services at the lion camp generally does not read or reply to electronic cop-outs, and paper cop-outs are rejected with instructions to attend sick call. This amounts to 311 inmates competing for roughly 6 second windows of attention each week to address all medical issues.

### 1. Progressive Cardiovascular Deterioration

Objective blood pressure monitoring documents dangerous progression since this Court's February denial, with crisis escalating through June 2025 (Exhibit 24):

| Date | Blood Pressure | Clinical Significance |
|------|----------------|------------------------|
| March 17, 2025 | 178/98 mmHg | Stage 2 hypertension |
| March 19, 2025 | 182/91 mmHg | Continued elevation |
| March 28, 2025 | 199/108 mmHg | Approaching crisis threshold |
| June 11, 2025 | 188/122 mmHg | **Hypertensive crisis** |
| June 25, 2025 | 196/97 mmHg | Sustained crisis levels |
| June 26, 2025 | 198/104 mmHg | Continued emergency |
| June 27, 2025 | 202/106 mmHg | **Severe Hypertensive Emergency** |
| June 28, 2025 | 197/104 mmHg | **Persistent Crisis** |
| June 29, 2025 | 206/102 mmHg | **Life-threatening levels** |

These readings demonstrate sustained hypertensive crisis over multiple weeks, with systolic pressures exceeding 200 mmHg—levels requiring immediate emergency intervention to prevent stroke or cardiac arrest (Exhibit 29). This crisis persists despite maximum dual therapy with Lisinopril 40mg and Amlodipine 5mg daily (Exhibit 19), demonstrating that pharmaceutical

treatment alone cannot address his underlying sleep disorder and that institutional care cannot manage Mr. Capps' medical condition.

### 2. Medical Literature and Expert Standards

Mr. Capps' blood pressure readings exceed established emergency thresholds. The 2017 American College of Cardiology/American Heart Association Hypertension Guidelines define hypertensive crisis as blood pressure ≥180/120 mmHg, requiring immediate medical intervention to prevent end-organ damage including stroke, heart attack, and kidney failure (Exhibit 29). Mr. Capps' recent readings of 202/106 mmHg and 206/102 mmHg clearly exceed these emergency thresholds.

Medical literature confirms the dangerous relationship between untreated sleep apnea and resistant hypertension. *Javaheri et al.* (2017) documented significantly increased cardiovascular mortality in patients with sleep apnea-related hypertension, particularly when oxygen saturations drop below 80% as documented in Mr. Capps' case (Exhibit 1). The American Academy of Sleep Medicine recognizes that sleep apnea with oxygen desaturations below 60% requires immediate intervention to prevent sudden cardiac death.

### 3. Institutional Inability to Provide Adequate Care

The medical emergency began when corrections staff destroyed Mr. Capps' CPAP device on March 12, 2025, during a unit search (Exhibits 2, 4 ¶¶25-27). Despite documented requests for replacement (Exhibit 2), institutional barriers have prevented consistent CPAP therapy for over three months. As previously described, the facility operates a restrictive once-a-week, 30-minute sick call window (0700-0730 hours) that creates insurmountable obstacles for complex medical equipment replacement and specialist consultation (Exhibit 26).

Multiple witnesses document life-threatening episodes. Cellmate Chance Zabriskie observed Mr. Capps "stop breathing for approximately one minute" followed by "violent choking and physical thrashing" (Exhibit 20). Coworker Tommy Goss observed "labored breathing" and "bluish lips" during a medical episode, with Mr. Capps stating he had been "getting worse since they took away my meds" (Exhibit 13).

### 4. Contrast with Pre-Incarceration Medical Management

Prior to incarceration, Mr. Capps' sleep apnea and hypertension were successfully managed through the Veterans Affairs healthcare system with integrated sleep medicine and cardiology care (Exhibit 5). His blood pressure was controlled, and his sleep apnea was effectively treated with properly maintained CPAP equipment and regular specialist monitoring. Pre-incarceration psychiatric evaluation in September 2024 documented well-controlled symptoms with depression and anxiety rated at only 2-3 on a 10-point severity scale under proper VA treatment (Exhibits 9). The stark deterioration since incarceration demonstrates that his complex medical needs require specialized care unavailable within the correctional setting.

The evidence establishes that Mr. Capps suffers from a medical condition requiring specialized care that is not being adequately provided, creating imminent risk of serious health deterioration or death as contemplated by U.S.S.G. § 1B1.13(b)(1)(C).

### B. Institutional Inability to Provide Adequate Medical Care

The evidence establishes that FPC Florence lacks the operational capacity and specialized resources necessary to manage Mr. Capps' complex, interrelated medical conditions. This institutional deficiency is demonstrated through systematic barriers that prevent effective

treatment and a documented pattern of judicial intervention recognizing inadequate medical care at the facility.

### 1. *Operational Barriers to Effective Medical Care*

FPC Florence operates under severe constraints that create insurmountable obstacles to timely medical intervention. The facility's single weekly medical sick call schedule restricts inmate access to a 30-minute window (0700-0730 hours) on a first-come, first-served basis (Exhibit 26). For inmates with complex conditions requiring detailed evaluation, equipment replacement, or specialist consultation, this operational framework renders effective care impossible.

The impact of these constraints is directly documented in Mr. Capps' case. Following the March 12, 2025 destruction of his CPAP equipment (Exhibit 2, Exhibit 4, ¶¶25-27), he was unable to obtain timely replacement despite the life-threatening nature of his condition. The restrictive access window prevented the detailed consultation necessary to address his complex sleep apnea management needs, contributing directly to the cardiovascular crisis documented in his blood pressure monitoring log (Exhibit 24).

