Dr. Brian A. Coon, PhD, JD, PE (Kansas Bar #22988)
Of Counsel to Defendant Aid Society
310 W. Central Ave., Ste. 203
Wichita, KS 67202
Defendant Aid Society
10808 S. River Front Parkway, Suite 3046
South Jordan, UT 84095
Phone: (316) 265-5882
Toll-Free: (800) 489-8146
Email: brian.coon@defendantaidsociety.org

*Attorney for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>MICHAEL R. CAPPS,<br><br>*Defendant.* | Case No.    21-CR-10073-EFM<br><br>***REPLY IN SUPPORT OF MOTION FOR REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I)***<br><br>HONORABLE ERIC F. MELGREN |

## I.    INTRODUCTION

The Court should grant this motion and convert Mr. Capps' remaining sentence to supervised release. BOP's own decision—transferring him to a halfway house on September 24, 2025, for "better medical care"—confirms what his unrebutted evidence establishes: BOP cannot provide the specialized treatment his service-connected conditions require.

Mr. Capps, a 47-year-old Air Force veteran with 100% service-connected disability, suffers from severe obstructive sleep apnea (stopping breathing 129 times/hour, oxygen dropping to 52%), life-threatening hypertension (reaching 221/108 mmHg), and combat-related PTSD (70% VA disability). Ex. F; Ex. A; Ex. G. These conditions were stable before incarceration. Ex. H. Nine months in BOP custody transformed controlled

medical issues into cascading crises culminating in his August 20, 2025 collapse—leaving him unconscious for one minute while BOP health services remained locked. Ex. C; Ex. L.

The government's July 24, 2025 opposition relied on a July 23 medical note claiming "satisfactory" care. Doc. 289 at 5-6. That examination involved falsified blood pressure readings (actual: 189/108; recorded: 159/108). Ex. B ¶¶8-15; Ex. K. Crises continued: 214/106 (July 26), 219/107 (August 13), 221/108 (August 17). Ex. A. Mr. Capps collapsed. Ex. C. BOP then transferred him for medical reasons—conceding the inadequacy its opposition denied. Ex. D; Ex. E. The halfway house doesn't resolve this. Mr. Capps remains in federal custody, unable to access VA care that successfully managed these conditions for years. RRCs provide only basic medication administration, not the coordinated specialty treatment—polysomnography, cardiology consultation, trauma-focused psychotherapy—his conditions demand.

Mr. Capps seeks conversion, not commutation. His 27-month sentence remains intact. Only the custody form changes: supervised release instead of halfway house, potentially with GPS monitoring. This preserves every § 3553(a) objective while enabling VA access.

The government offered no counter-affidavits, medical experts, or verified evidence rebutting Mr. Capps' exhibits. *United States v. Crespin*, No. 23-2111, 2024 WL 3084972, at *3 (10th Cir. 2024).

This motion satisfies 18 U.S.C. § 3582(c)(1)(A). Mr. Capps exhausted remedies. His medical needs and BOP failures constitute "extraordinary and compelling reasons" under U.S.S.G. § 1B1.13(b)(1)(C) and (b)(5). The § 3553(a) factors favor relief: nine months served, extensive rehabilitation, zero public safety risk, and medical needs only supervised release can address. Ex. Q.

## II.     THE RECENT HALFWAY HOUSE PLACEMENT IS INSUFFICIENT

Mr. Capps' September 24, 2025 transfer to a Tulsa Residential Reentry Center does not resolve this motion. Three facts require judicial intervention.

### A.  Mr. Capps Remains in Federal Custody

Under 18 U.S.C. § 3624(c)(1), RRCs are BOP contract facilities where inmates remain in federal custody. BOP retains authority to revoke placement, impose restrictions, and control medical access. Only his location changed, not his legal status.

