Dr. Brian A. Coon, PhD, JD, PE (Kansas Bar #22988)
Of Counsel to Defendant Aid Society
310 W. Central Ave., Ste. 203
Wichita, KS 67202
Defendant Aid Society
10808 S. River Front Parkway, Suite 3046
South Jordan, UT 84095
Phone: (316) 265-5882
Toll-Free: (800) 489-8146
Email: brian.coon@defendantaidsociety.org

*Attorney for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.    21-CR-10073-EFM |
| *Plaintiff,* | |
| v. | ***EXHIBITS TO REPLY IN SUPPORT OF MOTION FOR REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I)*** |
| MICHAEL R. CAPPS, | |
| *Defendant.* | HONORABLE ERIC F. MELGREN |

## EXHIBITS TO REPLY IN SUPPORT OF
## MOTION FOR REDUCTION IN SENTENCE
## PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I)

# Exhibit A

**EXHIBIT 34**
**EXTENDED BLOOD PRESSURE MONITORING LOG**
**(SUPPLEMENTAL TO EXHIBIT 24)**

Michael R. Capps, Register Number: 66142-509
FPC Florence

| Initial Crisis Period (Post-CPAP Damage) | | | | | |
|---|---|---|---|---|---|
| Date | Time | Systolic | Diastolic | Classification | Notes |
| 3/17/25 | AM | 178 | 98 | Stage 2 Hypertension | First reading, 5 days post-CPAP damage |
| 3/19/25 | AM | 182 | 91 | Stage 2 Hypertension | Continued elevation |
| 3/28/25 | AM | 199 | 108 | Stage 2 Hypertension | Approaching crisis threshold |

| Hypertensive Crisis Period | | | | | |
|---|---|---|---|---|---|
| Date | Time | Systolic | Diastolic | Classification | Notes |
| 6/11/25 | AM | 188 | 122 | Hypertensive Crisis | Diastolic >120 - Emergency |
| 6/25/25 | AM | 196 | 97 | Hypertensive Crisis | Sustained crisis levels |
| 6/26/25 | AM | 198 | 104 | Hypertensive Crisis | Continued emergency |
| 6/27/25 | AM | 202 | 106 | Severe Hypertensive Emergency | >200 systolic |
| 6/28/25 | AM | 197 | 104 | Hypertensive Crisis | Persistent crisis |
| 6/29/25 | AM | 206 | 102 | Life-threatening Emergency | Highest recorded systolic |

**Extended Monitoring (Prison Recreation Office BP Cuff)**

*Note: Readings from 6/30/25 forward taken using prison-provided blood pressure cuff in recreation office*

| Date | Time | Systolic | Diastolic | Classification | Notes |
|---|---|---|---|---|---|
| 6/30/25 | AM | 203 | 99 | Severe Hypertensive Emergency | First reading with prison cuff |
| 7/2/25 | AM | 208 | 105 | Severe Hypertensive Emergency | Continued deterioration |
| 7/4/25 | AM | 201 | 101 | Severe Hypertensive Emergency | Holiday - July 4th |
| 7/6/25 | AM | 204 | 108 | Severe Hypertensive Emergency | Diastolic trending up |
| 7/8/25 | AM | 209 | 103 | Severe Hypertensive Emergency | >200 systolic sustained |
| 7/10/25 | AM | 205 | 106 | Severe Hypertensive Emergency | Persistent emergency levels |
| 7/12/25 | AM | 211 | 104 | Severe Hypertensive Emergency | New peak systolic |
| 7/14/25 | AM | 207 | 109 | Severe Hypertensive Emergency | Both parameters critical |
| 7/16/25 | AM | 213 | 101 | Severe Hypertensive Emergency | Systolic >210 |
| 7/18/25 | AM | 210 | 107 | Severe Hypertensive Emergency | Consistently life-threatening |
| 7/20/25 | AM | 206 | 105 | Severe Hypertensive Emergency | No improvement |
| 7/22/25 | AM | 212 | 103 | Severe Hypertensive Emergency | Sustained >210 systolic |
| 7/24/25 | AM | 208 | 108 | Severe Hypertensive Emergency | Diastolic >100 |
| 7/26/25 | AM | 214 | 106 | Severe Hypertensive Emergency | Highest recorded to date |
| 7/28/25 | AM | 211 | 104 | Severe Hypertensive Emergency | Critical levels maintained |
| 7/30/25 | AM | 209 | 109 | Severe Hypertensive Emergency | End of July readings |
| 8/1/25 | AM | 215 | 105 | Severe Hypertensive Emergency | August levels remain critical |
| 8/3/25 | AM | 212 | 107 | Severe Hypertensive Emergency | No medical intervention |
| 8/5/25 | AM | 217 | 103 | Severe Hypertensive Emergency | New record high systolic |
| 8/7/25 | AM | 214 | 108 | Severe Hypertensive Emergency | Current reading - immediate intervention required |

**Classification Reference:**
• **Normal:** <120/80 mmHg
• **Elevated:** 120-129/<80 mmHg
• **Stage 1 Hypertension:** 130-139/80-89 mmHg
• **Stage 2 Hypertension:** ≥140/90 mmHg
• **Hypertensive Crisis:** >180/120 mmHg
• **Severe Hypertensive Emergency:** >200/100 mmHg

**Critical Medical Notes:**
• **Duration of Crisis:** 58+ consecutive days at crisis levels (6/11/25 - 8/7/25)
• **Peak Reading:** 217/108 mmHg (8/5/25)
• **Average Crisis Period:** 208/105 mmHg
• **Equipment Change:** 6/30/25 - Switched to prison recreation office BP cuff
• **Medical Intervention: NONE DOCUMENTED**

**Emergency Indicators Present:**
✓ Systolic >200 mmHg sustained
✓ Diastolic >100 mmHg episodes

✓ Duration >48 hours (58+ days)
✓ Progressive deterioration
✓ Life-threatening cardiovascular emergency

**IMMEDIATE MEDICAL INTERVENTION REQUIRED**

*I declare under penalty of perjury that the readings are true and correct.*

**Michael R. Capps**
**Register Number: 66142-509**
**Date: August 7, 2025**

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
Plaintiff,

v.

MICHAEL R. CAPPS,
Defendant.

Case No. 22-CR-10073-EFM

## DECLARATION OF MICHAEL R. CAPPS

**1.** I, Michael R. Capps, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, and belief.

**2.** I am 47 years old and am currently incarcerated at Federal Prison Camp Florence in Florence, Colorado. I have been housed at this facility since December 31, 2024.

**3.** I am a United States military veteran who served honorably and was exposed to combat situations that resulted in my diagnosis with Post-Traumatic Stress Disorder (PTSD). I also suffer from severe sleep apnea and hypertension, all of which are service-connected conditions treated by the Department of Veterans Affairs prior to my incarceration.

**4.** I submit this declaration to provide first-hand testimony about systematic medical record falsification that I discovered occurred during my July 23, 2025 medical examination with Provider Maltezo, Seana FNP-BC, and the ongoing medical emergency that threatens my life.

**5.** My current medical condition has deteriorated to a crisis level since corrections staff destroyed my CPAP device on March 12, 2025. Without this life-saving equipment, my severe sleep apnea has caused my blood pressure to reach dangerous levels that require immediate medical intervention.

## THE JULY 23, 2025 EXAMINATION FALSIFICATIONS

**6.** On July 23, 2025, I attended a medical appointment with Provider Maltezo that lasted approximately 15-20 minutes. After obtaining a copy of the medical records from this examination, I discovered numerous false statements about what occurred during our encounter.

**7. Blood Pressure Reading Falsification:** During the examination, I observed Provider Maltezo take my blood pressure using an automated cuff machine. I saw the digital display clearly show a reading of 189/108. This reading alarmed me because I knew it indicated a medical emergency. However, Provider Maltezo recorded my blood pressure as 159/108 in her notes—a deliberate reduction of 30 points in the systolic reading.

**8.** When I expressed concern about the high reading I observed, Provider Maltezo dismissed my concerns and told me that the reading was "not that bad" and that we would "keep monitoring it." She made no mention of the reading constituting a medical emergency or requiring immediate intervention.

**9. False Documentation of Patient Comfort and Consent:** Provider Maltezo's notes repeatedly state that "IM states he is comfortable with this" regarding various treatment decisions. This is completely false. I specifically expressed serious concerns about several proposed treatments:

**10. Metformin Concerns:** When Provider Maltezo suggested starting Metformin, I told her I was very concerned about taking this medication because both my mother and maternal aunt experienced significant health complications while taking Metformin. Provider Maltezo then told me that unless I agreed to take Metformin, she would not consider restarting my previously prescribed Semaglutide from the VA. I felt coerced into agreeing, but I was not "comfortable with this" as she documented.

**11. Testosterone Dosage Dispute:** Provider Maltezo proposed restarting my testosterone at 75mg weekly. I specifically told her that my VA-optimized dosage was 240mg, developed over more than 24 months of treatment. I provided her with my VA medical records showing this correct dosage. I protested the reduced dosage and explained that the VA had determined the optimal level through extensive testing. Her documentation that "IM states understanding" is false—I specifically disagreed with the reduced dosage.

**12. Cardiac Treatment Opposition:** Regarding the blood pressure medication increase, I did not express comfort with the treatment plan. I specifically told Provider Maltezo that my blood pressure had been severely elevated for over 90 days with no meaningful improvement despite medication, and that I was concerned the current approach was not working. I disputed the adequacy of the treatment given the lack of improvement.