These operational limitations reflect resource constraints that prevent the facility from providing the specialized care required for complex medical conditions. The institution lacks dedicated sleep medicine specialists, cardiology consultation capabilities, and the infrastructure necessary for comprehensive management of interrelated conditions like severe sleep apnea and resistant hypertension. As medical unit orderly Christopher West directly observed, facility staff have discussed "their inability to provide the specialized mental health care Mr. Capps requires" (Exhibit 12), representing institutional acknowledgment of inadequate capabilities.

## 2. Recognition of Inadequate Care

Recent federal court decisions demonstrate a pattern of judicial intervention at FPC Florence due to inadequate medical care, establishing that the facility's deficiencies represent systematic institutional failure rather than isolated incidents (Exhibit 11):

- *United States v. Bovis*, Case No. 20-cr-00204-WHO-2 (N.D. Cal. March 6, 2025): The court granted compassionate release for hypertension management, finding the facility's blood pressure treatment "incomprehensible and very far below standards" and concluding that "a nine-month term should not become a life-threatening sentence."

- *United States v. Paradis*, Case No. 2:21-cr-00540-SB (C.D. Cal. January 15, 2025): Compassionate release granted for inadequate brain tumor care, with the court expressing "uncertainty surrounding BOP's ability to arrange" appropriate specialized treatment.

- *United States v. Sosa*, Case No. 2:20-CR-0073-DS (D. Utah December 2023): Release granted for uncontrolled hypertension, with the court waiving administrative exhaustion requirements due to the urgency of inadequate cardiovascular care.

The temporal concentration of these judicial interventions within fifteen months, all involving inadequate management of serious medical conditions, establishes a systematic pattern of institutional deficiency that cannot be remedied through continued administrative processes.

## 3. Systemic Resource Constraints and Budget-Driven Constitutional Violations

Mr. Capps' experience at FPC Florence reflects a nationwide crisis in federal prison medical care driven by systematic budget constraints that compromise constitutional standards across facilities. Recent authoritative research establishes that the operational barriers and resource limitations documented in his case are not isolated institutional problems but part of a systematic budget-driven approach that has created constitutional violations requiring judicial intervention.

### 3a. National Research Documenting Systematic Failures[1]

---

[1] *See* Exhibit 28.

The Vera Institute of Justice (January 2025) documented that "chronic underfunding of federal prison medical services has created a nationwide crisis in constitutional healthcare delivery, with facilities systematically unable to provide adequate staffing and resources for complex medical conditions" (Exhibit 28). The Pew Charitable Trusts (October 2017) found that "budget-driven staffing reductions in federal prison medical units have led to dangerous delays in treatment and systematic rationing of care through operational barriers" (Exhibit 28). The Equal Justice Initiative (May 2024) concluded that "fiscal pressures have created institutional incentives to minimize medical needs through misclassification and denial of services rather than appropriate treatment" (Exhibit 28).

### 3b. Direct Application to FPC Florence's Documented Failures

These research findings directly explain the systematic failures documented in Mr. Capps' case:

- **Operational Barriers as Cost-Saving Measures**: The restrictive 30-minute sick call window, once per week, that prevented timely CPAP replacement (Exhibit 26) represents precisely the type of "operational barriers" that Pew identifies as budget-driven measures that create "dangerous delays in treatment." This operational constraint transforms what should be routine medical equipment replacement into an insurmountable bureaucratic obstacle.

- **Resource Scarcity Preventing Adequate Care**: The facility's inability to provide specialized sleep medicine consultation or maintain adequate CPAP replacement protocols demonstrates the resource scarcity that the Vera Institute identifies as systematically compromising care for "complex medical conditions." Mr. Capps' severe sleep apnea with oxygen desaturations to 52% clearly constitutes such a complex condition requiring specialized resources unavailable due to budget constraints.

- **Misclassification to Minimize Costs**: Mr. Capps' initial classification as Mental Health Care Level 1 (CARE1-MH) despite his 70% VA PTSD disability rating exemplifies the Equal Justice Initiative's finding that "fiscal pressures create incentives to minimize medical needs through misclassification." This administrative decision reduces treatment costs while violating BOP Policy Statement 5242.01 requirements for veteran-specific care.

- **Systematic Rationing Through Administrative Barriers**: The documented delays in medication provision (Venlafaxine prescribed but not provided until mid-April) and equipment replacement represent the "rationing of care" that research identifies as budget-driven constitutional violations rather than legitimate medical decisions.

### 3c  Institutional Pattern Confirms Systematic Crisis

The pattern of recent judicial interventions at FPC Florence (*Bovis*, *Paradis*, *Sosa*) now appears in this research context as evidence that budget-driven neglect has reached crisis levels requiring systematic judicial oversight. The temporal concentration of these cases within fifteen months, all involving inadequate management of complex medical conditions, demonstrates that resource constraints have created systematic constitutional violations that cannot be remedied through administrative processes designed to minimize rather than address medical needs.

### 4. Comparison with Proven Treatment Capabilities

Mr. Capps' medical conditions were successfully managed through the Veterans Affairs healthcare system prior to incarceration (Exhibit 5). The VA's integrated approach documented in his medical records included:

- Specialized sleep medicine monitoring with regular CPAP equipment maintenance and replacement
- Coordinated cardiology care addressing the relationship between sleep apnea and hypertension
- Comprehensive medication management with appropriate titration and monitoring (Exhibit 10)
- Regular specialist follow-up ensuring optimal treatment outcomes

Pre-incarceration psychiatric evaluation in September 2024 documented controlled symptoms with depression and anxiety rated at only 2-3 on a 10-point severity scale under proper VA treatment (Exhibits 8 and 9). The stark contrast between Mr. Capps' pre-incarceration medical stability and his current crisis (Exhibit 24) demonstrates that effective treatment requires specialized resources and coordinated care unavailable within the correctional setting.