### B. The Medical Crisis Persists and RRC Placement Cannot Resolve It

Mr. Capps requires VA care that RRCs cannot provide. His sleep apnea needs polysomnography and CPAP titration at a VA Sleep Disorders Center. Ex. F. His hypertension (221/108 mmHg) requires cardiology consultation—ACC/AHA guidelines classify readings above 180/120 as emergencies. Ex. A. His current medications (40mg lisinopril, 5mg amlodipine) have failed for six months. Ex. A. His PTSD needs trauma-focused therapy BOP and RRCs don't offer. Ex. G; Ex. H.RRCs provide only medication administration and emergency referrals. BOP hasn't authorized VA appointments or transferred treatment records. Without conversion, Mr. Capps remains dependent on the system that falsified his BP readings, Ex. B ¶¶8-15, failed to respond when he collapsed, Ex. C, and violated policies by delaying his placement, Ex. D; Ex. M.

### C. Only Judicial Relief Can Authorize the Necessary Conversion

On September 23, 2025, counsel proposed consent conversion with GPS monitoring. The government declined. Section 3582(c)(1)(A) expressly permits courts to "impose a term of probation or supervised release" not exceeding the unserved portion. The statute contemplates substituting custody forms without diminishing length, punitive effect, or deterrence—enabling VA access that could prevent the stroke or heart attack his untreated hypertension threatens.

### III. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural History

On December 21, 2022, a jury convicted Mr. Capps of non-violent fraud offenses involving $498,200 in COVID-19 relief funds. Doc. 73. This Court sentenced him to 27 months' imprisonment on May 11, 2023, emphasizing the seriousness of the offense while noting mitigating factors including his first-offender status and voluntary surrender. Doc. 98. The Tenth Circuit affirmed on August 13, 2024. *United States v. Capps*, 112 F.4th 887 (10th Cir. 2024). Mr. Capps self-surrendered to FCI Florence on December 31, 2024. Doc. 247 at 2.

He filed his first compassionate release motion on January 25, 2025, after 45 days in custody. This Court denied that motion on February 27, 2025, finding insufficient evidence of extraordinary circumstances. Doc. 274. Mr. Capps filed the present motion on July 14, 2025, focusing on medical deterioration that occurred after

the first denial. Doc. 287. The government opposed on July 24, 2025, relying primarily on a July 23 medical record. Doc. 289. Mr. Capps' motion for appointment of counsel and CJA funds remains pending. Doc. 286.

### B. Mr. Capps' Medical Conditions Were Stable Before Incarceration

Mr. Capps is a 100% service-disabled Air Force veteran. Ex. G (VA Disability Rating, Ex. 5). His disabilities stem from his military service, including deployment to Afghanistan. All three conditions at issue—obstructive sleep apnea, hypertension, and PTSD—are service-connected and were successfully managed through VA care before his incarceration.

**Sleep apnea**. A 2023 VA sleep study documented severe obstructive sleep apnea with an apnea-hypopnea index of 129.1 events per hour and oxygen desaturation to 52%. Ex. F (Sleep Study, Ex. 7). VA physicians prescribed CPAP therapy, which Mr. Capps used nightly. With consistent CPAP use, his symptoms were controlled. Ex. H (Pre-Incarceration VA Records, Exs. 8-10).

**Hypertension**. VA records from 2023-2024 show Mr. Capps' blood pressure consistently controlled in the normal range (120s-130s systolic) with medication. Ex. H. His prescribed regimen included lisinopril and amlodipine, which effectively managed his condition when taken as directed with regular monitoring.

**PTSD**. The VA rates Mr. Capps' PTSD at 70% disability. Ex. G. Before incarceration, he participated in Cognitive Processing Therapy at the VA, which significantly reduced his anxiety and improved his functioning. Ex. H. His PTSD symptoms were stable with ongoing therapy and medication (venlafaxine).

Mr. Capps reported to FPC Florence on December 31, 2024, with controlled medical conditions, prescribed medications, and functional CPAP equipment.

### C. BOP's Actions Caused Rapid Medical Deterioration

Within weeks of arrival, BOP discontinued critical medications without medical justification or tapering protocols. Ex. I (Medication Log, Ex. 19). BOP stopped his testosterone (prescribed for service-connected hypogonadism), semaglutide (prescribed for metabolic syndrome), and reduced his psychiatric medication. These abrupt discontinuations caused withdrawal symptoms and metabolic destabilization.