## FABRICATED PHYSICAL EXAMINATION FINDINGS

**13.** Provider Maltezo's medical records document several physical examination findings for body parts and systems she never actually examined:

**14. Mouth Examination:** Her notes state "mucous membranes pink/moist." Provider Maltezo never looked in my mouth or asked me to open my mouth during the entire examination.

**15. Cardiac Examination:** Her notes document cardiac findings including "RRR, PMS intact." Provider Maltezo never used a stethoscope to listen to my heart during the examination.

**16. Pulmonary Examination:** Her notes state "respiratory effort is normal." Provider Maltezo never listened to my lungs with a stethoscope or conducted any pulmonary examination.

**17.** The examination consisted primarily of Provider Maltezo sitting at her computer while asking me general questions about my medications. She conducted minimal actual physical examination despite documenting detailed findings for multiple body systems.

## FABRICATED REVIEW OF SYSTEMS

**18.** Provider Maltezo's records document an extensive Review of Systems with denials for numerous symptoms she never asked me about. Specifically, she documented that I denied:

**19.** "Fevers, night sweats, chills and weight loss" - She never asked me about any of these symptoms.

**20.** "Palpitations, syncope" - She never asked me about heart palpitations or fainting episodes.

**21.** "Trouble breathing, excess sputum, wheezing" - She never asked me about breathing problems or respiratory symptoms.

**22.** "Abdominal pain, changes in bowel, problems with urination" - She never asked me about gastrointestinal or urinary symptoms.

**23.** "Skin rashes, concerning skin changes" - She never asked me about skin problems.

**24.** "Coughing up blood or blood in stool" - She never asked me about either of these serious symptoms.

**25.** The only symptoms she actually asked me about were general questions about my sleep and energy levels related to my testosterone deficiency.

## MEDICAL HISTORY MISREPRESENTATION

**26.** Provider Maltezo's notes state that I have "a history of narcolepsy." This is completely false. I have never been diagnosed with narcolepsy, and this condition does not appear anywhere in my extensive VA medical records. When she mentioned narcolepsy during our appointment, I corrected her and explained that my Armodafinil prescription was for daytime sleepiness caused by sleep apnea, not narcolepsy.

**27.** Provider Maltezo also documented contradictory diagnoses, listing both "Hypersomnia" and "Insomnia" as current conditions. I have never claimed to have insomnia. My problem is hypersomnia (excessive daytime sleepiness) caused by my severe sleep apnea and the lack of proper CPAP treatment.

## IGNORED PSYCHOLOGY CONSULTATION

**28.** During the examination, Provider Maltezo acknowledged that the psychology department had formally requested psychotropic medications to help manage my PTSD symptoms, including nightmares, insomnia, and mood issues. This request is documented as "Complaint 2" in her notes.

**29.** Despite acknowledging this request from psychology and my obvious need for mental health medication support, Provider Maltezo provided no psychotropic medications and offered no medical justification for denying the psychology department's recommendation.

**30.** This denial of mental health treatment has significantly impacted my ability to cope with the stress of my medical emergency and the institutional failures I have experienced.

## MEDICATION PROMISE FAILURES

**31.** Provider Maltezo documented specific treatment plans including prescriptions for testosterone (75mg weekly), Modafinil (200mg daily), Metformin (500mg daily), and continuation of Effexor (venlafaxine).

**32.** Despite these documented medication orders dated July 23, 2025, I have not received any of these medications. When I have inquired about them at pill line or during sick call, staff tell me they have no record of these prescriptions.

**33.** This pattern of documenting treatment plans while failing to actually provide the medications represents a cruel deception that gives the appearance of medical care while providing none of the actual benefits.

## ONGOING MEDICAL EMERGENCY

**34.** Since the destruction of my CPAP device on March 12, 2025, my medical condition has deteriorated dramatically. I continue to experience severe sleep-disordered breathing, with multiple episodes each night where I stop breathing and wake up gasping for air.

**35.** My blood pressure remains at dangerous levels. I regularly monitor my blood pressure using the unit's medical equipment, and my readings consistently exceed 180/120 mmHg, with some readings over 200/110 mmHg. These readings indicate hypertensive crisis requiring immediate medical intervention.

**36.** I experience daily symptoms including severe morning headaches, dizziness, chest discomfort, extreme fatigue, and difficulty concentrating. I am in constant fear that I will suffer a stroke or heart attack due to my uncontrolled hypertension.

**37.** Despite having a replacement CPAP hose provided in July 2025, my CPAP mask remains broken from the March incident, making the device largely ineffective. The institutional medical staff have been unable or unwilling to provide a replacement mask for over four months.

## IMPACT OF FALSIFIED MEDICAL RECORDS

**38.** The falsified medical records created by Provider Maltezo have directly harmed my medical care by creating a false impression that I am receiving adequate treatment and that my condition is stable.

**39.** I am deeply concerned that these falsified records will be used to justify denial of future medical care or to argue against my need for specialized treatment through the VA medical system.

**40.** The systematic falsification of my medical records has destroyed any trust I might have had in the institutional medical system's ability to provide honest, competent care for my life-threatening conditions.

## PATTERN OF INSTITUTIONAL FAILURES

**41.** The July 23, 2025 examination falsifications are part of a broader pattern of institutional medical failures I have experienced, including the previously documented falsified medical record from January 8, 2025, which described me as a "healthy 47-year-old male" on a date when I was only 46 years old.

**42.** I have also witnessed other inmates' administrative remedy forms being physically altered with correction fluid to remove allegations of medical misconduct, demonstrating that document falsification is a systematic problem at this facility.

**43.** The restrictive medical care schedule, with only 30 minutes of sick call per week, makes it virtually impossible to receive adequate care for complex medical conditions requiring specialized equipment and monitoring.

## NEED FOR IMMEDIATE VA MEDICAL CARE

**44.** Prior to my incarceration, the Department of Veterans Affairs provided comprehensive, specialized care for my service-connected conditions. The VA medical system has the equipment, expertise, and protocols necessary to manage my severe sleep apnea and resulting hypertension.

**45.** The institutional medical system at FPC Florence has demonstrated that it cannot provide the specialized care I require and cannot be trusted to provide honest documentation of my medical needs and treatment.

**46.** I am in immediate need of coordinated medical care through the VA system to address my hypertensive crisis and provide proper CPAP therapy for my severe sleep apnea. Continued institutional custody under current medical circumstances poses an imminent threat to my life.

**47.** I understand that I am statutorily eligible for community custody placement and would comply with all supervised release conditions while receiving the specialized medical care necessary to preserve my life and health.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on July 28, 2025, at Federal Prison Camp Florence, Florence, Colorado.


Michael R. Capps
Register Number: 66142-509
Federal Prison Camp Florence
P.O. Box 5000
Florence, CO 81226

# Exhibit C

**EXHIBIT 36**

**VERIFIED DECLARATION OF BUTCH LAWRENCE**
**IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE**

I, **Butch Lawrence**, declare under penalty of perjury under the laws of the United States that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a federal inmate currently housed at the Federal Prison Camp (FPC) Florence, located in Florence, Colorado. My Bureau of Prisons (BOP) Register Number is 20699-511. I am the cellmate of Michael Capps (BOP #66142-509) and have been living with him since I arrived at this facility.

2. I'm writing this declaration to tell you what I saw happen to my cellmate Mike on August 20, 2025. I've been around long enough to know when something's seriously wrong with a person, and what happened that day scared the hell out of me.

3. Mike's been keeping track of his blood pressure readings in a notebook, and I've seen those numbers - they've been way too high for weeks. The day before this incident, on **August 19, 2025**, his reading was 217/108. That's not good by any stretch.

4. On **August 20, 2025, around 1:30 in the afternoon**, Mike, myself, and our neighbor Shannon Siminole (BOP #88673-510) were taking a walk around the yard. It's something we do regularly to get some fresh air and exercise.

5. During our walk, I could see Mike wasn't doing well. He was sweating pretty bad even though it wasn't that hot, his face was pale as a sheet, and he was walking unsteady like he might fall over. He told Shannon and me that he thought his blood pressure was spiking again and that he was feeling dizzy with chest pain.

6. What happened next happened fast. Mike just dropped right there on the walking track - didn't stumble or catch himself, just went down unconscious. I'm talking completely out cold. I immediately got down beside him, calling his name loud while Shannon checked to make sure he was still breathing.

7. Mike was unconscious for about a minute, which felt like forever when you're watching someone you care about lying there not responding. When he came to, he was confused and shaky, still pale, and complaining that his head was killing him.

8. I helped him sit up and then we got him to his feet. Shannon and I both knew this was serious - people don't just pass out for no reason. We needed to get him medical help right away, so we walked him over to the medical office.

9. When we got to the medical office, the door was locked tight. There was a sign posted saying medical staff only see inmates by appointment and you have to submit requests through the computer system. Here's a guy who just passed out from what's obviously a medical emergency, and there's nobody there to help him.

10. Shannon had the good idea to go to the recreation office where they keep a blood pressure machine. We helped Mike over there and got a reading of **220/110**. I don't know much about medical stuff, but I know those numbers are dangerous. Mike was trembling, saying he felt sick to his stomach, and his heart was racing.

11. I went looking all over the yard for any corrections officer who could help us or call for medical assistance. I checked everywhere - the housing units, the recreation area, around the perimeter. There wasn't a single guard anywhere on the yard when we needed help.

12. After about 20 minutes, Mike said his dizziness was getting a little better, but I could tell he was still in bad shape. With no medical staff available and no guards to be found, Shannon and I had no choice but to help him back to our cell so he could rest.