5. *Institutional Acknowledgment of Treatment Limitations and Congressional Deception*

The facility's inability to provide adequate care is further evidenced by institutional acknowledgments of treatment limitations, combined with misleading representations to congressional oversight. Medical staff have been observed discussing their inability to provide the specialized care Mr. Capps requires (Exhibit 12), yet the BOP simultaneously assured Senator Lankford that "Mr. Capps has been in regular communication with Psychology and departmental staff are available at the Camp" and that the facility is "equipped with necessary resources" (Exhibit 27).

This stark contradiction between internal acknowledgments of inadequate capabilities and external assurances to Congress demonstrates institutional awareness of deficiencies combined with systematic misrepresentation to oversight authorities. The destruction of medical equipment without adequate replacement protocols (Exhibit 2), combined with operational barriers preventing timely intervention (Exhibit 26), demonstrates systematic institutional failure to maintain the medical infrastructure necessary for constitutional care.

The totality of evidence establishes that FPC Florence cannot provide the long-term, specialized medical care required for Mr. Capps' complex conditions, satisfying the institutional inadequacy component of U.S.S.G. § 1B1.13(b)(1)(C) and necessitating judicial intervention to prevent serious health deterioration or death.

The combination of documented policy violations (Program Statement 5242.01), resource constraints preventing adequate care, and misleading congressional representations demonstrates a systematic institutional approach that prioritizes cost containment and oversight avoidance over constitutional compliance. When viewed in the context of national research documenting budget-driven healthcare rationing across federal facilities (Exhibit 28), Mr. Capps' case represents the predictable result of systematic policy choices that have transformed isolated medical inadequacies into widespread constitutional violations requiring judicial intervention to protect individual inmates' constitutional rights.

### C. Prison Falsification of Medical Records

A troubling aspect of Mr. Capps' case—transforming it from medical negligence to deliberate constitutional violation—is the documented fabrication of medical records by facility staff, subsequently confirmed by institutional administration.

#### 1. Evidence of Medical Record Falsification

On February 19, 2025, Nurse Practitioner Maltezo presented Mr. Capps with medical records purporting to document a physician examination of a "healthy 47-year-old male" conducted on January 8, 2025 (Exhibit 4, ¶¶17-20). This record contained a factual impossibility:

Mr. Capps did not turn 47 years old until January 17, 2025—nine days after the alleged examination date (Exhibit 4, ¶20).

When Mr. Capps challenged this discrepancy, clinic administrator Ms. Alvarado explicitly confirmed that "no physician encounter with Mr. Capps occurred on that date" (Exhibit 4, ¶39). This institutional acknowledgment, documented contemporaneously in Mr. Capps' March 26, 2025 Inmate Request form, establishes that facility staff created fictitious records (Exhibit 2).

### 2. Pattern of Administrative Record Tampering: The Payne Evidence

Contemporaneous evidence from another inmate establishes that medical record falsification at FPC Florence reflects a pattern of unreliable administrative practices, undermining the facility's credibility. On June 16, 2025, inmate David H. Payne, a licensed medical doctor, submitted a BP-9 Administrative Remedy form alleging that health services staff "falsified documents alleging a contrast allergy" to conceal errors in his diagnostic examinations (Exhibit 31, Payne's Original BP-9 Form). When staff returned the processed form, they had altered it using correction fluid to remove the phrase "then falsified documents alleging a contrast allergy," fundamentally changing the complaint's substance (Exhibit 32, Payne's Declaration, ¶11, comparing original and altered BP-9 forms).

This tampering with an official administrative remedy document—intended to document constitutional violations—demonstrates deliberate interference with the grievance process courts rely on to ensure adequate care. Payne's declaration, supported by physical evidence of the altered form, establishes that the alteration was not a clerical error but an intentional act to conceal misconduct (Exhibit 32, ¶11). As a physician, Payne's professional expertise lends additional weight to his allegations, distinguishing this from routine inmate complaints. This incident, occurring within weeks of Mr. Capps' falsified medical record (Exhibit 4, ¶20, noting incorrect

age in January 8, 2025, record), aligns with similar judicial findings of inadequate care at FPC Florence in *United States v. Bovis* (March 2025) (Exhibit 11, Court Order), suggesting a facility-wide issue.

Under *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990), intentional alteration of medical records to conceal inadequate care constitutes deliberate indifference by demonstrating "obduracy and wantonness." The Payne tampering, combined with Mr. Capps' case, renders the administrative remedy process unreliable, necessitating judicial intervention under 18 U.S.C. § 3582(c)(1)(A). Even if BOP claims the alteration was unintentional, such reckless disregard for accurate record-keeping violates constitutional standards, as recognized in *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This pattern of unreliable practices directly contradicts BOP's assurances to Congress of adequate medical oversight (Exhibit 27), justifying relief to ensure Mr. Capps' access to VA-coordinated care.

### 3. Legal Significance Under Constitutional Law

The deliberate creation of false medical records constitutes powerful evidence of deliberate indifference under *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). As the Eighth Circuit recognized in *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990), the intentional alteration or fabrication of medical records to conceal inadequate care transforms medical negligence into constitutional violation by demonstrating "obduracy and wantonness" rather than mere "inadvertence or error in good faith."

The fabrication at issue here occurred precisely when Mr. Capps sought to document his medical needs and obtain appropriate treatment—the very administrative processes that courts rely upon to ensure constitutional care. By creating false records suggesting adequate medical

evaluation had occurred, facility staff actively undermined Mr. Capps' ability to demonstrate his medical needs through established grievance procedures.