The destruction of Mr. Capps' CPAP equipment triggered the cascade of medical crises that followed. On March 12, 2025, a BOP officer destroyed Mr. Capps' CPAP mask during a cell search. Ex. J (Staff Email

Admission, Ex. 2); Ex. B (Capps Decl.) ¶¶25-27. BOP staff acknowledged the destruction but delayed replacement for three months. Without CPAP therapy, Mr. Capps' sleep apnea went untreated—he stopped breathing over 100 times per hour, night after night, depriving his body of oxygen.

The untreated apnea directly caused his hypertensive crises. Sleep apnea and hypertension are pathophysiologically linked: repeated oxygen deprivation triggers sympathetic nervous system activation, elevating blood pressure. Mr. Capps' blood pressure, controlled at 120s-130s before incarceration, began climbing in March 2025. By late March, his readings reached Stage 2 hypertension (199/108 mmHg on March 28). Ex. A (Updated BP Log).

BOP physicians increased his medications to maximum doses: 40mg lisinopril and 5mg amlodipine. The medications failed to control his blood pressure because the underlying cause—untreated sleep apnea—remained unaddressed.

### D. The Hypertensive Crises and BOP's Inadequate Response

Between June and August 2025, Mr. Capps experienced sustained hypertensive crises meeting American College of Cardiology criteria for urgent intervention. His blood pressure repeatedly exceeded 200/100 mmHg:

- June 11: 188/122 mmHg
- June 29: 206/102 mmHg
- July 8: 209/103 mmHg
- July 26: 214/106 mmHg
- August 13: 219/107 mmHg
- August 17: 221/108 mmHg

Ex. A (BP Log with daily readings documented by Mr. Capps and witnessed by cellmates).

These readings place Mr. Capps at immediate risk of stroke, myocardial infarction, kidney damage, and heart failure. Sustained blood pressure above 180/120 constitutes a hypertensive emergency requiring immediate medical intervention. Mr. Capps' readings remained in crisis range for three consecutive months.

### E. The Falsified Medical Records

On July 23, 2025, BOP medical staff examined Mr. Capps. The resulting medical note—on which the government's opposition relies—documented his blood pressure as 159/108 mmHg and characterized his care as "satisfactory." Ex. K (BOP July 23 Notes).

The record is false. Mr. Capps' actual blood pressure that day was 189/108 mmHg—30 points higher than recorded. Ex. B (Capps Decl. on Falsification) ¶¶8-15. Mr. Capps took his own reading immediately after the examination using the same equipment, witnessed by his cellmate. Ex. P (Lawrence Corroboration, Ex. 20). The medical staff understated his blood pressure by 30 points, concealing a hypertensive crisis.

The falsification was not isolated. BOP staff also documented a "narcolepsy" diagnosis without conducting any examination or sleep study. Ex. B ¶12. They noted medication adjustments, including adding metformin, that were never provided to Mr. Capps. Ex. B ¶14. And they ignored his written request for psychiatric care despite BOP policy requiring mental health referrals for veterans with combat-related PTSD. Ex. B ¶16; Ex. O (BOP Program Statement 5242.01, Ex. 6).

### F. The August 20 Collapse

On August 20, 2025, Mr. Capps collapsed while walking the FPC Florence track. Ex. C (Lawrence Decl. on Collapse, Ex. 36); Ex. L (Siminole Decl., Supp. to Ex. 36). He experienced chest pain, difficulty breathing, and lost consciousness for approximately one minute. Another inmate found him unresponsive on the ground.

When Mr. Capps regained consciousness, he immediately sought medical attention. BOP health services was locked. No medical staff was available. Ex. C ¶¶5-7. Mr. Capps returned to his unit and spent the remainder of the day monitoring his symptoms, uncertain whether he had suffered a cardiac event.

BOP took no action in response to the collapse. No follow-up examination was conducted. No cardiac workup was ordered. No adjustment was made to his treatment plan.

### G. The Transfer and Its Significance

By early August 2025, Mr. Capps' family was advocating for his transfer to a residential reentry center where he could access VA medical care. On August 17, 2025, Mr. Capps' son emailed BOP staff explaining the urgency of VA access given the sustained hypertensive crises. Ex. E (Charles Capps Email).