13. I stayed close to keep an eye on Mike's condition. I was worried he might pass out again, and frankly, I was scared he could have a stroke or heart attack right there in our cell. This wasn't some minor health issue - this was a man in serious medical trouble.

14. I've seen Mike's medical problems get worse since he's been here. His CPAP machine got broken by a guard back in March, and they still haven't fixed it properly. His blood pressure has been getting worse and worse, and the medical staff here just don't seem to take it seriously.

15. What bothers me most is that when someone needs help - real help - there's nobody here who can provide it. Mike's been approved for halfway house placement to get proper medical care, but they keep delaying it for reasons that don't make sense. Meanwhile, he's getting sicker.

16. I'm not a doctor, but I've worked construction my whole life and I know what it looks like when someone's in trouble. Mike was in trouble that day, and if something like this happens again without proper medical care available, I'm afraid we might lose him.

**17.** I respectfully ask the Court to consider Mike's medical situation seriously. He's a good man who deserves a chance to get the medical care he needs before it's too late. What I witnessed on August 20, 2025 was a medical emergency, plain and simple, and this place just isn't equipped to handle his condition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

**Butch Lawrence**

Register Number: 20699-511

Federal Prison Camp Florence
5725 8th Street
Florence, CO 81226

Executed this 21 day of August, 2025, at FPC Florence, Florence, Colorado.

# Exhibit D

## EXHIBIT 35

### VERIFIED DECLARATION OF MICHAEL R. CAPPS
### IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE

I, **Michael R. Capps**, declare under penalty of perjury under the laws of the United States that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a federal inmate currently incarcerated at the Federal Prison Camp (FPC) Florence, located in Florence, Colorado. My Bureau of Prisons (BOP) Register Number is 66142-509. I am 47 years of age and of lawful age to make this declaration.

2. I am a United States Air Force veteran with service-connected disabilities including severe sleep apnea, hypertension, and PTSD. I arrived at FPC Florence on December 31, 2024, and am currently serving a 27-month sentence with a release date of May 2, 2026.

3. On **July 7, 2025**, I submitted a BP-9 administrative remedy requesting a five-factor review under 18 U.S.C. § 3621(b) to determine my eligibility for pre-release custody placement, specifically requesting placement in a Residential Reentry Center (RRC) or home confinement based on my medical needs and statutory eligibility.

4. On **July 16, 2025**, Camp Administrator D. Griffin called me into her office and informed me that she agreed to resubmit me for a halfway house placement date of **September 30, 2025**, based on my medical needs. Administrator Griffin asked me to withdraw my BP-9 as a result of this agreement, which I did on the same date (Administrative Remedy #1247459-F1).

5. Administrator Griffin's recommendation for September 30, 2025 placement was based on her completion of the statutory five-factor review required under 18 U.S.C. § 3621(b). This recommendation was supported by my case manager, medical staff, psychology staff, and Institution Warden D. Jones, all of whom endorsed the September 30, 2025 placement date based on my documented medical needs.

6. On **August 1, 2025**, Case Manager Rodriguez identified an error in the paperwork and corrected the mistake, resubmitting the recommendation for approval to the Dallas, Texas Residential Reentry Management (RRM) office.

7. On **August 7, 2025**, Camp Administrator Griffin notified me that the Residential Reentry Management office in Dallas, Texas had modified her recommendation and assigned **January 8, 2026** for placement, despite Griffin's completion of the statutory five-factor review and the unanimous endorsement of local staff for the September 30, 2025 date.

8. I was informed by institutional staff that the Dallas RRM office cited **"bed space limitations"** as the primary factor for delaying my placement from September 30, 2025 to January 8, 2026.

9. I have personal knowledge that on **June 17, 2025**, BOP Director William K. Marshall III issued a memorandum to all Chief Executive Officers titled "Use of Home Confinement as a Release Option." This memorandum explicitly states that **"Residential Reentry Center (RRC) bed availability/capacity shall not be a barrier to HC when an individual is statutorily eligible and appropriate for such placement."**

10. The Director's memorandum further states that referrals **"ordinarily should not experience delays in prerelease placement based on administrative timing, presumed RRC capacity limits or placement constraints, or pending credit accrual."**

11. The Dallas RRM office's decision on August 7, 2025, citing bed space limitations as justification for delaying my placement, directly violates the explicit policy directive issued by the BOP Director 52 days earlier on June 17, 2025.

12. Since arriving at FPC Florence, I have experienced severe medical deterioration due to the facility's inability to provide adequate care for my service-connected conditions. My CPAP mask was damaged by a corrections officer on March 12, 2025, and despite multiple requests, has not been properly replaced, causing my sleep apnea to remain untreated.

13. I have maintained detailed blood pressure monitoring records documenting the progressive deterioration of my hypertension since the CPAP damage. These readings show a clear pattern of escalation from Stage 2 Hypertension in March 2025 to sustained Hypertensive Crisis and Severe Hypertensive Emergency levels beginning in June 2025.

14. During the period from **June 11, 2025 through August 7, 2025** (the date of the Dallas RRM decision), I sustained **58+ consecutive days** of blood pressure readings at Hypertensive Crisis or Severe Hypertensive Emergency levels, including:

   a. Peak reading of **217/108 mmHg on August 5, 2025** (two days before Dallas RRM decision)
   b. Reading of **214/108 mmHg on August 7, 2025** (the day Dallas RRM made their bed space decision)
   c. Average readings during this period of **208/105 mmHg** - consistently life-threatening levels

15. According to American Heart Association guidelines, blood pressure readings over 180/120 mmHg constitute a Hypertensive Crisis requiring immediate medical attention, and readings over 200/100 mmHg constitute a Severe Hypertensive Emergency requiring emergency intervention to prevent stroke, cardiac arrest, or organ damage.

16. Despite maintaining blood pressure readings at life-threatening emergency levels for over 58 consecutive days, **no documented medical intervention** has been provided by FPC Florence medical staff. My requests for emergency medical care have been ignored or delayed.

17. The timing correlation between the Dallas RRM's policy violation and my medical emergency is particularly egregious: Dallas RRM made their decision to delay my placement based on prohibited bed space limitations while I was experiencing severe hypertensive emergency (214/108 mmHg on August 7, 2025), following 58 days of sustained crisis-level readings.

18. I have witnessed a pattern of administrative dysfunction at FPC Florence, including the alteration of administrative remedy documents as documented in the case of inmate David H. Payne (BOP #76493-112), who submitted evidence that staff used correction fluid to remove his allegations of document falsification from his BP-9 form.

19. The facility has also created false medical records in my case, including a fabricated physician encounter dated January 8, 2025, listing my age as 47 when I did not turn 47 until January 17, 2025. Clinic Administrator Ms. Alvarado confirmed that "no physician encounter with Mr. Capps occurred on that date."

20. The combination of the Dallas RRM's direct violation of the BOP Director's explicit policy and the ongoing medical emergency created by administrative delays demonstrates that further administrative remedies are futile and that immediate judicial intervention is necessary to prevent irreversible harm or death.

21. Prior to incarceration, my medical conditions were successfully managed through the Veterans Affairs healthcare system with integrated care including proper CPAP equipment, regular cardiology monitoring, and mental health treatment. The deterioration I have experienced at FPC Florence directly results from the facility's inability to provide adequate specialized care.

22. I am already eligible for placement in community custody under BOP policies effective April 26, 2025, and have completed extensive rehabilitation programming including Thresholds, Non-Residential RDAP, 7 Habits of Highly Effective People, Basic Cognitive Thinking, Drug Education, Business Management, and Veterans' Reentry Program.

23. I have maintained a clean disciplinary record throughout my incarceration and pose no risk to public safety. My conviction was for a non-violent offense, I voluntarily surrendered, and I have substantial community ties and support systems in place.

24. The current medical crisis requires immediate access to specialized cardiovascular care and proper sleep apnea treatment that cannot be provided within the federal prison system. Each day of delay increases the risk of stroke, cardiac arrest, or irreversible organ damage.

25. I respectfully submit this declaration in support of my motion for compassionate release, requesting that the Court convert the remainder of my sentence to supervised release with appropriate medical monitoring conditions, as this represents the only effective remedy capable of providing immediate relief while maintaining appropriate accountability and oversight.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

**Michael R. Capps**
Register Number: 66142-509
Federal Prison Camp Florence
5725 8th Street
Florence, CO 81226

Executed this 20th day of August, 2025, at FPC Florence, Florence, Colorado.

Subject: Urgent Request for Review - Michael Capps (66142-509) RRC Placement Delay
From: Charles Capps charles.capps@emailpro.net
To: rxstover@bop.gov rxstover@bop.gov
Date: 8/17/25 10:14 PM

# Exhibit E

Dear Mr. Stover,

I am writing regarding my father, Michael Capps (Register Number: 66142-509), currently housed at FPC Florence. I respectfully request your immediate review and intervention regarding a concerning delay in his approved Residential Reentry Center (RRC) placement.

On September 30, 2025, my father was scheduled for RRC placement based on recommendations from his unit team, medical staff, psychology department, and approval from Warden Jones. Despite these comprehensive endorsements and Director Marshall's directive against unnecessary placement delays, this transfer has been postponed for four months without clear justification.

My father is a 100% service-disabled veteran suffering from:
Severe hypertensive blood pressure (uncontrolled for 4+ months)
Combat-related PTSD requiring specialized treatment
Additional medical conditions requiring VA care access

The continued delay in RRC placement prevents him from accessing critical VA healthcare resources and specialized treatment programs specifically designed for veterans with his conditions.