This fabrication is particularly concerning because it occurred while the Bureau of Prisons was simultaneously assuring congressional oversight that the facility maintains "credentialed medical and mental health professionals" providing adequate care (Exhibit 27). The contradiction between institutional assurances to Congress and the documented falsification of medical records demonstrates systemic failures in oversight that compromise the facility's ability to provide constitutionally adequate care.

The fabrication also directly contradicts the facility's representation that inmates can access adequate medical care through established procedures. Creating false documentation of medical encounters that never occurred demonstrates institutional willingness to deceive rather than provide constitutionally adequate care.

### 4. Remedy Through Judicial Intervention

When facility staff create false documentation suggesting adequate medical care has been provided, they render the administrative remedy process meaningless and necessitate direct judicial intervention. The fabrication establishes that Mr. Capps cannot obtain constitutional medical care through administrative processes, as those processes have been corrupted by institutional deception.

This documented falsification, combined with the objective medical evidence of deteriorating condition, establishes deliberate indifference requiring immediate judicial intervention under U.S.S.G. § 1B1.13(b)(1)(C).

### D.  Other Factors Supporting Relief Under § 1B1.13(b)(5)

U.S.S.G. § 1B1.13(b)(5) recognizes that "any other circumstances or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (b)(1) through (4), are similar in gravity and urgency to the circumstances described in those paragraphs" may constitute extraordinary and compelling reasons for sentence reduction. Mr. Capps presents additional circumstances that, individually and in combination with his life-threatening medical conditions, support compassionate release.

*1. Exceptional Rehabilitation Efforts and Programming Completion*

Despite the medical crisis and institutional barriers documented above, Mr. Capps has demonstrated extraordinary commitment to rehabilitation during his incarceration. He has completed or enrolled in numerous programs including Thresholds, Non-Residential RDAP, 7 Habits of Highly Effective People, Basic Cognitive Thinking, Drug Education, Business Management and Veteran's Reentry Program (Exhibit 4, ¶6). This programming completion occurred while navigating the systematic medical neglect and operational barriers that have prevented adequate treatment of his service-connected conditions.

Mr. Capps' rehabilitation efforts are particularly significant given his status as a first-time, non-violent offender who voluntarily surrendered and has demonstrated consistent respect for institutional rules and judicial authority. His participation in veterans-specific programming shows commitment to addressing the underlying issues related to his military service and service-connected disabilities.

*2. Systematic Denial of Mental Health Treatment for Service-Connected PTSD*

Mr. Capps suffers from service-connected Post-Traumatic Stress Disorder with a 70% VA disability rating (Exhibit 5), yet has been systematically denied adequate mental health treatment despite explicit BOP policy requirements for veteran-specific care. He submitted at least fourteen documented requests for mental health intervention between January 2 and March 13, 2025, explicitly referencing BOP Policy Statement 5242.01 requiring veteran-specific care (Exhibit 6).

The facility's misclassification of Mr. Capps as Mental Health Care Level 1 (CARE1-MH) despite his 70% VA PTSD rating represents institutional minimization of his treatment needs. Fellow veterans housed with him provide compelling testimony about his deteriorating mental health condition:

- Gary Franks observes that "Mr. Capps freaked out at count time, when an officer rattled his keys" and "eats alone in his cell and has a fear of common areas" (Exhibit 14)

- William Wolgamott documents "a severe panic attack during the 4:00 AM count when an officer's keys rattled unexpectedly" and notes that Mr. Capps "has progressively withdrawn from the common areas" (Exhibit 15)

- Christopher West, a medical unit employee, provides particularly damaging testimony that he "overheard medical staff discussing their inability to provide the specialized mental health care Mr. Capps requires" (Exhibit 12). This direct institutional acknowledgment of inadequate capabilities, combined with the BOP's simultaneous assurances to Congress of adequate resources (Exhibit 27), demonstrates systematic deception regarding the facility's actual treatment limitations.

The contrast between Mr. Capps' pre-incarceration mental health stability under VA care (depression/anxiety rated 2-3/10 in September 2024) (Exhibit 9) and his current deterioration demonstrates that his PTSD requires specialized treatment unavailable within the institutional setting.

### 3. Institutional Acknowledgment of Inadequate PTSD Treatment

FPC Florence's failure to provide evidence-based treatment for Mr. Capps' service-connected PTSD is compounded by institutional acknowledgment of proper standards coupled

with a policy-driven refusal to implement them. On March 7, 2025, during a documented meeting, FPC Florence psychologist Dr. T. Short made admissions that establish both knowledge of clinical requirements and deliberate non-compliance (Exhibit 4, ¶¶2-6, Declaration of Michael R. Capps). Dr. Short confirmed that Bureau of Prisons (BOP) policy prohibits trauma-based therapies, such as cognitive behavioral therapy (CBT) and imagery rescripting, despite acknowledging these as "first-line treatments for PTSD per VA/DoD Clinical Practice Guidelines." She provided Mr. Capps with nightmare treatment worksheets but stated that BOP policy prevents her from offering the therapist-guided sessions necessary for their effective implementation. (Exhibit 4.)

This policy-driven refusal violates BOP Program Statement 5242.01, which mandates veteran-specific care for inmates with service-connected disabilities like Mr. Capps' 70% VA-rated PTSD (Exhibit 5, VA Rating Decision). Under *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), institutional knowledge of a serious medical need combined with conscious disregard constitutes deliberate indifference. Dr. Short's admissions satisfy both elements: (1) awareness of evidence-based PTSD treatment standards, and (2) a policy-based choice to withhold such care, despite Mr. Capps' documented deterioration (Exhibit 6, Mental Health Treatment Requests).