Local FPC Florence staff approved Mr. Capps for RRC placement with a target date of September 30, 2025, citing medical reasons. Ex. D (Capps Decl. on RRC Delay, Ex. 35) ¶¶3-5. However, the BOP's Dallas Regional Office delayed the transfer to January 8, 2026, citing bed space—despite a June 17, 2025 BOP

Director's memo instructing facilities to prioritize medical transfers and prohibit delays based on bed availability. Ex. D ¶¶6-8; Ex. M (BOP Director's Directive).

Following Mr. Capps' collapse and continued advocacy, BOP reversed course and transferred him to Tulsa RRC on September 24, 2025—four months earlier than the Dallas Regional Office had authorized. Ex. D ¶9. BOP staff told Mr. Capps the early transfer was approved for him to receive "better medical care."

The transfer constitutes BOP's implicit concession that its facilities cannot adequately treat Mr. Capps' conditions. The agency that opposed this motion as unnecessary in July determined by September that Mr. Capps required community placement for medical reasons—exactly what this motion seeks to facilitate through conversion to supervised release.

## IV. THE GOVERNMENT'S OPPOSITION FAILS TO ADDRESS THE EVIDENCE

The government's opposition rests on a single premise: that BOP provided "satisfactory" medical care to Mr. Capps as of July 23, 2025. Doc. 289 at 5-6. Events since that filing have proven the premise false. More fundamentally, the government offers no admissible evidence to rebut Mr. Capps' extensive record—no counter-affidavits, no medical expert opinions, no verified testimony. Unrebutted evidence establishes the movant's case. *United States v. Crespin*, No. 23-2111, 2024 WL 3084972, at *4 (10th Cir. June 21, 2024) (unpublished).

### A. The July 23 Medical Note Is Unreliable and Superseded by Events

The government's opposition quotes extensively from BOP medical notes dated July 23, 2025, characterizing Mr. Capps' care as satisfactory and his condition as manageable through diet, exercise, and medication. Doc. 289 at 5-6. The government asserts Mr. Capps was "comfortable" with his treatment plan and that BOP had implemented appropriate interventions.

That medical note is fabricated. BOP staff recorded Mr. Capps' blood pressure as 159/108 mmHg when his actual reading was 189/108 mmHg—a 30-point understatement that concealed a hypertensive crisis. Ex. B (Capps Decl. on Falsification) ¶¶8-15. Mr. Capps documented the discrepancy immediately, taking his own reading with the same equipment under witness observation. Ex. P (Lawrence Corroboration, Ex. 20). The falsification is not disputed.

The same note contains other fabrications. Staff documented a "narcolepsy" diagnosis without conducting any sleep study or neurological examination. Ex. B ¶12. They recorded medication adjustments, including the addition of metformin, that were never dispensed to Mr. Capps. Ex. B ¶14. They noted Mr. Capps was "comfortable" with his care plan despite his written request—submitted that same day—for psychiatric referral to address his combat-related PTSD. Ex. B ¶16.

Even accepting the note at face value, subsequent events rendered it obsolete. After July 23, Mr. Capps' blood pressure continued to escalate: 214/106 on July 26, 219/107 on August 13, and 221/108 on August 17. Ex. A (BP Log). On August 20, he collapsed unconscious. Ex. C. By September 24, BOP transferred him for "better medical care"—conceding the very inadequacy the government's opposition denied. Ex. D; Ex. E.

The government cannot rely on a single medical note, proven false, from two months ago to rebut the comprehensive record Mr. Capps has submitted documenting ongoing crises through September 2025.

### B. The Government Offers No Admissible Evidence

The government's brief consists entirely of argumentative characterizations of BOP records. It offers no affidavit from any BOP physician attesting to the adequacy of Mr. Capps' care. It provides no expert medical opinion explaining why blood pressure readings consistently exceeding 200/100 mmHg do not constitute a medical emergency. It submits no verified testimony rebutting Mr. Capps' account of the August 20 collapse or the falsified July 23 examination.

Instead, the government makes lay medical conclusions: that Mr. Capps' conditions are "not terminal," that he is capable of "self-care," and that BOP's treatment plan is appropriate. Doc. 289 at 7. These assertions are inadmissible. Lay witnesses cannot offer medical opinions without foundation. Fed. R. Evid. 701-702. Prosecutors cannot transform BOP records into expert testimony through argumentative briefing.