Administrative Actions Taken
Administrative remedies BP-8 and BP-9 have been filed
Congressional inquiry initiated through Senator Lankford's office
Multiple requests for clarification have been submitted

Specific Requests
1. Immediate review of the decision to override the unanimous recommendations for RRC placement
2. Written explanation for the four-month delay beyond the approved 9/30/25 date
3. Timeline for when placement will occur
4. Interim medical care to address his deteriorating health conditions

My father served our country with honor in Afghanistan and deserves the dignified treatment befitting a disabled veteran. The current situation not only contradicts established BOP procedures but also jeopardizes his health and successful reintegration.

I respectfully request your prompt attention to this matter and look forward to your response within 10 business days.

incerely,

Charles Capps

son of Michael Capps (66142-509)

c: Senator Lankford's Office, VA Patient Advocate

Sent from Proton Mail Android

TRULINCS  66142509 - CAPPS, MICHAEL R - Unit: FLF-T-A

---------------------------------------------------------------------------------------

FROM: 66142509
TO: Mockin, Rabbi
SUBJECT: Recent Medical Incident
DATE: 08/25/2025 02:12:05 PM

# Exhibit E2

Afternoon Rabbi -

Hopefully your week is starting off well... I wanted to loop you in to a new medical incident that occurred this past week.

As you may recall from my last email, I have been attempting to track my blood pressure on a daily basis - since the prison refuses to check it but once a month, I found the recreation office has a monitor we can use to self-monitor...

On August 19, my recorded BP was 217/108 - I had a severe headache, some chest tightness and seemed to be short of breath most of the morning. Like most days, I pressed on thinking things would subside as the day went on...

The following day, on the 20th, my cellmate Butch Lawrence and my neighbor Shannon Siminole were taking our usual walk around the yard - I've been averaging 4-6 miles daily at least 5-6 days of the week. During our walk, I began experiencing similar symptoms from the day before, just more severe - intense dizziness, chest pain, irregular heartbeat and shortness of breath... Both Shannon and Butch asked me if I was ok and before I could really even speak, I began getting tunnel vision before blacking out - I woke up on the ground, no memory of falling or hitting the ground.

Butch and Shannon claim I was out for about a minute before waking up with intense head pain, throbbing chest and continued breathing difficulty.

The two of them helped me up and walked me to the medical clinic - which was locked and closed - apparently we have to schedule appointments through TRULINKS now and wait for an appointment - we did make it back to recreation and checked my BP again at 220/110 - they got me some water and I attempted to rest in the chair for about 20 minutes of so. Butch tried to find a CO on the yard but everyone was gone - so they took me back to my bunk to try and rest...

Obviously the event was beyond alarming and honestly scared me in a way I don't think I've ever felt - the Bureau continues to restrict access to my VA prescribed medications and have done nothing to address my BP continuing to rise...

My unit team has requested I be transferred to a RRC on 9/30/25, opening access to VA healthcare where I can be seen by a cardiologist, sleep specialist and endocrinologist - all specialties that Florence either does not have or will not refer to. However, the RRM moved this date back to 1/8/26 citing bed space - there has to be a bed somewhere in the Bureau - any location will allow me to access the VA care I need.

I am not sure what resources you may or may not have available, but any assistance would be appreciated...

Thank you.

Michael Capps

TRULINCS 66142509 - CAPPS, MICHAEL R   Unit: FLF T A

------------------------------------------------------------

FROM: Mockin, Rabbi
TO: 66142509
SUBJECT: RE: Recent Medical Incident
DATE: 08/26/2025 02:06:05 PM

Hello Michael,

I'm so sorry to hear about what happened to you this week during your walk. Please know that I have reached out to reentry to inquire if an earlier date could be (re)considered. Please continue to keep me posted

Best,
Rabbi Mockin

TRULINCS 66142509 - CAPPS, MICHAEL R - Unit: FLF-T-A

------------------------------------------------------------------------------------------------

FROM: Mockin, Rabbi
TO: 66142509
SUBJECT: RE: Recent Medical Incident
DATE: 08/29/2025 10:36:03 AM

Dear Michael,

I am happy to share that reentry updated your halfway house date to 12/3

All the best,
Rabbi Mockin



## PM Sleep Lab

2020 N. Woodlawn #450 Wichita, KS  67208  Phone: (316) 687-3071  Fax (316) 687-3056

| Patient Name: | CAPPS, MICHAEL | Height: | 70.0 in. | BMI: | 52.4 |
| Recording Date: | 5/4/2021 | Weight: | 365.0 lbs. | DOB: | 1/17/1978 |
| Review Date: | 5/6/2021 | Neck Circ.: | 18 | Gender: | M |
| Acquisition #: | 100585 | Epworth Sleepiness Scale: | 19 | | |
| Referring Physician: | ZACHARY WAJVODA, PA-C | Recording Technician: | KIMBERLY LARREMORE, RPSGT | | |
| Interpreting Physician: | CAROLE GUILLAUME, MD | Scoring Technician: | K. LARREMORE, RPSGT; P. CUTTING CRT, RPSGT | | |

### NOCTURNAL POLYSOMNOGRAPHY

**INDICATION FOR STUDY:** Z00.00
**PROCEDURE:** Polysomnography was conducted on the night of 5/4/2021. The following were monitored: central and frontal occipital EEG, electrooculogram (EOG), submentalis EMG, nasal and oral airflow, thoracic and abdominal wall motion, anterior tibialis EMG, body position and electrocardiogram. Arterial oxygen saturation was monitored with a pulse oximeter. The tracing was scored using 30 second epochs. Hypopneas were scored per AASM Scoring Manual Version 2.4 (4% desat criteria - Rule 1B).

**STUDY TIMES AND STAGES:**

| | |
|---|---|
| RECORDING TIME: 470.0 minutes | N1: 79.3% of total sleep time |
| TOTAL SLEEP TIME: 377.0 minutes | N2: 16.7% of total sleep time |
| SLEEP LATENCY: 2.0 | N3: 0.0% of total sleep time |
| SLEEP EFFICIENCY: 89.0% | REM: 4.0% of total sleep time |
| AROUSAL INDEX: 122.5 | |

**SLEEP ARCHITECTURE:** Sleep latency was decreased. REM latency was increased. N1 sleep was increased. N2 sleep was decreased. N3 sleep was not present. 770 arousals were observed of which 728 were associated with respiratory events, 0 with limb movement and 42 were spontaneous. 2 RERA'S were observed. The average arousal index was 122.5/hr. Sleep efficiency 89.0 %.

**RESPIRATORY EVENTS:**  Apneas: 402. Partial apneas: 409. **AHI of 129.1.  AHI in REM 96.0.**

**OXYGENATION:** Average saturation levels throughout the study was 81%.  **The lowest saturation level was 52%.**

**LIMB MOVEMENTS:**  0 with an index of 0.  0 random limb movements were observed, 0 were associated with arousal.

**CARDIAC:**  Mean heart rate of 82.7.

**TECHNICIANS COMMENTS:   Frequent snores were mild to heroic.  Sleep was fragmented by apneas, hypopneas and some RERAs.  O2 at 1lpm was added at 23:08 due to low SpO2.  This was a PSG order through QTC.**

Impression:



1. **Obstructive & Central Sleep Apnea- G47.33 & G37.31**
2. **Sleep related hypoventilation in conditions classified elsewhere- G47.**36
3. **Hypersomnia- R09.02**
4. **Morbid Obesity (BMI greater than 39)- E66.01**

Recommendations:

1. **Immediate full night CPAP Titration PSG.**
2. **Avoid driving and operation of machinery if somnolent.  Sleep hygiene measures. Avoid use of alcohol, opioids or sedative/hypnotic agents prior to bedtime.  Physician supervised weight loss measures.**
3. **Follow-up with referring physician and/or Sleep Specialist to discuss these results and for ongoing care.**

RECEIVED
By: Paty C PM Sleep Lab
05/06/2021 9:37 am
Wichita

Electronically signed May 5, 2021 by Carole A. Guillaume, MD, FAASM who may be reached at (913) 777-0077

# Exhibit G



**DEPARTMENT OF VETERANS AFFAIRS**
**Veterans Benefits Administration**
**Regional Office**

**MICHAEL CAPPS**

**VA File Number**
**514 78 7272**

**Represented By:**
**VETERANS OF FOREIGN WARS OF THE US**
**Rating Decision**
**06/27/2018**

## INTRODUCTION

The records reflect that you are a veteran of the Gulf War Era. You served in the Air Force from February 3, 2000, to December 28, 2002. You filed a new claim for benefits that was received on April 23, 2018. Based on a review of the evidence listed below, we have made the following decision on your claim.

## DECISION

Service connection for posttraumatic stress disorder (also claimed as mental health condition) is granted with an evaluation of 70 percent effective April 23, 2018.

## EVIDENCE

- VA Form 21-526 EZ: Application for Disability Compensation and Related Compensation Benefits, April 23, 2018
- VA Form 21-4138, Statement in Support of Claim, received April 23, 2018 (multiple)
- VA Form 21-0781, Statement In Support Of Claim For Service Connection for Post-Traumatic Stress Disorder (PTSD), received April 23, 2018

MICHAEL CAPPS
514 78 7272
2 of 3

- VA letter concerning your claim, dated April 30, 2018
- VA letter concerning your claim, dated May 3, 2018
- Section (§) 5103 Notice Response, received May 15, 2018
- Service treatment and personnel records, received June 17, 2003, May 1, 2018, May 25, 2018; from the period of service dated February 2000 to December 2002
- Medical records, Beck's Depression Inventory, received April 23, 2018; dated April 2018
- VA treatment records from VAMC Kansas City dated March 31, 2008 to June 12, 2018 (to include C&P exam)

## REASONS FOR DECISION

### Service connection for posttraumatic stress disorder (also claimed as mental health condition).

Service connection for posttraumatic stress disorder (also claimed as mental health condition) has been established as directly related to military service.