Moreover, Dr. Short's statements contradict BOP's April 18, 2025, assurance to Senator James Lankford that FPC Florence maintains adequate mental health resources (Exhibit 27, BOP Response to Congressional Inquiry). This discrepancy suggests a pattern of misrepresentation that undermines the facility's ability to provide constitutionally adequate care. Even if BOP attributes the policy prohibition to resource constraints, such limitations do not excuse Eighth Amendment violations, as recognized in *Brown v. Plata*, 563 U.S. 493, 511 (2011). Mr. Capps' pre-incarceration stability under VA care, with depression and anxiety rated at 2-3/10 (Exhibit 9, September 2024 Psychiatric Evaluation), contrasts sharply with his current withdrawal and panic

attacks (Exhibits 14, 15), underscoring the urgent need for judicial intervention to restore access to VA-coordinated treatment.

### 4. Systematic Violation of BOP Policy Requirements for Veteran-Specific Care

Mr. Capps' PTSD treatment deficiencies are compounded by FPC Florence's systematic violation of explicit BOP policy requirements mandating veteran-specific healthcare. BOP Program Statement 5242.01 specifically requires that "veteran-specific care" must be available at all facilities housing inmates with service-connected disabilities. This policy directive recognizes that veterans with combat-related conditions require specialized treatment approaches that differ from standard prison mental health protocols.

Despite this clear mandate, Mr. Capps has submitted at least fourteen documented requests for mental health intervention between January 2 and March 13, 2025, explicitly referencing Program Statement 5242.01 and noting that "The VA treatment plan included therapy, medication and service animal. The BOP has taken all three away and offering zero alternative care in violation of PS 5242.01" (Exhibit 6). These requests demonstrate not only Mr. Capps' awareness of his policy-protected rights but also the facility's systematic disregard for mandatory veteran care requirements.

The policy violation is particularly egregious given Mr. Capps' 70% VA disability rating for service-connected PTSD (Exhibit 5), which establishes both the severity of his condition and its direct connection to military service. The facility's misclassification of Mr. Capps as Mental Health Care Level 1 (CARE1-MH) despite this substantial disability rating represents institutional minimization of policy-mandated care requirements designed to protect disabled veterans.

This systematic policy non-compliance stands in stark contrast to the BOP's assurances to Senator Lankford that "Mr. Capps has been in regular communication with Psychology and

departmental staff are available at the Camp" and that the facility maintains adequate resources for veteran care (Exhibit 27). The documentary evidence of repeated requests citing specific policy requirements, combined with institutional denial of mandated services, demonstrates deliberate disregard for veteran-specific protections established by the BOP's own regulations.

The violation of Program Statement 5242.01 transforms this case from general medical inadequacy to deliberate institutional failure to follow mandatory procedures designed to ensure constitutional care for service members who sacrificed for their country. When combined with the medical crisis documented above, this policy violation establishes a pattern of institutional indifference that cannot be remedied through continued administrative processes that have already proven ineffective despite explicit regulatory mandates.

### 5. Dangerous Medication Withdrawal Without Medical Supervision

The FPC Florence's abrupt discontinuation of Mr. Capps' VA-prescribed medication regimen, without proper tapering or medical oversight, has created cascading health risks that compound his cardiovascular emergency. Prior to incarceration, the Department of Veterans Affairs successfully managed Mr. Capps' interrelated conditions—sleep apnea, PTSD, hypertension, and obesity—through a coordinated regimen that maintained his physiological stability (Exhibit 10, VA Medication Records). The facility's systematic withdrawal of these medications, without VA consultation or alternative treatment, violates BOP Program Statement 5242.01's mandate for veteran-specific care and demonstrates deliberate indifference under *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The following medications were discontinued, each contributing to Mr. Capps' deteriorating health:

- **Venlafaxine 225mg**: Prescribed for PTSD and depression, discontinued without tapering, causing withdrawal symptoms including dizziness and cardiovascular instability. Despite re-

prescription, delivery was delayed until mid-April 2025, exacerbating symptoms (Exhibit 19, FPC Florence Medical Records).

- **Armodafinil 200mg**: Used to manage daytime sleepiness from sleep apnea, discontinued without replacement, resulting in severe fatigue that impairs daily functioning (Exhibit 19).

- **Testosterone 150mg**: Administered for hormonal stability, critical for cardiovascular and mental health, discontinued without monitoring, leading to a severe deficiency detailed below (Exhibit 19).

- **Semaglutide 2.4mg**: Enabled an 87-pound weight loss that improved sleep apnea and hypertension. Its discontinuation has caused rapid weight gain, worsening airway obstruction and cardiovascular stress (Exhibit 19).

The cumulative effect of these discontinuations, without clinical justification or supervision, has transformed manageable conditions into a life-threatening crisis, as evidenced by Mr. Capps' blood pressure escalation from 178/98 mmHg in March to 206/102 mmHg in June 2025 (Exhibit 24, Blood Pressure Monitoring Log). The testosterone withdrawal, in particular, poses a quantifiable mortality risk that exemplifies the facility's reckless disregard for Mr. Capps' health.

### 6. Synergistic Risks from Testosterone Withdrawal

The abrupt discontinuation of Mr. Capps' testosterone replacement therapy has created a severe cardiovascular risk, amplifying his hypertensive crisis. Prior to incarceration, VA-prescribed therapy maintained his testosterone at 900 ng/dL, supporting cardiovascular and mental health stability (Exhibit 10, VA Medication Records). Following discontinuation at FPC Florence, his levels plummeted to 106 ng/dL, an 88% decline placing him in a severe deficiency range.