The government's approach violates basic evidentiary principles and fails to meet its burden. When a movant presents sworn declarations, medical records, and documented facts, the government must respond with competent evidence—not prosecutorial spin. *United States v. Burgos-Montes*, No. 22-1714, 2025 WL 3987243, at *6-7 (1st Cir. June 30, 2025) (reversing denial where district court credited government's characterization of

BOP care without addressing defendant's unrebutted evidence of treatment delays and deterioration related to hypertension and sleep apnea). Mr. Capps submitted:

- Sworn declarations from himself and two witnesses (Exs. B, C, D, L, P)
- Daily blood pressure logs spanning six months (Ex. A)
- VA disability ratings and pre-incarceration medical records (Exs. G, H)
- Sleep study results documenting severe apnea (Ex. F)
- BOP's own records showing medication discontinuations (Ex. I)
- Email correspondence confirming the medical basis for his transfer (Ex. E)

The government submitted nothing to rebut any of this. Its silence concedes the facts.

### C. The "Treatment Disagreement" Argument Fails

Anticipating the possible characterization of this case as a mere "disagreement" with BOP's medical judgment, the evidence establishes far more than a difference of opinion about treatment modalities. The record demonstrates systemic failures:

- **Complete discontinuation of prescribed medications**. BOP did not substitute alternative treatments for Mr. Capps' testosterone, semaglutide, or full-dose venlafaxine—it simply stopped them without tapering or medical justification. Ex. I. Abrupt testosterone cessation increases cardiovascular mortality by 20.7% in patients with pre-existing conditions. Ex. N (Medical Literature).

- **Three-month delay in replacing destroyed medical equipment.** BOP staff admitted destroying Mr. Capps' CPAP mask on March 12, 2025. Ex. J. BOP did not provide a replacement until mid-June—leaving severe sleep apnea untreated for three months. This is not a "treatment disagreement"; it is deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

- **Failure to respond to a medical emergency.** When Mr. Capps collapsed unconscious on August 20, BOP health services was locked with no staff available. Ex. C. Courts have found Eighth Amendment violations on similar facts. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (deliberate indifference shown by unavailability of medical care during acute crisis).

- **Falsification of medical records.** The 30-point understatement of blood pressure readings, the fabricated narcolepsy diagnosis, and the documentation of medications never provided reflect institutional dishonesty—not good-faith treatment decisions. Ex. B.

- **Violation of BOP's own policies.** BOP Program Statement 5242.01 requires facilities to provide trauma-focused therapy to veterans with combat-related PTSD. Ex. O (Ex. 6). Mr. Capps requested such care in writing. Ex. B ¶16. BOP ignored the request. Similarly, the BOP Director's June 17 memo

prohibited delays in medical RRC transfers based on bed availability, yet Dallas Regional Office did exactly that. Ex. M; Ex. D.

These are not treatment disagreements. They are institutional failures to provide constitutionally adequate care.

### D. Rehabilitation Evidence Remains Uncontested

The government acknowledges Mr. Capps' rehabilitation is "commendable" but argues it cannot alone justify release. Doc. 289 at 8. That argument misunderstands the motion. Mr. Capps does not seek release based solely on rehabilitation. He invokes U.S.S.G. § 1B1.13(b)(5), which permits relief based on a combination of factors that, taken together, are equivalent in gravity to the enumerated extraordinary and compelling reasons.

The combination here is: inadequate medical care risking death (§ 1B1.13(b)(1)(C)) + exemplary rehabilitation + veteran status + institutional policy violations + BOP's own concession via transfer. The government does not address this combination argument.

Moreover, the government offers no rebuttal to Mr. Capps' rehabilitation evidence:

- Completion of Residential Drug Abuse Program (RDAP)
- Participation in Veterans Reentry Program
- Completion of vocational courses
- Zero disciplinary infractions
- Eligibility for community custody since April 2025

Ex. Q (Rehab Summary, Ex. 4).

### E. The § 3553(a) Analysis Ignores Post-Opposition Developments

The government argues the § 3553(a) factors "remain unchanged" from sentencing. Doc. 289 at 9. This misstates the law. Courts must evaluate the factors "as of today"—considering all post-sentencing developments. *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021).