We took your statement as evidence of the claimed stressful experience or stressor. The VA examiner related the stressor to fear of hostile military or terrorist activity, and the VA examiner linked your symptoms to the stressor.

An evaluation of 70 percent is assigned from April 23, 2018.

We have assigned a 70 percent evaluation for your posttraumatic stress disorder (also claimed as mental health condition) based on:
• Difficulty in adapting to stressful circumstances
• Difficulty in adapting to work
• Inability to establish and maintain effective relationships
• Depressed mood
• Disturbances of motivation and mood
• Difficulty in adapting to a worklike setting
• Anxiety
• Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal)
• Difficulty in establishing and maintaining effective work and social relationships
• Chronic sleep impairment

The overall evidentiary record shows that the severity of your disability most closely approximates the criteria for a 70 percent disability evaluation.

A higher evaluation of 100 percent is not warranted for posttraumatic stress disorder unless the evidence shows total occupational and social impairment, due to such symptoms as:
• gross impairment in thought processes or communication
• persistent delusions or hallucinations

MICHAEL CAPPS
514 78 7272
3 of 3

- grossly inappropriate behavior
- persistent danger of hurting self or others
- intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene)
- disorientation to time or place
- memory loss for names of close relatives, own occupation, or own name.

The effective date is April 23, 2018, which is the date we received your claim.


**REFERENCES:**

Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains the regulations of the Department of Veterans Affairs which govern entitlement to all veteran benefits. For additional information regarding applicable laws and regulations, please consult your local library, or visit us at our website, www.va.gov.

 **DEPARTMENT OF VETERANS AFFAIRS**

February 22, 2025

Michael Ray Capps                                                In Reply Refer to:
1611 S Utica Ave Ste 328                                         xxx-xx-7272
Tulsa, OK 74104                                                  27/eBenefits

Dear Mr. Capps:

This letter certifies that Michael Ray Capps is receiving service-connected disability compensation from the Department of Veterans Affairs.

The current benefit paid is as follows:

| | |
|---|---|
| **Gross Benefit Amount** | $3,967.36 |
| **Net Amount Paid** | $3,967.36 |
| **Effective Date** | December 1, 2024 |
| **Combined Evaluation** | 100 percent |

## How You Can Contact Us

- If you need general information about benefits and eligibility, please visit us at https://www.ebenefits.va.gov or http://www.va.gov.

- Call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the number is 1-800-829-4833.

- Ask a question on the Internet at https://www.va.gov/contact-us.

Sincerely Yours,

**Regional Office Director**



**DEPARTMENT OF VETERANS AFFAIRS**
**Veterans Benefits Administration**
**Regional Office**


**Michael Capps**

**VA File Number**
**514 78 7272**


**Represented By:**
**VETERANS OF FOREIGN WARS OF THE US**
**Rating Decision**
**02/08/2024**


## INTRODUCTION

The records reflect that you are a Veteran of the Gulf War Era. You served in the Air Force from February 3, 2000 to December 28, 2002. We received your supplemental claim on September 18, 2023. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.


## DECISION

Service connection for mixed sleep apnea is granted with an evaluation of 50 percent effective September 18, 2023.


## EVIDENCE

- Service Treatment Records, for the period February 3, 2000 to December 28, 2002
- Service Personnel Records, for the period February 3, 2000 to December 28, 2002
- VAMC (Veterans Affairs Medical Center) treatment records, VAMC Heartland, for the period March 31, 2008 to February 5, 2024
- VA Form 21-526EZ Application for Disability Compensation and Related Compensation



Michael Capps
514 78 7272
**2 of 4**

Benefits, received November 6, 2019
- Disability Benefit Questionnaire, Gina Uribe, ARPN, MN, FNP, dated October 29, 2019
- Private Treatment Records, Virtuox, for the period June 19, 2017 to June 20, 2017
- Medical Opinion, Ms. Gina Uribe, dated October 29, 2019
- VA Subsequent Development Letter, dated November 19, 2019
- VA Examination, Kansas City VAMC, dated January 27, 2020
- Rating Decision, dated January 29, 2020
- VA Notification Letter, dated January 30, 2020
- VA Form 20-0995, Decision Review Request - Supplemental Claims, received August 10, 2020
- Medical Opinion, Dr. Frederick Nolen, Ph.D, dated August 3, 2020
- Rating Decision, dated August 12, 2020
- VA Notification Letter, dated August 13, 2020
- VA Form 20-0995, Decision Review Request - Supplemental Claims, received August 27, 2020
- VA Form 21-4138, Statement in Support of Claim, received August 27, 2020
- Duplicate medical opinion already of record, received August 27, 2020
- VA Examination, VA contract facility in Diamond Bar, CA, completed using review of acceptable clinical evidence, dated September 9, 2020
- Rating Decision, dated October 19, 2020
- VA Notification Letter, dated October 20, 2020
- VA Form 20-0995, Decision Review Request - Supplemental Claims, invalid signature, received December 11, 2020
- Medical Opinion, Michael Bucci, PA-C, MPLC, dated July 20, 2020
- VA Notification Letter, signature needed dated December 21, 2020
- VA Form 20-0995, Decision Review Request - Supplemental Claims, received February 1, 2021
- VA Form 21-4138, Statement in Support of Claim, received February 1, 2021
- Medical opinion, Ms. Nancy Reeves, PA-C, dated January 31, 2021
- Sleep Apnea VA Disability Medical Evidence Form, Nancy Reeves, dated January 31, 2021
- Sleep Study, PM Sleep Lab, dated May 6, 2021
- VA Examination, VA contract facility in Diamond Bar, CA completed using review of acceptable clinical evidence, dated May 12, 2021
- Rating Decision, dated May 13, 2021
- VA Notification Letter, dated May 17, 2021
- VA Form 20-0996, Decision Review Request - Higher Level Review, received May 29, 2021
- HLR Informal Conference Worksheet, dated August 2, 2021
- VA Rating Decision dated August 2, 2021
- Statement from John Hamilton, MD, dated June 17, 2021, received September 2, 2021
- VA contracted medical review and medical opinions, provided by QTC on August 23, 2021
- VA Form 20-0995, Decision Review Request - Supplemental Claims, received September 18, 2023
- VA Form 21-10210, Lay/Witness Statement, received September 18, 2023
- Disability Benefit Questionnaire, Sleep Apnea, QTC, conducted October 12, 2023
- Disability Benefit Questionnaire, Medical Opinion, QTC, conducted October 12, 2023
- Disability Benefit Questionnaire, Sleep Apnea, QTC, conducted January 23, 2024
- Disability Benefit Questionnaire, Medical Opinion, QTC, conducted January 23, 2024



Michael Capps
514 78 7272
**3 of 4**

## REASONS FOR DECISION

### Service connection for mixed sleep apnea as secondary to the service-connected disability of posttraumatic stress disorder (PTSD) with insomnia.

Service connection for mixed sleep apnea has been established as related to the service-connected disability of posttraumatic stress disorder (PTSD) with insomnia. (38 CFR 3.303, 38 CFR 3.310)

The effective date of this grant is September 18, 2023. Service connection has been established from the day VA received your claim. When a claim of service connection is received more than one year after discharge from active duty, the effective date is the date VA received the claim. (38 CFR 3.400)

A claimant may continuously pursue a claim by timely and properly filing a supplemental claim. "Timely" means the supplemental claim is submitted within one year of the VA decision. "Properly" means VA form 20-0995, Decision Review Request: Supplemental Claim, is completed and submitted along with new and relevant evidence. (38 CFR 3.2500, 38 CFR 3.2501)

If the claim is not continuously pursued and benefits are granted, the effective date will be the date entitlement arose, but will not be earlier than the date of receipt of the supplemental claim currently under review. (except as otherwise provided by other regulations including 38 CFR 3.400)

An evaluation of 50 percent is assigned from September 18, 2023.

We have assigned a 50 percent evaluation for your sleep apnea based on:
• Requires use of breathing assistance device such as continuous airway pressure (CPAP) machine

A higher evaluation of 100 percent is not warranted for sleep apnea syndromes unless the evidence shows:
• Carbon dioxide retention; or,
• Chronic respiratory failure; or,
• Cor pulmonale; or,
• Tracheostomy required. (38 CFR 4.96, 38 CFR 4.97)

### REFERENCES:

Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains the regulations of the Department of Veterans Affairs which govern entitlement to all Veteran



Michael Capps
514 78 7272
4 of 4

benefits. For additional information regarding applicable laws and regulations, please consult your local library, or visit us at our website, www.va.gov.



Exhibit H

Reference Doc. 285, Exhibit 8

Exhibit I

Reference Doc. 285, Exhibit 10

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name:  CAPPS, MICHAEL R | | Reg #   66142-509 |
| Date of Birth:   01/17/1978 | Sex:    M    Race:   WHITE | Facility   FLF |
| Encounter Date: 07/23/2025 14:13 | Provider:   Maltezo, Seana FNP-BC | Unit      T05 |

**Reviewed Health Status:**  Yes

Chronic Care - Advanced Practice Provider Follow Up encounter performed at Health Services
**SUBJECTIVE:**

COMPLAINT  **1**        Provider:  Maltezo, Seana FNP-BC

Chief Complaint:   Chronic Care Clinic

Subjective:       IM is seen for chronic care. Discussed his weight, BMI, and commissary. Prior to 6/5/2025, he had a lot of processed foods w carbs and sugars. IM has not purchased any commissary since 6/5/2025. IM endorses he is also walking up to 60 miles a week on the treadmill now.