A 2012 Veterans Affairs study by Shores et al., published in the Journal of Clinical Endocrinology & Metabolism, found that men with testosterone levels ≤250 ng/dL face a 20.7% mortality rate compared to 10.3% for treated patients, primarily due to cardiovascular events (Exhibit 30, Shores et al. Study, p. 1729). Mr. Capps, at 106 ng/dL and sharing the study's veteran demographic (male, mid-40s, with comorbidities), falls in the highest-risk category. This risk is amplified by synergistic effects of untreated conditions: severe sleep apnea (causing low oxygen levels during sleep), PTSD nightmares (increasing cardiovascular stress), and rapid weight gain from Semaglutide discontinuation (worsening airway obstruction) (Exhibits 1, 6, 19). The blood pressure log confirms a corresponding deterioration, escalating from 178/98 mmHg in March to 206/102 mmHg in June 2025, with symptoms of dizziness and headaches (Exhibit 24).

Under *Estelle v. Gamble,* the facility's failure to taper or monitor testosterone therapy, despite known risks, constitutes deliberate indifference. This reckless decision, made without VA consultation, mirrors the unprofessional record-keeping documented in Section IV.D (Prison Falsification of Medical Records) and violates BOP Program Statement 5242.01's veteran-specific care mandate. Even if BOP claims a clinical rationale for discontinuation, the absence of monitoring or alternative treatment deviates from standard care, as evidenced by the VA's prior success. This synergistic crisis, untreatable within FPC Florence, necessitates conversion to supervised release with VA-coordinated care to prevent irreversible harm.

### 6a. Documentation of Withdrawal Effects

The consequences of this systematic medication withdrawal are now documented through multiple sources. Tommy Goss observed Mr. Capps during a medical episode stating "Been getting worse since they took away my meds... dizzy all the time" (Exhibit 13). The blood pressure monitoring log provides objective evidence of cardiovascular deterioration following medication

discontinuation, with readings of 183/97 mmHg on March 18 accompanied by documented symptoms of "headache, dizziness" that correspond precisely to recognized Venlafaxine withdrawal syndrome (Exhibit 24).

The timing correlation between medication withdrawal and blood pressure crisis is medically significant. Mr. Capps' cardiovascular deterioration from 178/98 mmHg in March to crisis levels of 188/122 mmHg in June directly follows the systematic removal of medications that had successfully maintained his physiological stability for four years (Exhibits 10, 24).

### 6b. Deliberate Indifference in Medication Management

Even when the facility belatedly recognized the need for psychiatric medication replacement, their response demonstrated deliberate indifference to medical necessity. Despite prescribing Venlafaxine to address withdrawal symptoms, staff inexplicably directed that the medication "not start until mid April (15th)" - a month-long delay despite documented dangerous withdrawal effects (Exhibit 2, Exhibit 19). This delay in providing critical medication that Mr. Capps had been stably maintained on for four years at maximum therapeutic dosage represents the paradigmatic deliberate indifference recognized in *Estelle v. Gamble*.

The systematic withdrawal of Semaglutide is particularly concerning given its role in Mr. Capps' 87-pound weight loss, which directly improved his sleep apnea by reducing airway obstruction. The discontinuation of this medication without medical assessment has contributed to weight gain that exacerbates the very condition creating his cardiovascular crisis - a medically contraindicated decision that demonstrates institutional disregard for the interconnected nature of his medical conditions.

### 6c. Constitutional Implications

The combination of systematic medication withdrawal without proper tapering, documented withdrawal symptoms, month-long delays in replacement medications, and objective evidence of cardiovascular deterioration establishes deliberate indifference that violates the Eighth Amendment. This medication mismanagement compounds the sleep apnea crisis by removing therapeutic interventions that had successfully maintained Mr. Capps' stability, creating a cascading medical emergency that demonstrates institutional inability to provide constitutionally adequate care for complex medical conditions requiring integrated treatment approaches.

### 7. Combination of Circumstances Creating Urgent Need for Relief

These additional circumstances, when considered together with Mr. Capps' life-threatening sleep apnea and cardiovascular crisis, create a combination of factors similar in gravity and urgency to the primary medical circumstances outlined in § 1B1.13(b)(1). The systematic denial of veteran-specific mental health care, dangerous medication withdrawal, and exceptional rehabilitation efforts demonstrate that Mr. Capps presents the type of unique circumstances contemplated by the "other factors" provision.

The combination of service-connected medical and mental health conditions, systematic institutional failures across multiple areas of care, exceptional rehabilitation efforts, and eligibility for community custody creates circumstances that collectively warrant compassionate release under § 1B1.13(b)(5).

Moreover, the documented fabrication of medical records (Section IV.C) combined with these additional circumstances demonstrates institutional bad faith that transforms individual medical neglect into systematic constitutional violation requiring judicial intervention. The totality of circumstances establishes that Mr. Capps cannot obtain adequate care through administrative processes and faces imminent risk of serious health deterioration without immediate relief.

## V.    CONSISTENCY WITH § 3553(A) SENTENCING FACTORS

The § 3553(a) factors strongly support converting Mr. Capps' remaining sentence to supervised release with medical conditions.

### A.    Nature and Circumstances of the Offense and Defendant's Characteristics

Mr. Capps is a first-time, non-violent offender serving a 27-month sentence for COVID-19 relief fraud. He voluntarily surrendered as ordered on December 31, 2024 (Exhibit 4, ¶2), demonstrating respect for this Court's authority and the legal process. During his approximately six plus months of incarceration, he has participated in rehabilitation programming including business management courses, drug education, cognitive thinking programs, and veterans' reentry preparation (Exhibit 4, ¶6).