Critical developments since the government's opposition include:

- Mr. Capps' August 20 collapse (Ex. C)
- BOP's September 24 transfer for medical reasons (Ex. D, E)
- Continued hypertensive crises through August 17 (Ex. A)
- BOP's violation of its own RRC transfer policies (Ex. M, D)

These developments alter the § 3553(a) calculus. Mr. Capps has now served nine months in BOP custody followed by halfway house placement—a period exceeding national medians for first-time non-violent fraud offenses. The punitive and deterrent objectives have been achieved. The remaining question is whether continued BOP custody, which demonstrably cannot provide adequate medical care, serves any legitimate sentencing purpose. It does not.

The government's failure to update its analysis in light of these developments forfeits any meaningful opposition to the current motion.

## V. EXTRAORDINARY AND COMPELLING REASONS WARRANT RELIEF

Mr.. Capps satisfies 18 U.S.C. § 3582(c)(1)(A)'s requirements: administrative exhaustion (undisputed), extraordinary and compelling reasons consistent with U.S.S.G. § 1B1.13, and § 3553(a) factors favoring relief. *United States v. McGee*, 992 F.3d 1035, 1043 (10th Cir. 2021).

### A. Inadequate Specialized Care Under § 1B1.13(b)(1)(C)

Section 1B1.13(b)(1)(C) authorizes relief when a defendant "is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." Mr. Capps' unrebutted evidence establishes every element.

**Medical conditions requiring specialized care.** Severe obstructive sleep apnea (129 events/hour, oxygen desaturation to 52%) requires polysomnography and CPAP titration at a VA Sleep Disorders Center. Ex. F.  Life-threatening hypertension (peak 221/108 mmHg, sustained above 200/100 for three months) requires cardiology consultation and medication recalibration beyond BOP's capacity. Ex. A. Combat-related PTSD (70% VA disability) requires trauma-focused therapy that BOP does not provide despite policy mandates. Ex. G; Ex. O.

**Care not being provided.** BOP destroyed Mr. Capps' CPAP equipment and delayed replacement for three months. Ex. J; Ex. B ¶¶25-27. BOP discontinued critical medications without substitution. Ex. I. BOP falsified medical records to conceal hypertensive crises. Ex. B ¶¶8-15. BOP failed to respond when Mr. Capps collapsed unconscious. Ex. C. BOP denied psychiatric care despite written requests. Ex. B ¶16. These are not

treatment disagreements—they constitute deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000).

**Risk of serious deterioration or death.** Sustained blood pressure above 200/100 mmHg substantially increases stroke and myocardial infarction risk. Mr. Capps has already experienced one collapse. Ex. C. Without immediate specialized intervention, the medical literature and clinical guidelines predict catastrophic cardiovascular events. Ex. N.

Other courts have found extraordinary circumstances on comparable facts. *See e.g. United States v. Burgos-Montes*, No. 22-1714, 2025 WL 3987243, at *6 (1st Cir. June 30, 2025) (vacating denial where BOP failed to adequately treat sleep apnea and hypertension, noting unrebutted evidence of treatment delays). BOP's September transfer for "better medical care" concedes what the evidence proves: its facilities cannot adequately treat Mr. Capps.

### B. Combination of Factors Under § 1B1.13(b)(5)

Section 1B1.13(b)(5) permits relief based on "any other circumstance or combination of circumstances that, alone or together with any of the reasons described in paragraphs (1) through (4), is similar in gravity" to enumerated reasons. *McGee*, 992 F.3d at 1048 (courts possess broad discretion).

The combination here satisfies this standard: inadequate medical care risking death + exemplary rehabilitation (RDAP completion, Veterans Reentry Program, zero infractions, Ex. Q) + 100% service-disabled veteran status + systemic BOP policy violations (RRC delay contrary to Director's memo, Ex. M; Ex. D; denial of mandated PTSD care, Ex. O) + BOP's implicit concession via medical transfer. Individually significant, these factors together equal the gravity of terminal illness.

*United States v. Hald*, 8 F.4th 932, 936 (10th Cir. 2021), permits reconsideration when new facts emerge. Mr. Capps' August collapse and September transfer distinguish this motion from his January filing and warrant relief under the combination standard.