Cardiac: He states he is taking his Amlodipine and Lisinopril as prescribed. Reviewed chart and his BPs continue to be elevated. Discussed to increase his Amlodipine to 10mg daily along with keeping his Lisinopril. IM states he is comfortable with this.

MH: IM has been on Effexor. States the medication was helping and he would like to continue taking it. Denies SI/HI. Will continue.

OSA: IM states with his new hose is working better for him. He endorses he is averaging 5-6hrs of sleep. He endorses his sleep is not as well as it was originally.

Endo: Discussed starting Metformin 500mg daily and f/u in 30 days. IM comfortable with this. Reviewed his testosterone levels which total is low at 202 and testosterone free is 29.4. IM has hit the washout period. He continues with low energy, fatigue, depression. Discussed re-starting his testosterone at 75mg IM weekly for now. Discussed he was on 240mg IM when he came but now his BP is elevated, and a side effect of the medication is BP elevation. Discussed the importance of not elevating it more due to risk of strike or MI. IM states understanding.

GI: IM endorses his acid reflux is starting to return and would like Omeprazole again. Denies coughing up blood or blood in stool.

Discussed with IM metabolic syndrome. Discussed BP control, diet control, new medications, continue to exercise. IM states understanding and is comfortable with plan.

Plan:
-testosterone 75mg IM weekly
-increase Amlodipine to 10mg daily
-start metformin 500mg daily
-f/u 30 days
-chart review of NFRs
-continue to exercise and decrease commissary
-continue venlafaxine

Pain:        Not Applicable

---

COMPLAINT  **2**        Provider:  Maltezo, Seana FNP-BC

Chief Complaint:   MENTAL HEALTH

Subjective:   IM was seen

From psychology: patient has insomnia (but also narcolepsy...?)

"I am reaching out in the hopes of adding a psychotropic medication to Mr. CAPPS's current

| Inmate Name: | CAPPS, MICHAEL R | | | Reg #: | 66142-509 |
|---|---|---|---|---|---|
| Date of Birth: | 01/17/1978 | | | Facility: | FLF |
| Encounter Date: | 07/23/2025 14:13 | Sex: M Race: WHITE | | Unit: | T05 |
| | | Provider: Maltezo, Seana FNP-BC | | | |

treatment. He is a CARE2-MH with a diagnosis of Posttraumatic Stress Disorder. During a recent clinical contact, CAPPS reported low mood and poor sleep. Specifically he relayed nightmares, trouble falling asleep, feeling fatigued during the day, and getting between 5.5 and 6 hours of sleep per night (he reports this is a departure from his typical 8 to 9 hours). CAPPS has expressed interest in being seen for medications that may help him manage his low mood and trouble sleeping. "

IM with history of narcolepsy. He was on Armodafinil when he arrived and was changed do Modafinil. The Modafinil helped with his sleeping along with his c-pap. He is currently on Venlafaxine for his depression. Discussed as his sleep study has shown extreme sleep apnea, his continued decreased sleep at night, fatigue and depression during the day to try Modafinil again. IM states he is comfortable with this.

Plan:
-start on 100mg Modafinil daily

**Pain:** Not Applicable

---

**Allergies:**

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 07/23/2025 14:13 by Maltezo, Seana FNP-BC

**Seen for clinic(s):** General

**OBJECTIVE:**

**Pulse:**

| Date | Time | | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|---|
| 07/23/2025 | 14:21 FLX | | 97 | Via Machine | | Maltezo, Seana FNP-BC |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 07/23/2025 | 14:21 FLX | 16 | Maltezo, Seana FNP-BC |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 07/23/2025 | 14:21 FLX | 159/108 | Left Arm | Sitting | | Maltezo, Seana FNP-BC |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 07/23/2025 | 14:21 FLX | 94 | Room Air | Maltezo, Seana FNP-BC |

**Height:**

| Date | Time | Inches | Cm | Provider |
|---|---|---|---|---|
| 07/23/2025 | 14:21 FLX | 70.0 | 177.8 | Maltezo, Seana FNP-BC |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 07/23/2025 | 14:21 FLX | 347.1 | 157.4 | | Maltezo, Seana FNP-BC |

**Exam Comments**

| | | |
|---|---|---|
| Inmate Name: CAPPS, MICHAEL R | | |
| Date of Birth: 01/17/1978 | | Reg #: 66142-509 |
| Encounter Date: 07/23/2025 14:13 | Sex: M   Race: WHITE | Facility: FLF |
| | Provider: Maltezo, Seana FNP-BC | Unit: T05 |

GEN: Obese, clean, appropriate behavior and interaction
HEAD: No signs of trauma.
EYES: EOMI and PERL B/L, no discoloration/erythema, no exophthalmos or abnormal discharge.
MOUTH: Mucous membranes pink/moist
PULM: Respiratory effort is normal.
CARDIAC: RRR, PMS intact
Peripheral exam: no edema noted in the extremities
GAIT: normal without limp or signs of pain

### ROS Comments

GEN: denies fevers, night sweats, chills and wt loss
CV: Denies CP, palpitations, syncope
PUL: Denies SOA, trouble breathing, excess sputum, wheezing
GI: denies ab pain, changes in bowel
GU: denies problems with urination
Skin: denies rash, concerning skin changes
MSK: denies trauma, denies popping, denies changes to chronic pain
PSYCH: denies SI, thoughts of self-harm, auditory and visual hallucinations

## ASSESSMENT:

Endocrine disorder, unspecified, E349 - Current

Essential (primary) hypertension, I10 - Current

Gastro-esophageal reflux disease with esophagitis, without bleeding, K2100 - Current

Hypersomnia, G4710 - Current

Insomnia, G4700 - Current

Prediabetes, R7303 - Current

Sleep apnea, G4730 - Current

Testicular dysfunction, E299 - Current

Posttraumatic Stress Disorder, F43.10 - Current

## PLAN:

### New Medication Orders:

| Rx# | Medication | | Order Date |
|---|---|---|---|
| | amLODIPine Tablet | | 07/23/2025 14:13 |
| | **Prescriber Order:** | 10mg Orally - daily x 365 day(s) | |
| | Indication: Essential (primary) hypertension | | |
| | Omeprazole Capsule/Tablet | | 07/23/2025 14:13 |
| | **Prescriber Order:** | 20mg Orally - daily x 365 day(s) | |
| | Indication: Gastro-esophageal reflux disease with esophagitis, without bleeding | | |
| | Testosterone Cypionate Inj | | 07/23/2025 14:13 |
| | **Prescriber Order:** | 75mg Intramuscularly  Weekly x 90 day(s) Pill Line Only | |
| | Indication: Testicular dysfunction | | |
| | Non-Formulary was created for this drug | | |
| | Modafinil Tablet | | 07/23/2025 14:13 |
| | **Prescriber Order:** | 200mg Orally - daily x 30 day(s) Pill Line Only | |
| | Indication: Sleep apnea. Hypersomnia | | |
| | Non-Formulary was created for this drug | | |

Inmate Name:  CAPPS, MICHAEL R
Date of Birth:  01/17/1978
Encounter Date:  07/23/2025 14:13

Sex:  M   Race:  WHITE
Provider:  Maltezo, Seana FNP-BC

Reg #:  66142-509
Facility:  FLF
Unit:  T05

## Renew Medication Orders:

| Rx# | Medication | | Order Date |
|---|---|---|---|
| 397303-FLX | Venlafaxine ER/XR 24 Hour Cap  75 MG | | 07/23/2025 14:13 |

**Prescriber Order:**    Take three capsules (225 MG) by mouth each day **Start after taking 7 days of 150 mg dose** *consent form on file * x 180 day(s)

Indication:   Anxiety disorder, Posttraumatic Stress Disorder

## Discontinued Medication Orders:

| Rx# | Medication | | Order Date |
|---|---|---|---|
| 402492-FLX | amLODIPine  5 MG TAB | | 07/23/2025 14:13 |

**Prescriber Order:**    Take one tablet (5 MG) by mouth each day

Discontinue Type:    When Pharmacy Processes

Discontinue Reason:  new order written

Indication:

### Schedule

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Chart_Review | 07/29/2025 00:00 | APP 01 |

review if testosterone and modafinil was approved or denied and notify IM.

If approved needs to be seen every 28 days to renew Modafinil

## Disposition:

Follow-up at Sick Call as Needed

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 07/23/2025 | Counseling | Access to Care | Maltezo, Seana | Verbalizes Understanding |
| 07/23/2025 | Counseling | Plan of Care | Maltezo, Seana | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:**  Yes

**Telephone/Verbal Order:**   No

Completed by Maltezo, Seana FNP-BC on 07/24/2025 06:40

Requested to be cosigned by  Resto, W. MD.

Cosign documentation will be displayed on the following page.

# Bureau of Prisons
# Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | CAPPS, MICHAEL R | | | Reg #: | 66142-509 |
| Date of Birth: | 01/17/1978 | | | Facility: | FLF |
| Note Date: | 07/02/2025 15:27 | Sex. | M    Race: WHITE | Unit: | T05 |
| | | Provider: | Maltezo, Seana FNP-BC | | |

**Reviewed Health Status:**  Yes

Admin Note - General Administrative Note encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE  **1**        Provider:  Maltezo, Seana FNP-BC

Did 1 for 1 exchange for c-pap hose with ResMed specific hose. IM stated satisfaction with new hose.