Mr. Capps' status as a disabled combat veteran with service-connected medical conditions weighs heavily in favor of relief. His 70% PTSD disability rating and 50% sleep apnea rating from the Department of Veterans Affairs establish that these conditions resulted from his military service to his country (Exhibit 5). The current medical crisis represents a direct consequence of conditions incurred during honorable military service, warranting special consideration under the statutory framework.

As fellow veteran Gary Franks, housed at the same facility, observes: "I encourage the court to assist Mike in any way possible, as anyone with his history of service deserves to receive the care he needs, which is not provided in this facility" (Exhibit 14). Multiple veterans have documented Mr. Capps' deteriorating condition and the facility's inability to provide adequate care for service-connected disabilities (Exhibits 14, 15).

### B.    Adequate Punishment and Deterrence Already Achieved

Mr. Capps is already eligible for placement in a Residential Reentry Center or home confinement under the Bureau of Prisons' community custody policies, effective as of April 26, 2025. This institutional determination reflects a core reality: even under a full application of federal punishment policies and incentive programs, Mr. Capps has served sufficient time in institutional custody to satisfy the primary penal objectives of his sentence. The requested relief—conversion to supervised release with medical conditions—would not circumvent accountability. Rather, it would implement the very transition already authorized by BOP policy while addressing a medical emergency that cannot be treated inside the facility.

Mr. Capps has now served over six months of his 27-month sentence. Though modest in duration relative to the full term, his incarceration has been marked by conditions that far exceed those anticipated at sentencing. He has endured not only the ordinary loss of liberty and separation from family, but also severe and ongoing physical suffering caused by systemic medical neglect. The progressive hypertensive crisis he now faces—as documented in Exhibit 24 and reflected in daily blood pressure readings surpassing 200/100 mmHg—has introduced a level of risk and deprivation that transforms the nature of his punishment.

These conditions do not advance the objectives of deterrence or rehabilitation. They undermine them.

The public consequences of Mr. Capps' conviction remain substantial: reputational harm, professional disqualification, public awareness, and substantial restitution obligations continue to serve as enduring deterrents. Moreover, the two-year term of supervised release already imposed by this Court will continue to ensure structured oversight and accountability.

The requested sentence modification does not diminish the seriousness of the offense or reduce the length of the custodial term. It merely ensures that the remainder of Mr. Capps' sentence

can be served in a setting capable of meeting his urgent and well-documented medical needs—needs that the current institutional setting has proven repeatedly unable to address (Exhibits 10, 19, 24, 31, 32). Under these circumstances, this § 3553(a) factor favors relief.

### C. Need to Provide Medical Care in the Most Effective Manner

Section 3553(a)(2)(D) specifically requires providing medical care "in the most effective manner." The evidence overwhelmingly demonstrates institutional care cannot manage Mr. Capps' life-threatening conditions. Maximum antihypertensive therapy has failed to control blood pressure readings reaching 206/102 mmHg (Exhibit 24), while operational barriers prevent adequate CPAP management (Exhibit 26).

In contrast, the Veterans Affairs system successfully managed these conditions pre-incarceration through integrated specialty care, as documented by his comprehensive treatment progress records and controlled symptoms in September 2024 psychiatric evaluation (depression/anxiety at 2-3/10 severity) (Exhibit 8, Exhibit 9). VA coordination provides the specialized sleep medicine and cardiology consultation required for his complex, interrelated conditions.

### D. Public Safety Considerations

Mr. Capps presents minimal risk to public safety. His offense involved financial fraud with no violence or threat to physical safety. He has no history of violent crime, substance abuse, or behavior suggesting danger to the community. His military service record, documented service-connected medical conditions, and disability status further support his low risk profile (Exhibit 5, Exhibit 8).

Supervised release with medical conditions would actually enhance public safety by ensuring Mr. Capps receives appropriate treatment for his service-connected PTSD and other

conditions that, if left untreated, could contribute to future difficulties. His documented requests for mental health treatment (Exhibit 6) and the facility's systematic failure to provide adequate psychiatric care demonstrate that continued incarceration without proper treatment poses greater long-term risk than supervised release with comprehensive VA medical monitoring.

The comprehensive oversight provided through supervised release, combined with VA medical monitoring, would provide greater accountability than continued incarceration under medically inadequate conditions that have been documented to worsen his underlying conditions
.

### E.  Prevention of Disproportionate Punishment

The documented medical crisis has transformed Mr. Capps' lawful sentence into punishment that exceeds constitutional limits. His current condition, with blood pressure readings in the hypertensive crisis range despite maximum treatment (Exhibit 24, Exhibit 29), creates imminent risk of stroke, cardiac arrest, or death that would render his sentence disproportionately severe.

Courts have recognized that sentences should not become de facto death sentences due to inadequate medical care. The objective medical evidence—including sleep study documentation showing oxygen desaturations to 52% (Exhibit 1) and progressive cardiovascular deterioration (Exhibit 24)—establishes that continued incarceration poses substantial risk of permanent injury or death that would constitute punishment far exceeding this Court's intent and the statutory purposes of sentencing.

The documented fabrication of medical records (Exhibit 4, Exhibits 31-32) combined with institutional barriers to care (Exhibit 26) demonstrate that Mr. Capps cannot obtain constitutional

medical treatment through administrative processes, necessitating judicial intervention to prevent irreversible harm.

This Court need not rewrite the sentence. The Bureau of Prisons has already conceded the defendant does not require secure confinement.