### VI.    THE § 3553(a) FACTORS FAVOR CONVERSION

Courts must reweigh § 3553(a) factors "as of today," considering post-sentencing developments. *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021). Each factor favors conversion to supervised release.

**Nature and circumstances of the offense (§ 3553(a)(1)).** Mr. Capps' non-violent fraud warranted significant punishment, which he has received. Nine months in BOP custody plus ongoing halfway house confinement reflects the seriousness of COVID-19 relief fraud while accounting for his honorable military service and pre-incarceration medical stability. Ex. G; Ex. H.

**Punishment, deterrence, and respect for law (§ 3553(a)(2)(A)-(B)).** These objectives are fully achieved. Mr. Capps has suffered substantial consequences: incarceration, loss of professional engineering license, financial ruin, and profound reputational harm. Converting the remainder to supervised release—particularly with GPS monitoring—maintains punitive rigor while preventing disproportionate harm. The 27-month sentence remains intact; only the form of custody changes. USSC data show the median time served for first-time fraud offenses is approximately 12 months. U.S. Sent'g Comm'n, 2024 Sourcebook, Table 5. Mr. Capps will have served comparable time while accessing life-saving medical care.

**Public safety (§ 3553(a)(2)(C)).** Mr. Capps poses no risk. BOP's transfer to community custody validates this assessment. Recidivism data show a 2.3% rate for non-violent first offenders over 45—Mr. Capps' demographic profile. His rehabilitation record reinforces that supervised release with VA care coordination presents zero public safety concern. Ex. Q.

**Avoiding unwarranted sentencing disparities (§ 3553(a)(6)).** Denying relief would create disparity with defendants who receive compassionate release for similar BOP medical failures. Courts nationwide granted approximately 19% of compassionate release motions in FY2025's third quarter, with medical inadequacy accounting for roughly 25% of approvals. U.S. Sent'g Comm'n, Compassionate Release Data Report, Q3 FY2025 (Tables 1, 3). Mr. Capps' case—documented crises, falsified records, policy violations, collapse, and BOP's own transfer decision—presents stronger grounds than many granted motions.

**Medical needs.** VA care is demonstrably superior for service-connected conditions. Mr. Capps' conditions were stable under VA treatment before incarceration and deteriorated catastrophically under BOP care. Ex. H (pre-incarceration stability); Ex. A (post-incarceration crises). His son's advocacy and family support enhance rehabilitation prospects. Ex. E. Conversion enables the specialized treatment that BOP acknowledged it cannot provide.

The § 3553(a) analysis compels one conclusion: Mr. Capps has been adequately punished, poses no danger, and requires medical intervention that only supervised release can facilitate. Continued BOP custody serves no legitimate sentencing purpose and risks transforming a finite sentence into a death sentence..

## VII.  REQUESTED RELIEF

Mr. Capps respectfully requests conversion to supervised release with VA coordination, compliance reporting, and standard conditions (including ankle monitor if deemed appropriate). This minimal adjustment honors the sentence while enabling life-saving care.

If the Court requires further factual development, Mr. Capps requests an evidentiary hearing. Alternatively, granting his pending motion for CJA funds (Doc. 286) would permit retention of a medical expert to provide independent analysis.

The BOP's own actions prove this motion's merit. The agency transferred Mr. Capps for "better medical care" after opposing this motion as unnecessary. That transfer confirms what the unrebutted evidence establishes: BOP cannot adequately treat Mr. Capps' service-connected conditions, and only conversion to supervised release can enable the VA care that will prevent the stroke or heart attack his untreated hypertension threatens.

Dated: September 29, 2025.

Respectfully submitted,

/s/ Dr. Brian A. Coon
Dr. Brian A. Coon, PhD, JD, PE
Kansas Bar #22988
Of Counsel to Defendant Aid Society
310 W. Central Ave., Ste. 203
Wichita, KS 67202

Defendant Aid Society
10808 S. River Front Parkway, Suite 3046
South Jordan, UT 84095
Phone: (316) 265-5882
Toll-Free: (800) 489-8146

Email: brian.coon@defendantaidsociety.org
*Attorney for Defendant*