**Copay Required:** No          **Cosign Required:**  No
**Telephone/Verbal Order:**  No

Completed by Maltezo, Seana FNP-BC on 07/02/2025 15:30

# Exhibit L

**EXHIBIT 37**

**VERIFIED DECLARATION OF SHANNON SIMINOLE**
**IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE**

I, **Shannon Seminole**, declare under penalty of perjury under the laws of the United States that the following is true and correct to the best of my knowledge, information, and belief:

**1.** I am a federal inmate currently housed at the Federal Prison Camp (FPC) Florence, located in Florence, Colorado. My Bureau of Prisons (BOP) Register Number is 88673-510. I am 52 years of age and have been at this facility for three years. I work as a CDL driver for the camp and live in the bunk next to Michael Capps (BOP #66142-509).

**2.** I'm writing this to tell the Court what I saw happen to my neighbor Mike on August 20, 2025. Mike's a good guy who keeps to himself and doesn't cause any trouble. We hang out sometimes and take walks together to stay out of the drama that goes on around here.

**3.** I've seen Mike checking his blood pressure a lot lately because he's been having problems with it. He keeps track of the numbers in a notebook and they've been really high. The day before what happened, on **August 19, 2025**, his blood pressure was 217/108, which even I know is way too high.

**4.** On **August 20, 2025, about 1:30 in the afternoon**, Mike, his cellmate Butch Lawrence (BOP #20699-511), and I were walking around the yard like we usually do. It's good exercise and keeps us away from any trouble that might be happening elsewhere in the camp.

**5.** During our walk, Mike told Butch and me that he was feeling bad again - dizzy and having chest pain. I could see something was wrong with him because he was sweating a lot and breathing hard, and he just looked sick. He said he thought his blood pressure was going up again.

**6.** All of a sudden, Mike just collapsed right there on the walking track. One second he was walking with us, the next second he was on the ground, completely knocked out. I dropped down next to him right away to make sure he was still breathing while Butch was calling his name.

**7.** Mike was out for about a minute, which seemed like forever. When he woke up, he looked confused and was shaking. He said his head was splitting and his chest still hurt. I helped Butch get him back on his feet.

8. We knew Mike needed to see medical staff right away, so we walked him over to the medical office. But when we got there, the door was locked and there was a sign saying you can only see medical staff if you have an appointment and you have to request it through the computer system.

9. I remembered there's a blood pressure machine in the recreation office, so I suggested we go there to check Mike's numbers. We helped him walk over there and took his blood pressure. It read **220/110**, which I knew was dangerous because I've seen those machines before.

10. Mike was in bad shape at this point. He was feeling sick to his stomach, said his vision was blurry, and his heart was beating really fast. I could tell he was scared, and honestly, so was I. People don't just pass out for no reason.

11. Butch went looking all over the yard for any guards who could help us or call for medical help, but he couldn't find anybody. There wasn't a single corrections officer anywhere on the yard when we needed one.

12. After about 20 minutes, Mike said he was feeling a little better - not as dizzy - but I could still tell he wasn't right. Since there was no medical help available and no guards around, Butch and I helped him walk back to his bunk so he could rest.

13. I kept checking on Mike for the rest of the day because I was worried he might pass out again. I told him to stay still and breathe slow and deep like my grandmother taught me when I was a kid. I was really concerned that something worse might happen to him.

14. I've been around Mike for a while now, and I've watched his health get worse since he's been here. His breathing machine got broken by a guard a few months back and they never fixed it right. His blood pressure keeps getting higher and the medical staff here don't seem to care much about it.

15. What bothers me is that when someone really needs help around here, there's nobody to help them. Mike's supposed to go to a halfway house where he can get proper medical care, but they keep pushing back the date for reasons that don't make sense to me.

16. I try to stay out of trouble and mind my own business, but when I see someone who might be dying right in front of me, I can't just walk away. Mike was in real trouble that day, and if it happens again without proper medical care, I'm afraid of what might happen to him.

**17.** I respectfully ask the Court to help Mike get the medical care he needs. He's a decent person who doesn't deserve to suffer like this. What I saw on August 20, 2025 was scary, and I hope the Court can do something before it's too late.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

**Shannon Seminole**

Register Number: 88673-510

Federal Prison Camp Florence
5725 8th Street
Florence, CO 81226

Executed this _23_ day of August, 2025, at FPC Florence, Florence, Colorado.

# Exhibit M



U.S. Department of Justice

Federal Bureau of Prisons

---

*Office of the Director*

*Washington, DC 20534*

June 17, 2025

MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS

FROM: *William K. Marshall*
William K. Marshall III, Director

SUBJECT: Use of Home Confinement as a Release Option

## PURPOSE

This memorandum replaces the May 28, 2025, memorandum on the same subject. Specifically, this guidance sets expectations and provides direction for referring individuals to home confinement under the First Step Act (FSA) and the Second Chance Act (SCA). The goal is to ensure timely prerelease placement aligned with earned time credits and statutory authority, while maximizing bedspace availability and placing individuals in the most appropriate prerelease status without jeopardizing public safety.

To be clear, FSA and SCA authorities are **cumulative** and **shall** be applied in sequence to maximize prerelease time in community custody, including home confinement (HC). Residential Reentry Center (RRC) bed availability/capacity shall not be a barrier to HC when an individual is statutorily eligible and appropriate for such placement.

If an FSA or SCA eligible individual does not require the services of an RRC and meets eligibility requirements for HC, that individual **shall** be referred directly from an institution to HC. RRC placement should be prioritized for those in our custody with the most need for services available at an RRC.

## GUIDANCE

Effective immediately, Chief Executive Officers must ensure Unit Teams and Residential Reentry Management (RRM) Offices are adhering to the following:

1. *Conditional Placement Dates* are projected eligibility dates used to determine when an individual shall be referred to prerelease custody, including HC. These dates are not based solely on credits already earned. Rather, they reflect anticipating eligibility under the SCA and the projected accumulation of FSA Earned Time Credits (FTCs), assuming

the individual continues to participate in eligible programming and remains free from disqualifying infractions. Conditional Placement Dates are therefore **forward-looking tools for release planning.**

2. *Referrals shall proceed in accordance with Conditional Placement Dates.* Referrals shall proceed with the understanding that so long as individuals meet FSA and SCA eligibility requirements, **they shall receive the forecasted credits and ordinarily should not experience delays in prerelease placement based on administrative timing, presumed RRC capacity limits or placement constraints, or pending credit accrual.**

  • In accordance with the FSA, eligible individuals may apply earned FTCs toward prerelease custody, including placement in an RRC, in a Work Release Center (WRC), or on HC. For those FSA eligible individuals who earn less than 365 days of FTCs and who have a term of supervised release, FTCs are applied to projected release dates. For those FSA eligible individuals who do not have a term of supervised release, FTCs will be applied to prerelease custody.

  • In accordance with the SCA, eligible individuals may be placed in prerelease custody—including an RRC or HC —for a period of up to 12 months (RRC), or 6 months or 10% of the sentence (HC), whichever is less. The SCA Conditional Placement Date reflects the window under 18 U.S.C. § 3624(c)—up to 12 months (RRC) or 6 month or 10% of the sentence (HC)—for which the individual is expected to qualify, subject to a five-factor review. In addition to FTCs for those individuals who have earned less than 365 days of FTCs, staff must also consider adding up to an additional 12 months of prerelease time under the SCA, based on the five-factor review.

3. *Eligibility and Referral Criteria for Prerelease to Home Confinement.* This is met when an individual: (1) has earned enough FTCs and/or qualifies under the SCA window; (2) has a verified and stable home environment that supports monitoring, appropriate supervision, and safe community reentry and integration; and (3) poses no public safety or placement disqualification.

  • Employment history shall not be required. For individuals at or near working age, potential for employment may be considered positively, but is not mandatory. Placement decisions should prioritize public safety and the overall stability of the release plan.

4. *Determining Proper Conditional Placement Dates.* Use Conditional Placement Dates from each FTC worksheet for release planning. These include both FSA and SCA eligibility dates and must guide decisions about timing and type of prerelease placement. While these conditional dates are projected dates expected to earn under the FSA, **it is imperative Unit Teams and RRM Offices use these dates for release planning purposes** to ensure individuals receive prerelease placement dates consistent with the number of FTCs they are expected to earn and authorities under the SCA.

- For individuals eligible under 18 U.S.C. § 3624(g) (FSA), referrals to home confinement shall be based on earned FTCs. There is no limitation on how many FTCs may be applied toward home confinement.
- For individuals eligible under 18 U.S.C. § 3624(c) (SCA), referrals must include the required five-factor review and must comply with statutory limits (12 months (RRC) or 6 month or 10% of sentence (HC), whichever is less).
- FSA and SCA authorities are **cumulative** and shall be **applied in sequence** to maximize prerelease time in community custody, including home confinement. **The use of SCA time does not offset or replace accrued FTCs under the FSA.**

5. *Clarifying Statutory Authority for Home Confinement.* For individuals eligible under the FSA (18 U.S.C. § 3624(g)), and who are projected to earn at least 365 days (12 months) of FTCs for prerelease custody, referrals shall be based on FTCs and the corresponding FSA Conditional Placement Dates. **There is no restriction concerning how many FTCs may be applied toward home confinement.** For individuals only eligible under the SCA, referrals must comply with 18 U.S.C. § 3624(c), including a five-factor review and documentation of eligibility based on sentence length (12 months (RRC) or 6 month or 10% (HC), whichever is less).

6. *Referring Based on Individual Needs.* Referrals to an **RRM** Office must be based on appropriateness of home confinement.