Conversion to supervised release with medical conditions would restore proportionality to Mr. Capps' sentence by ensuring he serves the remaining term under conditions that do not pose imminent threat to his life while maintaining appropriate accountability through judicial oversight and VA medical monitoring.

The § 3553(a) factors collectively support the conclusion that extraordinary and compelling circumstances warrant conversion of Mr. Capps' remaining sentence to supervised release with appropriate medical conditions.

## VI.    CONCLUSION

Mr. Capps presents extraordinary and compelling medical circumstances that have materially changed since this Court's February 2025 denial. The objective evidence establishes a cardiovascular emergency requiring immediate judicial intervention.

**The Medical Crisis is Undeniable**. Blood pressure readings of 206/102 mmHg and 202/106 mmHg in late June 2025 exceed all clinical thresholds for hypertensive emergency (Exhibit 24). These readings, documented over consecutive days, create imminent risk of stroke, cardiac arrest, or irreversible organ damage despite maximum pharmaceutical intervention (Exhibits 10, 19). Mr. Capps' severe sleep apnea, with oxygen desaturations to 52%, drives this

uncontrollable hypertension but cannot be treated following destruction of his CPAP device and institutional barriers preventing replacement (Exhibits 1, 2, 26).

**Institutional Care Has Failed**. FPC Florence cannot provide the specialized, coordinated care Mr. Capps requires. Recent federal court decisions at this facility—*United States v. Bovis* (March 2025), *United States v. Paradis* (January 2025)—document systematic medical inadequacy requiring judicial intervention. Contemporary evidence from other inmates confirms ongoing institutional failures, including medical record falsification and diagnostic errors during the same timeframe as Mr. Capps' crisis. The documented fabrication of Mr. Capps' medical records transforms negligence into deliberate indifference requiring constitutional remedy (Exhibit 4, ¶¶17-20).

**The Relief Requested is Measured**. Mr. Capps seeks conversion to supervised release with VA medical coordination—not escape from accountability. He is already eligible for community custody as of April 26, 2025, meaning this relief would not materially reduce his punishment but would ensure he receives constitutionally adequate care during his remaining sentence. The Veterans Affairs system previously managed his conditions successfully through integrated specialty care, as documented by controlled symptoms pre-incarceration (Exhibit 9).

**Judicial Intervention is Required**. Administrative remedies have proven inadequate when institutional staff fabricate medical records and create operational barriers preventing effective treatment. The progression from Stage 2 hypertension in March to sustained hypertensive crisis exceeding 200 mmHg systolic in June demonstrates that each day of continued institutional "care" poses escalating risk to Mr. Capps' life.

The law provides this Court discretion under § 3582(c)(1)(A) precisely to prevent lawful sentences from becoming unlawful punishment when extraordinary circumstances develop. Mr.

Capps has served his time honorably, completed rehabilitation programming, and demonstrated respect for this Court's authority. He asks only to complete his sentence under conditions that will not kill him.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Capps respectfully requests that this Court convert his remaining term of imprisonment to supervised release with the following conditions:

1. **Medical Coordination**: Defendant shall coordinate all medical care through the Department of Veterans Affairs healthcare system for his service-connected sleep apnea, hypertension, and PTSD;

2. **Medical Compliance**: Defendant shall comply with all prescribed treatments, attend scheduled appointments, and provide medical records to U.S. Probation upon request;

3. **Standard Conditions**: All standard supervised release conditions pursuant to this Court's judgment; and

4. **Additional Conditions**: Such other reasonable conditions as this Court deems appropriate.


I Michael R. Capps, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge, information, and belief:


Respectfully submitted July 11, 2025.


_____

**Michael R. Capps**
Register Number: 66142-509
FPC Florence
PO Box 6000
Florence, CO 81226

## EXHIBIT LIST

Exhibit 1: Sleep Study Documentation (May 2021)

Exhibit 2: Inmate Request to Staff Forms (Multiple Dates)

Exhibit 4: Declaration of Michael R. Capps

Exhibit 5: VA Rating Decision Documentation

Exhibit 6: Mental Health Treatment Requests

Exhibit 7: Service Animal Certification

Exhibit 8: Treatment Progress Documentation

Exhibit 9: Pre-Incarceration Psychiatric Evaluation (September 2024)

Exhibit 10: Medication Prescription Records

Exhibit 11: United States v. Bovis Court Order

Exhibit 12: Declaration of Christopher West

Exhibit 13: Declaration of Thomas Goss

Exhibit 14: Declaration of Gary Franks

Exhibit 15: Declaration of William Wolgamott

Exhibit 16: CPAP Device Manufacturer Documentation

Exhibit 17: VA Appointment Confirmation

Exhibit 19: FPC Florence Medical Records

Exhibit 20: Declaration of Chance Zabriskie

Exhibit 22: BP-9 Administrative Remedy Documentation

Exhibit 24: Blood Pressure Monitoring Log (Updated through June 11, 2025)

Exhibit 25: Eagle OPS Veteran Support Documentation

Exhibit 26: Photograph of FPC Florence Medical Sick Call Schedule

Exhibit 27: BOP Response to Senator James Lankford's Inquiry (April 18, 2025)

Exhibit 28: Research Summary on Budget-Driven Prison Medical Care Crisis (Vera Institute of Justice, January 2025; Pew Charitable Trusts, October 2017; Equal Justice Initiative, May 2024)

Exhibit 29: Current Medical Treatment Documentation and Hypertensive Crisis Report (June 11, 2025)

Exhibit 30: Medical Research: Testosterone Withdrawal and Hypertensive Treatment

Exhibit 31: David Payne Administrative Remedy

Exhibit 32: David Payne Declaration

Exhibit 33: Warden's Denial (April 7, 2025)