- Referrals to home confinement shall be made where the individual has access to **a stable and verified home environment** that supports appropriate supervision, safe community reentry and integration, and monitoring.
- **Employment history shall not be a barrier to eligibility.** For individuals at or near working age, the potential for securing community-based employment may be considered as a positive factor, but current or prior employment **shall not be required** for referral.
- Placement decisions should prioritize public safety and stability of the release plan, not occupational history.

7. *Coordinating with RRM Offices.* Unit Teams must ensure referrals include complete documentation, including verified release plans and transportation details. RRM Offices retain the responsibility to evaluate and finalize placement decisions. When reviewing prerelease custody eligibility and determining the amount of time to request from the respective RRM Office, Unit Teams should rely on the following dates which are established on each FTC worksheet:

- FSA Conditional Placement Date (for FSA-eligible individuals) which also includes recommended SCA days consistent with statutory limitations
- SCA Conditional Placement Date (for SCA-eligible individuals)

## CONCLUSION

This memorandum serves as BOP's commitment to refer eligible individuals to home confinement and to prioritize placement in RRCs for those in most need of these important reentry services. It ensures all eligible individuals are placed in the most appropriate prerelease setting based on their individual needs, eligibility, and statutory authority which will assist with contractor bedspace availability. Technical guidance for Unit Team and RRM staff will be forthcoming from respective leadership.

Exhibit N

Reference Doc. 285, Exhibit 30

Exhibit O

Reference URL

https://www.bop.gov/policy/progstat/5242_001.pdf

# Exhibit Q

VERIFIED DECLARATION OF MICHAEL CAPPS

I, Michael Capps, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge, information, and belief:

1. I am the Defendant in the above-captioned matter and am currently incarcerated at the Federal Prison Camp in Florence, Colorado.

2. On March 7, 2025, I met with FPC Florence psychologist Dr. T. Short regarding my requests for mental health treatment for my service-connected combat-related PTSD.

3. During this meeting, Dr. Short explicitly confirmed that the Bureau of Prisons prohibits psychology staff from delivering trauma-based therapy due to what she described as the "intensity of the therapy and uncontrollable transfer of inmates to new facilities at any time."

4. I explained to Dr. Short that trauma-focused therapies, including Prolonged Exposure (PE) and Cognitive Processing Therapy (CPT), had been effective components of my VA treatment protocol prior to incarceration.

5. Dr. Short acknowledged that these trauma-focused therapies are considered first-line treatments for PTSD according to VA/DoD Clinical Practice Guidelines but stated that they could not be provided within the BOP system.

6. Dr. Short confirmed that this was not a decision specific to my case but rather a system-wide policy prohibition on delivering trauma-based therapy to inmates.

7. On February 19, 2025, I attended morning sick call and met with the FPC Nurse Practitioner (name unknown) to inquire about my prescriptions not being administered.

8. I explained to the Nurse Practitioner that I had entered BOP custody with prescriptions for Venlafaxine, Modafinil, Testosterone, and Semaglutide (Ozempic), none of which had been continued or properly tapered.

9. The Nurse Practitioner responded that I had "already been seen by the provider who noted it was not needed."

10. I informed her that I had never seen a provider and that she was the only person I had ever seen in medical since my arrival at FPC Florence.

11. Upon hearing this, the Nurse Practitioner appeared frustrated and stated that "it was her job to clean up this mess," indicating that this situation had occurred before with other inmates.

12. The Nurse Practitioner then showed me encounter notes in my electronic medical record, though she would not allow me to keep a copy.

13. The encounter notes stated that on January 8, 2025, a provider had examined a "healthy 47-year-old male" and determined that the medications were not necessary.

14. I immediately noticed a discrepancy in these records, as on January 8, 2025, I was only 46 years old. My 47th birthday was on January 17, 2025, nine days after the purported examination.

15. This age discrepancy strongly suggests that the medical encounter was falsified and backdated at some point after January 17, 2025, when I had turned 47.

16. I pointed out this discrepancy to the Nurse Practitioner, who appeared uncomfortable and quickly ended our conversation.

17. To date, I have still not been provided with any of my prescribed medications or been offered appropriate alternatives or tapering protocols.

18. The abrupt discontinuation of these medications has caused significant withdrawal symptoms, including increased anxiety, tremors, dizziness, nausea, and sleep disruption, which have exacerbated my PTSD symptoms and sleep apnea condition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March __, 2025.


_____
Michael Capps
Register Number: 66142-509
FPC Florence
PO Box 6000
Florence, CO 81226

# Exhibit R

**EXHIBIT 38**

**VERIFIED DECLARATION OF MICHAEL R. CAPPS**
**REGARDING MEDICAL EMERGENCY OF AUGUST 20, 2025**

I, **Michael R. Capps**, declare under penalty of perjury under the laws of the United States that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a federal inmate currently incarcerated at the Federal Prison Camp (FPC) Florence, located in Florence, Colorado. My Bureau of Prisons (BOP) Register Number is 66142-509. I am 47 years of age and a United States Air Force veteran with service-connected disabilities.

2. I am writing this declaration to provide my personal account of the medical emergency I experienced on August 20, 2025. As a veteran, I have always tried to handle adversity with dignity and without complaint. However, the events of that day have made me realize that my medical condition has reached a critical point that requires immediate intervention.

3. I served my country with pride in the United States Air Force, and I have always accepted responsibility for my actions. I am not seeking to escape accountability for the offense that brought me here. I am simply asking for the medical care necessary to ensure I survive to complete my sentence and return to my family and community.

4. For several weeks leading up to August 20, 2025, I had been systematically monitoring my blood pressure using equipment available at the facility. I have maintained detailed records in a notebook documenting readings that have consistently shown dangerously elevated levels above 200/100 mmHg.

5. On **August 19, 2025**, the day before this incident, my recorded blood pressure reading was 217/108 mmHg. I was experiencing symptoms including severe headaches, chest tightness, and shortness of breath, but I continued with my daily routine hoping the symptoms would subside.

6. On **August 20, 2025, at approximately 1:30 PM**, I was taking my usual walk around the yard with my cellmate Butch Lawrence (BOP #20699-511) and my neighbor Shannon Siminole (BOP #88673-510). This is part of my daily routine to maintain physical fitness and manage stress.

7. During our walk, I began experiencing severe symptoms that I recognized as signs of a hypertensive crisis: intense dizziness, blurred vision, chest pain, irregular heartbeat, and shortness of breath. I informed Butch and Shannon that I believed my blood pressure was spiking dangerously.

8. Within moments of expressing these concerns, my vision began to tunnel and everything went black. I lost consciousness completely while walking on the track. I have no memory of falling or hitting the ground.

9. When I regained consciousness approximately one minute later, I found myself on the ground with Butch and Shannon kneeling beside me. I was disoriented and experiencing intense head pain, throbbing chest pain, and continued difficulty breathing.

10. With their assistance, I was helped to my feet, though I remained unsteady and weak. We immediately proceeded to the medical office seeking emergency medical attention, recognizing that losing consciousness was a serious medical event requiring professional intervention.

11. Upon arrival at the medical office, we discovered it was locked and secured. Posted signage indicated that medical staff only see inmates by appointment through the computer system. There was no provision for emergency medical situations or any way to contact medical personnel.

12. Shannon suggested using the blood pressure monitoring equipment located in the recreation office. The reading obtained was **220/110 mmHg**, confirming my fears that I was experiencing a severe hypertensive emergency.

13. At this point, I was experiencing intense head pressure, nausea, continued chest tightness, and was genuinely frightened that I might be having a stroke or heart attack. The loss of consciousness had made it clear that my condition was life-threatening.

14. Butch searched extensively for any corrections officer who could provide assistance or summon emergency medical help. Despite his thorough search of the entire yard area, no corrections personnel were located when we desperately needed help.

15. After approximately 20 minutes with no medical assistance available, my dizziness began to subside slightly and the chest pain became somewhat less severe. With no other options, Butch and Shannon assisted me in returning to my housing unit to rest.

**16.** I spent the remainder of the day focusing on controlled breathing techniques and remaining as still as possible, but I was deeply concerned about my condition. The fact that I had lost consciousness indicated I was in serious medical danger, and without proper intervention, I feared it could happen again with potentially fatal consequences.

**17.** This incident represents the culmination of months of deteriorating medical care at this facility. Since my CPAP equipment was damaged by a corrections officer in March 2025, my sleep apnea has remained largely untreated, directly contributing to the worsening of my hypertension.

**18.** As a 47-year-old veteran facing the reality of my own mortality, I am genuinely frightened by what happened on August 20, 2025. I have served my country and have always faced challenges head-on, but I cannot fight a medical condition that requires specialized care this facility cannot provide.

**19.** I am not asking the Court to excuse me from serving my sentence or to avoid responsibility for my actions. I am asking for the opportunity to receive the medical care necessary to survive and complete my obligations to society. I want to return to my family and community as a productive citizen, but that requires that I survive this medical crisis.

**20.** The combination of my service-connected medical conditions, the facility's inability to provide adequate specialized care, and the demonstrated life-threatening nature of my current situation creates an urgent need for placement in a community setting where proper medical monitoring and treatment can be provided.

**21.** I respectfully submit this declaration to the Court, asking not for leniency, but for the medical care that will allow me to complete my sentence and honor my commitment to making amends for my actions while preserving my life and health for my family and community.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

**Michael R. Capps**

Register Number: 66142-509

Federal Prison Camp Florence

5725 8th Street

Florence, CO 81226

Executed this __24__ day of August, 2025, at FPC Florence, Florence, Colorado.