**FILED**
**U.S. District Court**
**District of Kansas**

02/24/2026

**Clerk, U.S. District Court**
**By:_ JAL _Deputy Clerk**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**              **Case No. 6:21-cr-10073-EFM-1**

Plaintiff,                                 **Honorable Eric F. Melgren,**

                                           **Presiding**

v.

**MICHAEL R. CAPPS,**

Defendant Pro Se.

**DEFENDANT'S MOTION TO VACATE, SET ASIDE,**

**OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

**WITH MEMORANDUM OF LAW IN SUPPORT**

## I. INTRODUCTION

Michael R. Capps, proceeding pro se, respectfully moves this Court pursuant to 28 U.S.C. §
2255 to vacate, set aside, or correct his conviction and sentence. His conviction resulted from a
trial infected by multiple constitutional violations, all of which were left unaddressed through the
ineffective assistance of both trial counsel Kurt P. Kerns and appellate counsel Jacob Rasch-
Chabot. No court has ever reviewed the full scope of the constitutional errors presented here; this
motion is the first and only opportunity for the complete record to be placed before a court with
authority to remedy the accumulated prejudice Mr. Capps has suffered.

The errors fall into four distinct but interlocking categories. First, and most compellingly, trial
counsel failed to object to two extended cross-examination exchanges in which the prosecutor
narrated the contents of unauthenticated documents through embedded question premises —
including a letter from Kerns himself to the government — while Mr. Capps repeatedly denied

1

familiarity with the documents. The trial judge sua sponte identified this technique as improper without any prompting from defense counsel. The jury then made its own documentary record of the taint: two written questions submitted in open court, including the pivotal "Why would you apply for a grant for a company you were closing?" — a question that tracks with precision the inadmissible content from the second exchange and that proves the jury adopted that content as a factual premise in its deliberations on the counts of conviction. Second, trial counsel failed to preserve fundamental jury-integrity objections — specifically, the violation of Federal Rule of Criminal Procedure 24(c)'s mandatory protections governing alternate juror substitution and Rule 30's reinstruction requirement — arising from the court's own characterization of its scheduling as "insane" and from an alternate juror who had forty unsupervised hours of exposure to a high-profile media environment before rejoining the deliberating jury. Third, appellate counsel compounded both trial-level failures by omitting from the direct appeal the stronger structural error claim and the prosecutorial misconduct claim alike, despite receiving documented written notice of both more than six months before the Opening Brief was filed. Fourth, and independently, both trial and appellate counsel failed to challenge a sentencing process that was constitutionally compromised from the outset: the day before sentencing, the presiding judge directed substantive changes to the Presentence Report to inform the Bureau of Prisons how Mr. Capps should be classified — demonstrating that a sentence of imprisonment had been predetermined before Mr. Capps ever stood to address the Court in allocution.

This motion presents six claims across four constitutional categories. The accumulation of claims is not a sign of weakness; it reflects the interdependent nature of the constitutional failures documented in the record. Each claim identifies a discrete and independently cognizable failure, but the constitutional significance of the combined effect is precisely what the cumulative error

doctrine exists to capture. Claim Six frames that cumulative showing explicitly. The Court is invited to assess each claim on its own merits and then to assess whether the combined effect, across three independent categories of error, deprived Mr. Capps of a fundamentally fair trial and sentencing proceeding.

Because both prongs of *Strickland v. Washington*, 466 U.S. 668 (1984), are satisfied for each of these claims, and because the cumulative impact of these errors — spanning defense counsel failures, prosecutorial misconduct, and judicial error — deprived Mr. Capps of a fundamentally fair trial and sentencing proceeding, this Court should vacate his conviction and order a new trial, or in the alternative, vacate his sentence and order resentencing before a different judge, or at minimum, grant an evidentiary hearing pursuant to 28 U.S.C. § 2255(b).

## II. JURISDICTION AND TIMELINESS

### A. Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 2255. Mr. Capps was convicted and sentenced in this district. He self-surrendered on December 31, 2024 to FPC Florence, Colorado; was transferred to community custody at RRC Turley, Tulsa, Oklahoma on September 24, 2025; was transferred to home confinement on February 10, 2026; and is scheduled for release to supervised release on May 2, 2026, to be followed by a twenty-four month term of supervised release. Home confinement and supervised release each constitute "custody" for purposes of § 2255. *Jones v. Cunningham*, 371 U.S. 236, 240–43 (1963); *United States v. Cervini*, 379 F.3d 987, 989 n.1 (10th Cir. 2004) (supervised release constitutes "custody" under § 2255); *Oyler v. Allenbrand*, 23 F.3d 292, 293–94 (10th Cir. 1994). Moreover, the collateral consequences of the conviction — including felon status, civil disability, and the conditions of supervised release — independently sustain jurisdiction even after the custodial component is served. The motion

challenges the legality of the conviction and sentence on grounds that they were imposed in violation of the Constitution and laws of the United States.

## B. AEDPA Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 imposes a one-year limitation period on § 2255 motions, running from "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). A conviction becomes final when the Supreme Court denies a timely petition for a writ of certiorari. *Clay v. United States*, 537 U.S. 522, 527 (2003).

The Tenth Circuit affirmed Mr. Capps's conviction on August 13, 2024. *United States v. Capps*, No. 23-3095 (10th Cir. Aug. 13, 2024). Mr. Capps timely petitioned the Supreme Court for a writ of certiorari (Docket No. 24-6330). The Supreme Court denied the petition on February 24, 2025. The conviction became final on that date, and the one-year AEDPA limitation period expires on February 24, 2026. This motion is timely filed on February 24, 2026, within that period, by electronic submission through the Court's CM/ECF system from Mr. Capps's home confinement address. The filing date is established by the electronic filing timestamp recorded in CM/ECF, which constitutes the official record of filing for purposes of the AEDPA limitation period. Because the motion was submitted electronically through the Court's own filing system, the filing date is a matter of electronic record and is not dependent on mail delivery or any third-party intermediary. The District of Kansas permits pro se litigants who have been granted CM/ECF access to file documents electronically from home confinement, and Mr. Capps submitted this motion pursuant to that access. The CM/ECF timestamp of February 24, 2026, controls, and the motion is therefore timely.

Independently, ineffective assistance of counsel claims are never procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 504 (2003); *United States v. Galloway*, 56 F.3d 1239,

1240 (10th Cir. 1995) (en banc). IAC claims may be raised for the first time in § 2255

proceedings "whether or not the petitioner could have raised the claim on direct appeal."

*Galloway*, 56 F.3d at 1240.

**C. Mootness — The Resentencing Remedy Survives Completion of the Custodial Term**

Mr. Capps is scheduled for release to supervised release on May 2, 2026. Because this motion

will likely remain pending beyond that date, the Court must be satisfied that the requested relief

— including resentencing before a different judge — is not mooted by the completion of the

incarceratory term.

It is not. *Spencer v. Kemna*, 523 U.S. 1 (1998), narrowed the presumption of collateral

consequences established in *Jones v. Cunningham*, 371 U.S. 236 (1963), for habeas petitioners

who have fully completed their sentences. But *Spencer* does not defeat jurisdiction here for three

independent reasons. First, unlike the petitioner in *Spencer*, Mr. Capps has not completed his

sentence. Upon release from imprisonment he will begin a twenty-four month term of supervised

release with conditions constituting concrete, ongoing restraints on his liberty — conditions that

are traceable to the conviction and sentence challenged in this motion and that a resentencing

before a different judge could modify or eliminate. Supervised release constitutes "custody"

sufficient to sustain § 2255 jurisdiction. *Cervini*, 379 F.3d at 989 n.1. Second, the collateral

consequences of the underlying conviction are concrete, ongoing injuries that independently

satisfy Article III's case-or-controversy requirement. Those consequences are not generic or

abstract. Mr. Capps, as a federal felon, faces a permanent bar on possessing firearms under 18

U.S.C. § 922(g)(1); has lost the right to vote in federal elections under applicable Kansas law for

the period of his sentence and supervised release; is categorically ineligible for federal student

aid under 20 U.S.C. § 1091(r); and faces permanent bars and disclosure obligations in connection

with professional licensing across multiple industries in which he has operated. Vacatur of the conviction — not merely resentencing — is necessary to restore these rights and eliminate these disabilities. These are individualized consequences of this specific conviction that a resentencing order alone could not address. Third, even if the custodial component is served before this motion is adjudicated, § 2255 authorizes the court to "vacate, set aside or correct the sentence" without limitation to the imprisonment component. Where the constitutional deficiency infects the sentencing proceeding itself — as the predetermination evidence here establishes — the remedy extends to all components of the sentence, including the term and conditions of supervised release.

The government may argue that modification of supervised release is more properly sought under 18 U.S.C. § 3583(e). That provision authorizes modification of release conditions as a supervisory matter; it does not address the situation where the original sentencing proceeding was constitutionally infirm. Where the challenge is not to the conditions of supervision as currently administered but to the legality of the proceeding that imposed them, § 2255 is the proper vehicle. Section 2255 authorizes the court to 'vacate, set aside or correct the sentence' and to 'discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.' 28 U.S.C. § 2255(b). The statute itself thus provides the express authorization for the relief requested. The Supreme Court confirmed the same remedial scope in *United States v. Addonizio*, 442 U.S. 178, 185–86 (1979), identifying § 2255's authority to discharge, resentence, grant a new trial, or correct the sentence; *Addonizio* denied relief on a claim premised on the sentencing judge's frustrated subjective intent arising from post-sentencing Parole Commission policy changes, a category of claim materially different from the Capps predetermination claim, which rests on documented extrajudicial communication by the

sentencing judge establishing a predetermined custodial outcome before allocution. *See also Hill v. United States*, 368 U.S. 424, 426–27 (1962) (establishing that constitutional and jurisdictional sentencing violations are cognizable under § 2255, while non-constitutional, non-jurisdictional errors are not); *Davis v. United States*, 417 U.S. 333, 343–45 (1974) (confirming § 2255's availability for constitutional violations and granting relief on that basis). Resentencing before a different judge remains available relief under the court's authority to fashion appropriate remedies for constitutional violations. The Tenth Circuit has directed resentencing before a different judge where circumstances make impartiality a legitimate concern. *United States v. Cudjoe*, 534 F.3d 1349, 1356–57 (10th Cir. 2008) (remanding for resentencing by a different judge upon government's breach of plea agreement). The governing standard for when such reassignment is appropriate derives from *Santobello v. New York*, 404 U.S. 257, 263 (1971), which *Cudjoe* itself follows: courts may direct reassignment whenever the circumstances of the original proceeding make impartiality a legitimate concern. In exercising that equitable authority, the relevant considerations are whether the original judge would have difficulty setting aside prior conclusions in the resentencing, whether reassignment would entail undue waste of judicial resources, and whether the appearance of justice would be served by proceeding before a different judge. All three considerations favor reassignment on these facts.

## III. STATEMENT OF THE CASE

### A. Indictment, Charges, and Trial Overview

A grand jury returned a nineteen-count indictment charging Mr. Capps with bank fraud, false statements to a bank and to the Small Business Administration, wire fraud, and money laundering in connection with the alleged fraudulent procurement of COVID-19 economic relief funds for three business entities. Count 11 (wire fraud, Sedgwick County) was dismissed by

agreement of the parties during trial, on December 13, 2022. R.3.448. The remaining eighteen counts were submitted to the jury. Mr. Capps was convicted on twelve counts (Counts 1, 2, 4, 5, 7, 8, 9, 10, 12, 13, 14, and 15) and acquitted on six (Counts 3, 6, 16, 17, 18, and 19). R.3.1178–1181. He asserted a good faith defense throughout.

**B. The Pretrial Conference and the "Cockamamie" Trial Schedule (December 2, 2022)**

The trial proceeded under an irregular, non-consecutive schedule that the district court itself characterized as "cockamamie" at the December 2, 2022 pretrial conference. Concerned about the length of the jury instructions — forty primary instructions spanning approximately fifty-three transcript pages — the court proposed instructing the jury before opening statements: "it's an extraordinarily long set of instructions, and I told my law clerk we don't have enough coffee in the courthouse to keep the jury awake while I read that." R.3.24. Both parties agreed to pre-evidence instruction, though both later confirmed they believed the court would reinstruct the jury at the close of evidence as well. R.3.948.

Trial began on December 12, 2022. The court read all forty primary jury instructions to the jury before any evidence was presented. The instructions are designated Instructions 1 through 40, spanning approximately transcript pages 281 through 334.

**C. The Court's Initial Refusal to Reinstruct (December 15, 2022 — Day 3)**

On December 15, 2022 (the third day of trial, before the close of evidence), the government asked whether the court intended to reread the instructions at the close of evidence. The court responded: "Oh, believe me, not a chance." R.3.948. Defense counsel then confirmed the mutual expectation: "Although I called Alan about that exact question, and we both thought you were going to reread them." R.3.948. The court justified its refusal on scheduling grounds: "See, the problem — and you all may have forgotten this because we've already talked about this is a

four-day trial and Monday will be our fourth day — but I'm in Oklahoma Tuesday." R.3.948–49.

The court's refusal was thus communicated and locked in before the close of evidence,

motivated expressly by the judge's own travel schedule.

**D. Defense Counsel's Written Motion and the Formal Denial (December 19, 2022 — Day 4)**

Following the court's initial refusal on December 15, defense counsel filed a written motion

requesting that the court reread eight specific instructions before deliberations: Instructions 3, 5

through 9, 23, and 27, covering the indictment, unanimity, the government's burden, the

presumption of innocence, reasonable doubt, and the good faith defense. R.1.121. The motion

did not cite Federal Rule of Criminal Procedure 30 or any rule-based legal authority.

On December 19 (Day 4 of trial), the court denied the motion: "I've a painful memory of a 45-

minute session in which I read instructions. . . . [I]t does compare to a Stephen King novel, is a

bit of a horror to go through that. I think it would be error for me to single out some instructions

as opposed to others. I think it would be cruel and inhumane to reread them all again." R.3.960.

Defense counsel responded: "I understand." "Understood, Your Honor." "Thank you." And,

when asked if anything further: "No, Your Honor." R.3.960–61. No Rule 30 objection was

placed on the record.

**E. The Court's Acknowledgment That Jurors Cannot Rely on Memory Alone**

The jury began deliberating on the afternoon of December 19, 2022. During deliberations, the

jury submitted a question: "Can we get a transcript of the testimony of Michael Capps from

today?" R.3.1162. The court denied the request and told the jury to rely on "collective memory"

and notes. R.3.1165–1166. This instruction to rely on collective memory was delivered

simultaneously with the court's refusal to reinstruct the jury on forty legal standards it had

received a week earlier. The same jury that was told to rely on memory was the jury that had

received forty instructions seven days earlier and had never heard them again. The jury's inability to retain same-day oral testimony is powerful circumstantial evidence of the limits of juror recall under these conditions.

**F. Alternate Juror Dismissal Without Media Admonition (December 19, 2022)**

At approximately 2:29 P.M. on December 19, after closing arguments concluded, the two alternate jurors (Jurors 13 and 14) were dismissed to the judge's chambers. R.3.1158–1159. The court told them only that it would "visit with you personally to thank you for your service and discuss with you briefly what it means for your service as alternates." R.3.1159. No admonition regarding media coverage, internet research, or discussion of the case appears on the record at this point.

By stark contrast, the twelve sitting jurors received an explicit, extensive media admonition from the court on the same afternoon at pages 1167–1168, after the alternates had already been dismissed: "I strongly admonish you not to read any press accounts of this trial. I always say that, though very few trials get press accounts. This case has had a fair amount of media coverage. . . . [S]ome of the press accounts may talk about matters that were not introduced at trial from some background part of the story or whatever, which, of course, it's inappropriate for you to consider. So, just, for a variety of reasons, don't read anything online or in print or listen to anything on television or the radio about this case at all. Of course, don't do any independent research on this." R.3.1167–1168. The court itself acknowledged that "this case has had a fair amount of media coverage." The alternates, who were about to be dismissed into that same media environment without supervision, heard none of this admonition.

**G. The Forty-Hour Unsupervised Window: Alternate Notified Monday Evening, Returns Wednesday Morning**

The record establishes the precise timeline of the alternate's exposure window. The jury was discharged at approximately 5:31 P.M. on Monday, December 19. R.3.1169. Juror No. 2 informed the court that evening that she would not be able to continue. The alternate juror was "quickly called" the same evening to advise him he would serve. R.3.1172–1173. Trial did not resume until Wednesday, December 21, at 8:38 A.M. R.3.1172.

This means the alternate juror knew from Monday evening — approximately 5:30 P.M. — that he would be the deciding juror in a case that had generated, in the court's own words, "a fair amount of media coverage." R.3.1168. He had approximately forty hours between his notification on Monday evening and the resumption of proceedings on Wednesday morning, during which no court officer supervised his access to news, the internet, or communications about the case. The record contains no admonition to this alternate — either at dismissal on Monday or at recall on Wednesday — regarding media avoidance. R.3.1158–1159, 1173.

## H. The Alternate Juror Substitution: The Court's Announced Standard vs. Its Actual Instruction (December 21, 2022)

When the parties convened on December 21, 2022, the court informed counsel that the substitution had already been made. The court described to counsel the standard it intended to apply: "Counsel, I'm just going to bring in the jury and talk to them about the requirement that since we've substituted an alternate, they need to not presume any prior decisions that were made but essentially review their deliberations from the beginning. So unless there's anything that you want to talk about, I'll have Mr. Schmidt bring in the jury." R.3.1173. Defense counsel said nothing in response to the court's direct invitation to raise concerns.

When the court delivered the actual instruction to the reconstituted jury, the language was materially weaker: "You now have an obligation as a jury to at least reexamine all those

decisions and make sure that the alternate juror who's been added to your ranks has an ability to participate in those decisions. And, obviously, if he is in complete agreement with them, that's great. If he wants to discuss them, then just like all of you have a right to discuss decisions you're making as a jury, he should be given that right. But he has the right and obligation for full participation in decisions that you're making. So in a way it's like starting over, although you can let him know where things are going on and allow him to participate, but I just wanted to let you know that any preliminary decisions that you've made need to be reviewed for his consent since all decisions from the jury have to be unanimous." R.3.1174–1175.

The gap between what the court told counsel ("not presume any prior decisions," "essentially review their deliberations from the beginning") and what it told the jury ("at least reexamine"; "in a way it's like starting over, although you can let him know where things are going on") is dispositive. The court articulated the correct legal standard to the lawyers — then failed to deliver it to the people who needed to apply it. The final sentence of the instruction invited eleven jurors to brief the new alternate on existing conclusions and seek his ratification — the precise opposite of beginning anew. No voir dire of the alternate was conducted. No deliberation materials were confiscated. No objection was entered by defense counsel. No consent from Mr. Capps was obtained. R.3.1173.

## I. Deliberation Timing

The jury deliberated for approximately two hours and fifty-one minutes on December 19 (2:29 P.M. to approximately 5:20 P.M.), without reaching a verdict. R.3.1162. On December 21, after the alternate was substituted, the court recessed at 8:44 A.M. to await the verdict. The jury returned its verdict at 3:47 P.M. R.3.1176. Total deliberation time on December 21 was approximately seven hours. The jury thus deliberated approximately three hours in its original

12

composition without reaching a verdict, and approximately seven hours in its reconstituted composition before convicting.

**J. The Court's Own Characterization of the Trial Schedule**

In dismissing the jury on the evening of December 19, the court stated: "I apologize again for this crazy schedule. I have never done that to another jury. You are the unlucky winners of my insane schedule." R.3.1166. This acknowledgment — that the schedule was "insane," that the court had "never done that to another jury" — is the court's own testimony that this was an exceptional situation created by its scheduling conflicts, not by any legitimate pedagogical choice.

**K. The Prosecution's Cross-Examination Exchanges (December 19, 2022)**

During the cross-examination of Mr. Capps on December 19, 2022, AUSA Metzger conducted two extended exchanges employing the same improper technique: narrating the contents of documents Mr. Capps denied having seen, through question premises, without establishing the authentication and foundation required by the Federal Rules of Evidence.

**Exchange One (R.3.1003–1007)**. AUSA Metzger introduced and began eliciting the contents of a letter addressed to the U.S. Attorney's Office. Mr. Capps stated: "I've never seen this document." R.3.1003. Despite this denial, Metzger continued to question Mr. Capps about the letter's contents — eliciting references to Kerns's own signature, the July 16, 2021 date, DOJ letterhead, and the substance of page two. R.3.1004–1005. The document was authored by Kerns himself — defense counsel's own prior correspondence with the government. Judge Melgren intervened at R.3.1004 without any objection from either party: "Well, counsel, if he's not seen the document, he can't testify on it." The examination continued nonetheless. At R.3.1006, Judge Melgren issued a full sua sponte intervention: "Counsel, if he's not familiar with this exhibit, you

can't just have him read it to the jury as testimony. If he doesn't know the exhibit, you cannot solicit testimony from it. I don't — I don't know why we're doing this." Defense counsel Kurt P. Kerns did not object at any point during Exchange One. No curative instruction was requested or given.

**Exchange Two (R.3.1054–1056)**. After the judicial intervention in Exchange One, AUSA Metzger introduced an entirely separate document — a deposition transcript from *Cybertron International v. Michael Capps*, Case No. 17-CV-876, an order-in-aid-of-execution proceeding on May 20, 2021 — and embedded within his questions the proposition that Krivacy was in the process of being dissolved or closed. R.3.1054. Mr. Capps stated "I've never seen this document before" — twice — at R.3.1055. Despite four documented denials of familiarity with the document, Metzger directed Mr. Capps to read aloud from it. R.3.1056. Mr. Capps again denied recollection of the contents. The Cybertron transcript was used solely as a proposed refreshing document under Federal Rule of Evidence 612. It was never moved into evidence by the government, never admitted by the Court, and Capps specifically denied that it refreshed his recollection. R.3.1054–1056. The transcript itself therefore communicated no admissible fact to the jury. Unlike Exchange One, no judicial intervention occurred during Exchange Two; the identical technique — narrating inadmissible content through question premises after a witness denies familiarity — proceeded without check. Kerns did not object. No curative instruction was requested or given. The Research Team's review of the complete trial transcript confirmed that no objection by defense counsel appears anywhere in the transcript pages covering Exchange Two (R.3.1054–1060).

**The Juror Questions (R.3.1080, R.3.1082–1083)**. Following the conclusion of cross-examination, and while trial was still in session, the jury submitted written questions to the court.

Juror Question 1, at R.3.1080: "Why would you apply for a grant for a company you were closing?" This question tracks with precision the proposition embedded in Exchange Two — that Krivacy was being dissolved or wound down — correlating directly with Count 10, the KDOC Working Capital Grant for Krivacy, on which the jury convicted. Juror Question 2, at R.3.1082–1083: "Are any of these three businesses still open, and if closed, why did they close?" This question further demonstrates that the jury had absorbed the "closing" characterization: at least one juror treated Krivacy's closure as an established premise requiring explanation rather than as an open factual question. The questions are part of the open trial record; they are not internal deliberative communications subject to Federal Rule of Evidence 606(b). They are the jury's own contemporaneous written expression, submitted during the trial proceedings themselves, that the inadmissible content had lodged in its analytical framework.

**L. The Pre-Sentencing Email: Evidence of Judicial Predetermination (May 10, 2023)**

Mr. Capps was sentenced on May 11, 2023 before Chief Judge Melgren in Wichita, commencing at 1:59 P.M. R.3.1209. On May 10, 2023 — the day before the sentencing hearing — Chief Judge Melgren sent an email directly to probation officer Jeffrey Blessant, copied to both government counsel and defense counsel, directing substantive changes to the Presentence Investigation Report. See Exhibit B. The judge directed the probation officer to correct references describing Mr. Capps as a "Congressman" to instead reflect his status as a "Legislator," explaining: "I am concerned that 'Congressman' references may leave BOP with a misapprehension."

The significance of this language requires careful analysis. The alternative reading is straightforward and must be confronted directly: a federal judge who corrects a factual inaccuracy in a PSR before sentencing — substituting "Legislator" for "Congressman" — is

performing a routine administrative function. PSRs are transmitted to BOP for facility classification and programming purposes as a matter of standard practice, and every judge who corrects a PSR fact before sentencing is aware that BOP uses that information. On this reading, the email reflects factual conscientiousness, not a predetermined outcome.

That alternative reading, however, does not survive scrutiny of the email's specific language. The judge did not simply note a correction for accuracy. He expressed a concern about what BOP would "misapprehend." The word "misapprehension" is not the language of routine correction; it is the language of a judge who has already assumed BOP's operational role. A judge correcting a factual error for accuracy's sake would direct the change and move on; the goal is simply that the record reflect the true state of affairs. But a judge who is concerned about BOP's "misapprehension" of a specific characteristic — the level at which Mr. Capps served in government — is expressing concern about how BOP will categorize and house this defendant. That concern is only operationally meaningful if BOP is already, in the judge's mind, the institution that will receive this defendant. Transmitting an accurate PSR to BOP is standard practice; being concerned about how BOP will read a specific biographical detail is a different matter entirely, because it reflects a presupposition about BOP's custodial relationship with the defendant. The BOP classification consequence does not attach unless a custodial sentence is imposed.

The email is therefore documentary evidence that Chief Judge Melgren had predetermined a custodial sentence before the sentencing hearing and before Mr. Capps was permitted to speak in allocution. The government will argue that this inference reads too much into ordinary administrative conduct. That argument is addressed directly in Claim Five, Section D below. The

point here is that the email is not self-evidently benign, and its language repays the careful attention this motion gives it.

Trial counsel Kurt P. Kerns received this email on May 10, 2023 and forwarded it to Mr. Capps with the note: "Just in from Judge." Despite receiving this evidence of judicial predetermination on the eve of sentencing, trial counsel raised no objection; sought no recusal; made no challenge to the legitimacy of the allocution process; and took no action to ensure that Mr. Capps's opportunity to address the Court would be genuine rather than ceremonial.

**M. The Direct Appeal**

On direct appeal, appellate counsel Jacob Rasch-Chabot raised one issue: the district court's refusal to reinstruct the jury at the close of evidence. Because trial counsel had failed to preserve the issue with a proper Rule 30 objection, the Tenth Circuit reviewed for plain error and affirmed, noting that while "we find support for Mr. Capps's argument" on the merits, Mr. Capps could not satisfy the requirements of plain error review. *United States v. Capps*, No. 23-3095, slip op. at 7–8 (10th Cir. Aug. 13, 2024). The Rule 24(c) alternate juror substitution issue was never raised. The prosecutorial misconduct from Exchange One and Exchange Two was never raised.

No sentencing issue of any kind was raised, despite available grounds. First, appellate counsel had actual possession of the Melgren email before filing the Opening Brief. Mr. Capps forwarded the email chain to Rasch-Chabot on June 12, 2023 — specifically flagging the predetermination concern in writing — and the Opening Brief was not filed until December 13, 2023, six months later. Second, on May 31, 2023, Mr. Capps forwarded to Rasch-Chabot a complete memorandum setting out the prosecutorial misconduct theory from Exchange One and Exchange Two with specific transcript page and line citations — more than six months before

the Opening Brief was filed. The complete theory, with a roadmap to the record, was in

counsel's hands. It was not raised. Third, a challenge to the procedural unreasonableness of the

sentence itself was available under the standard established in *United States v. Cozad*, 21 F.4th

1259 (10th Cir. 2022), where the Tenth Circuit vacated a sentence by Chief Judge Melgren as

procedurally unreasonable. No such challenge was made.

## IV. LEGAL STANDARDS

### A. Standard Under 28 U.S.C. § 2255

A federal prisoner may move to vacate, set aside, or correct a sentence imposed "in violation of

the Constitution or laws of the United States." 28 U.S.C. § 2255(a). Where the motion, files, and

records of the case do not "conclusively show that the prisoner is entitled to no relief," the court

must grant an evidentiary hearing. *Id.* § 2255(b).

### B. Ineffective Assistance of Counsel Under Strickland

To establish ineffective assistance of counsel, a defendant must demonstrate: (1) that counsel's

performance fell below an objective standard of reasonableness measured by prevailing

professional norms; and (2) that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. *Strickland v.*

*Washington*, 466 U.S. 668, 688, 694 (1984). These standards apply equally to trial and appellate

counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). When an omitted claim is a "dead-bang

winner" — so obviously meritorious that a competent attorney would have raised it — both

prongs of *Strickland* are satisfied. *United States v. Cook*, 45 F.3d 388, 394–95 (10th Cir. 1995);

*Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003); *Neill v. Gibson*, 278 F.3d 1044, 1057

(10th Cir. 2001).

The Tenth Circuit evaluates failure-to-object IAC claims through the three-tier framework of *Cargle* and *Neill*: Tier 1 claims (plainly meritorious) directly establish deficient performance; Tier 2 claims (some merit) may establish deficient performance; Tier 3 claims (meritless) do not. *Cargle*, 317 F.3d at 1202. "A sufficiently meritorious omitted claim certainly can, by itself, establish constitutionally deficient performance." *Id.* at 1205.

## C. Structural Error Versus Trial Error

Federal law distinguishes between trial errors, which affect the trial process and are subject to harmless error analysis, and structural errors, which "affect the framework within which the trial proceeds" and require automatic reversal absent valid waiver. *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017). Structural errors are presumed prejudicial by their nature; no showing that the error affected the outcome is required, and no quantum of evidence — however overwhelming — can cure a structural defect.

## D. Prosecutorial Misconduct Framework

The Supreme Court's foundational condemnation of prosecutorial misconduct in *Berger v. United States*, 295 U.S. 78 (1935), extends to prosecutors who narrate prejudicial facts not in evidence through question premises. *Id.* at 84. *Berger* distinguished between misconduct that is "slight or confined to a single instance" and that which is "pronounced and persistent" with "a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Id.* at 89. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), asks whether the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

The Tenth Circuit applies a two-part framework: first, whether the conduct was improper; second, whether any improper conduct warrants reversal, assessed by considering "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the

case." *United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir. 1996); *United States v. Martinez-Nava*, 838 F.2d 411, 416 (10th Cir. 1988); *United States v. Lonedog*, 929 F.2d 568, 572 (10th Cir. 1991). Where no objection was entered at trial, *United States v. Olano*, 507 U.S. 725 (1993), governs plain error review — but on § 2255 collateral review the claim is properly channeled through IAC, avoiding this standard entirely.

**E. IAC Claims Are Never Procedurally Defaulted**

Ineffective assistance claims may be raised for the first time in § 2255 proceedings, whether or not they could have been raised on direct appeal. *Massaro*, 538 U.S. at 504; *Galloway*, 56 F.3d at 1240. Where IAC is established as cause for a procedural default, it simultaneously constitutes the prejudice required to overcome that default. *United States v. Harms*, 371 F.3d 1208, 1211 (10th Cir. 2004). A freestanding prosecutorial misconduct claim, if procedurally defaulted, may be reached once IAC provides the required cause and prejudice. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Coleman v. Thompson*, 501 U.S. 722, 753–54 (1991).

**V. ARGUMENT**

*The motion presents six claims. Claim One (prosecutorial misconduct) leads because it presents the motion's most viscerally compelling and least abstractly legal evidentiary configuration: documentary proof, in the jury's own handwriting, that inadmissible content lodged in its analytical framework. Claim Two addresses the Rule 24(c) alternate juror substitution, which involves a more technically involved structural error analysis but is independently established. Claims Three through Six follow in order.*

**CLAIM ONE: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL — FAILURE TO OBJECT TO PROSECUTORIAL MISCONDUCT DURING CROSS-EXAMINATION**

**A. Overview — This Claim Approaches Dead-Bang Winner Status**

Of all the claims presented in this motion, Claim Two approaches most closely the "dead-bang winner" standard under *Cook*, 45 F.3d at 394–95. Three independently compelling features converge: the trial judge's sua sponte intervention demonstrates the error's obviousness without any prompting by defense counsel; Kerns's repeated silence across two separate exchanges employing the identical improper technique, continuing through and after the judicial admonition, eliminates any plausible strategic rationale; and the juror questions — the jury's own written contemporaneous documentation of its engagement with the inadmissible content — converts speculative prejudice into demonstrated prejudice. No other claim in this motion rests on evidence this direct and this contemporaneous.

## B. Deficient Performance — The Dual Exchanges and the Court's Interventions

When a trial judge identifies and corrects improper conduct without any party requesting it, the error's obviousness is objectively established as a matter of record. That is what occurred at R.3.1004 and R.3.1006 of this trial. The government will argue that the judicial interventions demonstrate that the system worked — that the court identified and managed the improper examination without requiring defense counsel to act. That argument proves too much. The court's sua sponte interventions stopped the examination; they did not function as a curative. Stopping improper examination is a stop signal, not a reset mechanism. The court drew the jury's attention to an evidentiary irregularity and then did nothing to direct the jury to disregard what it had already heard. The jury was left with the content of the improper questions in its analytical framework, with no instruction to set that content aside, and with the court's own signal that something had gone wrong — which amplified rather than reduced the jury's likely attention to the flagged material. An intervention that stops ongoing misconduct is a necessary response to the problem; it is not a cure for the harm already done, and it is not a substitute for the defense

counsel's independent obligation to object and request a curative instruction. AUSA Metzger's technique in both exchanges was legally indefensible: when a witness denies familiarity with a document, the foundation for its use collapses entirely, and the examiner's proper recourse is extrinsic evidence under FRE 613(b) — not continued narration of the document's contents through question premises, which transforms cross-examination into prosecutorial testimony in violation of FRE 602 (personal knowledge), FRE 613(b) (foundation), FRE 611(a) (court control over examination mode), and FRE 901 (authentication).

The mild first intervention at R.3.1004 — "Well, counsel, if he's not seen the document, he can't testify on it" — established on the record that the technique was improper. The full sua sponte intervention at R.3.1006 — "Counsel, if he's not familiar with this exhibit, you can't just have him read it to the jury as testimony. If he doesn't know the exhibit, you cannot solicit testimony from it. I don't — I don't know why we're doing this" — removed any possible ambiguity. Kerns did not object to Exchange One. He then remained silent during Exchange Two, which employed the identical technique — this time directing Mr. Capps to read aloud from a document he had denied seeing four separate times — without any judicial intervention and without a single objection from defense counsel.

Silence across two extended exchanges employing the identical improper technique, continuing through the court's own identification of the problem, cannot be characterized as strategy. A single failure to object might be attributed to oversight. Two failures — the second occurring after the judge had already flagged the technique as improper — suggest systemic abdication. The "drawing attention" rationale, which sometimes excuses silence in the face of damaging but marginal material, fails entirely when the questioning was already extended and prominent and when the judge had already drawn maximum attention to the problem sua sponte. Under

*Cargle*'s three-tier framework, 317 F.3d at 1202, this objection falls squarely at Tier 1: the court's own intervention establishes its merit without need for further analysis.

## C. Kerns's Conflict of Interest as Evidence of Deficient Performance on Exchange One

The deficient-performance showing on Exchange One is independently reinforced by an additional factor: the identity of the document AUSA Metzger was narrating through question premises. The letter at issue was authored by Kerns himself — a letter from defense counsel to the U.S. Attorney's Office. Kerns therefore faced a direct conflict of interest between two competing interests: his personal interest in not drawing scrutiny to his own prior communications with the government, and his client's interest in an immediate objection to improper examination based on that document.

Mr. Capps acknowledges that the Tenth Circuit has held that the presumed-prejudice standard of *Cuyler v. Sullivan*, 446 U.S. 335 (1980), does not extend to personal-interest conflicts outside the multiple concurrent representation context. *United States v. Williamson*, 859 F.3d 843, 858–59 (10th Cir. 2017); *see also Mickens v. Taylor*, 535 U.S. 162, 175–76 (2002) (leaving open whether *Cuyler* applies beyond multiple concurrent representation). Accordingly, this section does not invoke *Cuyler*'s presumed-prejudice standard or seek to relieve Mr. Capps of his *Strickland* prejudice burden. Rather, the conflict evidence serves a distinct and more fundamental function: it demonstrates why Kerns failed to object, establishing deficient performance under *Strickland*'s first prong.

Kerns's silence during Exchange One — declining to object to improper examination premised on his own letter, while that very letter's contents were being narrated to the jury — is powerful evidence that his personal interest adversely affected his professional judgment. Faced with a document bearing his own name and implicating his own prior conduct with the government,

Kerns chose silence over objection. A competent attorney without a personal stake in the document at issue would have objected immediately, particularly after the court's sua sponte interventions at R.3.1004 and R.3.1006 had already identified the examination technique as improper. The conflict is the most probable explanation for the pattern of silence the record documents, given the specific circumstances: defense counsel's own correspondence was the foundation for the improper examination, the court had already flagged the technique as impermissible, and the prejudicial content was being delivered in extended form rather than as a passing reference. The alternative explanation — that a competent attorney made a strategic calculation to remain silent while a prosecutor narrated inadmissible content from that attorney's own letter to the jury — is less persuasive on these particular facts because the "drawing attention" rationale cannot operate where the judge has already drawn maximum attention to the impropriety. The conflict evidence thus reinforces and independently establishes the deficient-performance showing on Exchange One. The prejudice resulting from that deficient performance is addressed in Section E below, where the juror questions provide documentary proof that the inadmissible content from both exchanges — including Exchange One — lodged in the jury's analytical framework.

## D. The Compounding Failure — No Request for Curative Instructions

Even after inadmissible content had reached the jury through both exchanges, Kerns had a continuing duty to mitigate the damage by requesting curative instructions. He did not. The dual failure — no objection and no curative instruction — represents a total abdication of the defense function regarding these exchanges. Even where curative instructions are given, courts have recognized that some prejudicial evidence creates so strong an impression that instructions are insufficient to cure it. *Maestas v. United States*, 341 F.2d 493, 496 (10th Cir. 1965) ("where the

character of [the evidence] is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it . . . a mistrial should be ordered"). If even a timely instruction cannot always cure this category of prejudice, the complete absence of any instruction leaves the taint entirely unremedied.

## E. Prejudice — The Krivacy "Closing" Characterization and the Juror Questions as Documentary Proof of Jury Impact

The prejudice analysis begins with the evidentiary record on Krivacy's operational status at the time of the August 19, 2020 KDOC Working Capital Grant application (Count 10).

A complete review of the trial transcript establishes the following: no government witness and no government exhibit independently characterized Krivacy as closing, dissolving, or being wound down contemporaneously with the grant application. Special Agent Campbell's testimony addressed revenue misrepresentations and payroll falsifications; he did not characterize Krivacy's operational status as one of closure. The FBI forensic accountant traced fund flows and treated Krivacy as an operating entity with active accounts through mid-2020. No documentary exhibit admitted by the government independently established that Krivacy was closing during the August 2020 application period.

The only admitted evidence bearing on Krivacy's operational status came from Mr. Capps's own testimony, which established financial deterioration and temporal ambiguity — not a completed or committed decision to close as of the application date. On direct examination (Exchange One, R.3.1003–1007), Mr. Capps testified that Krivacy was "not going to be survivable," was "not meeting to do any of its work any further," and that its funds were transferred away "around the August timeframe." R.3.1004. This testimony constitutes properly admitted evidence of financial distress and operational decline. It does not, however, establish the specific proposition that

lodged in the jury's deliberations: that Krivacy was a company being "closed" — formally dissolved or legally wound down — at the precise moment of the grant application. Mr. Capps described an evolving process of deterioration, not a completed or announced closure. His "around the August timeframe" language does not specify whether the fund transfer occurred before or after August 19, and his subsequent testimony placed the actual dissolution decision as a "later stage" development. In response to Juror Question 1, Mr. Capps explicitly denied that the company had committed to dissolution on August 19, 2020: "at the time of the application Krivacy was not being dissolved. . . . we were fully committed to moving forward. There was no intent to dissolve at that point in time." R.3.1080.

The specific "closing" characterization that lodged in the jury's analytical framework was not derivable from Exchange One alone. It required the specific proposition embedded in AUSA Metzger's Exchange Two questions — that Mr. Capps had "applied for the dissolution of Krivacy in August of that year" — which rested entirely on the Cybertron International civil deposition transcript (Case No. 17-CV-876, May 20, 2021) that was never admitted into evidence, never moved as an exhibit, and that Mr. Capps specifically denied refreshed his recollection. R.3.1054–1056. As established in Section III.K above, the Cybertron transcript was used solely as a proposed refreshing document under Federal Rule of Evidence 612; it communicated no admissible fact to the jury. The only admissible content flowing from Exchange Two is Mr. Capps's temporally ambiguous acknowledgment that "an effort to begin the dissolution" occurred somewhere in "late Q3-Q4" of 2020 — a six-month window he simultaneously denied predated the grant application.

The critical distinction between Exchange One and Exchange Two turns on temporal specificity, not merely on the difference between financial distress and formal dissolution. Exchange One's

evidence of financial deterioration — "not going to be survivable," "not meeting to do any of its work any further," funds transferred "around the August timeframe" — establishes an ongoing process of decline extending across a period whose boundaries remain unspecified. A juror processing this evidence might conclude that Krivacy was in financial difficulty; that conclusion, however, does not supply the precise temporal predicate that Juror Question 1 asserts.

Juror Question 1 does not ask why Mr. Capps applied for a grant for a company that was struggling, or declining, or in distress. It asks why he applied for a grant for a company he was "closing" — a present-tense characterization that places the state of closure at the moment of the application, August 19, 2020. That temporal precision requires a specific factual predicate: that Krivacy's dissolution was not merely an eventual or undated outcome, but a contemporaneous, ongoing fact as of the application date. Exchange One does not supply that predicate.

Mr. Capps's testimony placed the fund transfer "around the August timeframe" — language that encompasses before and after August 19 — and his subsequent testimony placed the actual dissolution decision as a "later stage" development. The "around August" ambiguity, standing alone, does not resolve whether closure was occurring at, before, or after the application date. The specific temporal proposition — dissolution was occurring on and around August 19, 2020, contemporaneously with the grant application — appeared only through AUSA Metzger's Exchange Two question premises, which embedded the proposition that Mr. Capps had "applied for the dissolution of Krivacy in August of that year." That proposition rested entirely on the Cybertron International civil deposition transcript that was never admitted, never moved as an exhibit, and that Mr. Capps specifically denied had refreshed his recollection. The government cannot identify any admitted evidence that placed Krivacy's formal dissolution proceedings as contemporaneous with the August 19, 2020 application, because no such evidence was in the

record. Exchange One established deterioration without temporal precision; Exchange Two supplied the temporal precision through inadmissible question premises. It was this second proposition — dissolution contemporaneous with the application — that supplied the jury's analytical framework for Count 10, as Juror Question 1 proves.

The juror questions are not internal deliberative communications; they were submitted in open court, recorded in the trial transcript, and are part of the official trial record. Federal Rule of Evidence 606(b), which bars testimony about internal mental processes, does not apply to questions submitted in open court during trial.

Juror Question 1, at R.3.1080 — "Why would you apply for a grant for a company you were closing?" — is the most forensically significant passage in the entire record for purposes of this motion. It is direct, contemporaneous proof that at least one juror held the operative belief that Krivacy was "closing" when the grant was applied for — and held it firmly enough to pose it as an accusatory question, not a neutral inquiry. The juror had already accepted the "closing" predicate. The fact that Mr. Capps explicitly denied it in response — testifying that the company was "fully committed to moving forward" with "no intent to dissolve at that point in time" — and the jury nonetheless convicted on Count 10, is the core of the prejudice showing.

Juror Question 2, at R.3.1082–1083 — "Are any of these three businesses still open, and if closed, why did they close?" — further demonstrates the jury's absorption of the closing characterization. This question treats Krivacy's closure as an established premise requiring explanation, not an open factual question.

The defense counsel's failure to object to Exchange Two is particularly consequential. The "closing" inference arose not from deliberate prosecutorial argument — indeed, AUSA Metzger did not assert in closing argument that Krivacy was closing at the time of the grant application,

arguing Count 10 instead on the basis of inflated revenue figures — but from the organic accumulation of trial testimony, uniquely enabled by the absence of a defense objection during Exchange Two and the absence of any defense redirect addressing the temporal ambiguity created by Exchange One. The temporal ambiguity from Exchange One's "around August" language, fused with Exchange Two's unadmitted dissolution allegation through question premises, created a prejudicial inference that defense counsel was uniquely positioned to address and failed to do.

The verdict pattern corroborates this analysis. Mr. Capps was convicted on all Krivacy-related counts — Counts 4, 7, 10, 12, 13, 14, and 15 — and acquitted on the Midwest Business Group EIDL counts (3 and 6) and the second-wave money laundering counts (16–19). Exchange Two's inadmissible proposition targeted Krivacy specifically. The jury convicted on every Krivacy count and acquitted on the Midwest EIDL counts where the inadmissible Krivacy-dissolution narrative had less purchase. Under *Strickland*, 466 U.S. at 695–96, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." The split verdict proves this case was not overwhelming. The count-specific correlation between the inadmissible content and the conviction pattern demonstrates that the taint made the difference.

The court's own conduct compounds the prejudice analysis. Two distinct judicial failures warrant separate attention. First, after Judge Melgren issued sua sponte interventions during Exchange One at R.3.1004 and R.3.1006 — identifying the technique as improper — he gave no curative instruction. This created an unanswered judicial flag: the court drew the jury's attention to an evidentiary irregularity without directing the jury to disregard it. Second, having expressly identified the improper technique in Exchange One, the court permitted the identical technique to

proceed entirely unchecked in Exchange Two. Under the Tenth Circuit's framework in *Gabaldon*, 91 F.3d at 93–94, the "curative acts of the district court" is an independent factor. The record supplies the most defendant-favorable configuration: zero curative acts across both exchanges, combined with an affirmative judicial signal that the content was improper. The presumption that juries follow curative instructions — the government's standard fallback — is logically inoperative when no curative instruction was given. *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). The jury had no basis to know it should disregard the content because it was never told. Furthermore, the Tenth Circuit has recognized in analogous circumstances that curative instructions may be insufficient to remedy certain categories of taint — including structural taint created when the jury receives information about the defendant that infects the analytical framework in which it evaluates the evidence. *Iribe-Perez*, 129 F.3d 1167, 1171 (10th Cir. 1997) (holding that curative instructions could not eliminate the taint created when jurors were informed of the defendant's anticipated guilty plea, because the contamination operated at the structural level of how the jury approached all subsequent evidence). The complete absence of any instruction is categorically worse than a deficient one, and where — as here — the taint operated by embedding an inadmissible factual predicate into the jury's deliberative framework before any objection was raised, the *Iribe-Perez* principle applies with full force.

## F. Alternative: Freestanding Prosecutorial Misconduct Due Process Claim

In the alternative, and as an independent basis for relief if the IAC claims require further factual development, Mr. Capps asserts a freestanding due process claim based on the prosecutorial misconduct itself. This claim faces procedural default because it was not raised at trial or on direct appeal. The IAC claims provide the required cause, and the prejudice analysis is independently established without any circularity.

The potential circularity concern — that the IAC claims' prejudice showing depends on the underlying claims' merit, while the defaulted claim's revival depends on IAC cause and prejudice — does not arise here because the IAC prejudice for the appellate IAC claim (Claim Four) rests on elements that exist independently of the freestanding claim's legal characterization. Specifically, the IAC prejudice for appellate counsel's failure to raise the prosecutorial misconduct is established through: (1) the juror questions, which are objective record facts submitted in open court and not dependent on any legal characterization of the underlying conduct; (2) the judicial sua sponte interventions, which are similarly objective record facts establishing the error's obviousness; and (3) the absence of any curative instruction, which is itself a record fact. These three elements independently establish that the omitted claim was plainly meritorious and that its omission prejudiced the appeal — without requiring any assumption about the freestanding due process claim's merit. The freestanding claim's merit, once reached, is established through the same record evidence. There is no circular dependency: the IAC claim stands on record facts; the freestanding claim stands on those same facts evaluated under a different legal standard. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Coleman*, 501 U.S. at 753–54.

On the merits, both exchanges satisfy the first prong of *Gabaldon*'s two-part test — the conduct was improper — as established by Judge Melgren's own sua sponte interventions. The second prong — whether the misconduct warrants reversal — is assessed through the *Martinez-Nava* three factors. The curative acts factor weighs against harmlessness in its most defendant-favorable configuration: zero curative acts, combined with Exchange One interventions that drew the jury's attention to an evidentiary irregularity without directing it to disregard the content. The extent factor weighs heavily: two separate extended exchanges satisfying *Berger*'s "pronounced

and persistent" standard. 295 U.S. at 89. The role factor weighs most heavily: the juror questions demonstrate that the inadmissible content drove the jury's analytical framework on the precise counts of conviction.

## CLAIM TWO: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL — FAILURE TO OBJECT TO THE RULE 24(c) ALTERNATE JUROR SUBSTITUTION

### A. The Mandatory Requirements of Rule 24(c)(3)

Federal Rule of Criminal Procedure 24(c)(3) is unambiguous: "If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." The rule is mandatory, not discretionary. It exists to prevent precisely what occurred here: an alternate who may have been contaminated during his dismissal period joining a deliberating body that has already formed views, with the existing jurors simply briefing him rather than beginning fresh.

### B. Four Discrete Failures of Trial Counsel

**First: failure to object to the substitution itself.** The alternate was dismissed on December 19 with no on-record media admonition — while the sitting jurors received an explicit, detailed instruction to avoid all press coverage of a trial the court acknowledged "has had a fair amount of media coverage." R.3.1167–1168. The alternate was then notified the same evening that he would serve as a juror, giving him approximately forty hours of unsupervised exposure to that media environment before trial resumed. R.3.1172–1173. No voir dire of the alternate regarding potential contamination was conducted upon his recall. The minimum safeguards established in *United States v. Phillips*, 664 F.2d 971, 995–96 (5th Cir. 1981) — assurances from the alternate of no media exposure, confiscation of deliberation materials, individual assurances from sitting

jurors, and a mandatory "begin anew" instruction — were absent in their entirety. Defense counsel neither requested them nor objected to their absence.

**Second: failure to obtain Mr. Capps's personal consent to the substitution.** The Tenth Circuit in *United States v. Baccari*, 489 F.2d 274, 275 (10th Cir. 1973), cert. denied, 417 U.S. 914 (1974), recognized in a waiver context that "[r]ecall of the alternate juror without the defendants' consent would have been improper and grounds for a new trial." The court's holding was that the defendants had consented, rendering any objection waived. The precedential weight of *Baccari*'s personal-consent recognition is that of a necessary premise of the waiver holding — the Tenth Circuit's implicit acknowledgment that personal consent is a required predicate, even though the question of whether it is constitutionally mandated remains formally open after the Supreme Court's treatment in *Olano*. The most textually apposite affirmative authority for the consent requirement is the Fourth Circuit's decision in *United States v. Virginia Erection Corp.*, 335 F.2d 868, 872 (4th Cir. 1964), which reversed for a new trial where only counsel — and not the defendants personally — had consented to a non-standard jury arrangement, holding that "before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant." Mr. Capps acknowledges that *Virginia Erection Corp.* is out-of-circuit authority that predates the modern Rule 24(c) by decades. Its significance lies not in its binding force but in the principle it articulates: that jury composition is a personal right belonging to the defendant, not a procedural matter counsel may waive unilaterally. *Baccari*'s waiver-context recognition of this same principle within the Tenth Circuit, combined with *Virginia Erection Corp.*'s direct holding, together supply the strongest available authority for the consent requirement in the absence of a direct Tenth Circuit ruling. The Supreme Court in *Patton v. United States*, 281 U.S. 276, 312

(1930), established that where defendants had "personally assented" to a jury composition change, that personal assent was the constitutional predicate for proceeding. The Supreme Court in *United States v. Olano*, 507 U.S. 725, 733 (1993), expressly left open "whether the defendant must participate personally in the waiver" for Rule 24(c) purposes — it did not resolve the question. Regardless of how a court might ultimately resolve the Rule 24(c) consent question, Kerns's failure to even seek Mr. Capps's personal consent was independently deficient performance under *Strickland.*

**Third: failure to object to the legally inadequate "begin anew" instruction.** The inadequacy is most sharply illustrated by comparing what the court told counsel to what it told the jury. To counsel: the jury must "not presume any prior decisions that were made but essentially review their deliberations from the beginning." R.3.1173. To the jury: "at least reexamine" and "in a way it's like starting over, although you can let him know where things are going on." R.3.1174– 1175. The court then compounded the error by telling the jury that prior decisions "need to be reviewed for his consent" — a formulation that invites eleven jurors to brief the alternate on existing conclusions and seek his ratification of them. The contrast with *United States v. Ashby*, 864 F.2d 690, 694 (10th Cir. 1988), is stark. There, the district court asked whether any juror's impartiality had been compromised; instructed the jury to give no weight to statements of the replaced juror; conducted individual voir dire of each member; and received individual assurances that each could begin deliberations "as if the jury were leaving to deliberate for the first time." *Id.* at 694. Here, none of those steps were taken, and defense counsel did not request a single one.

**Fourth: failure to object at the moment of the court's direct invitation.** When the court announced to counsel that it was about to bring in the jury — stating the correct standard and

asking "unless there's anything that you want to talk about" — defense counsel said nothing. R.3.1173. That silence in response to an explicit invitation to object is the most clearly deficient moment of the entire proceeding. A competent attorney hearing the correct standard announced by the court would have immediately requested that the court use the same language when instructing the jury.

## C. This Is a Structural Error — And Weaver's Prejudice Requirement Is Independently Satisfied

Jury composition is among the most fundamental constitutional rights in the American criminal justice system. The Supreme Court recognized the constitutional dimension of Rule 24(c) in *Olano*, 507 U.S. at 732. The Tenth Circuit has treated improper alternate juror substitution without proper safeguards as implicating the constitutional right to a fair trial. *Baccari*, 489 F.2d at 275; *United States v. Beasley*, 464 F.2d 468, 470 (10th Cir. 1972). The structural error doctrine holds that such errors "affect the framework within which the trial proceeds" and are not subject to outcome-based harmlessness analysis. *Weaver*, 582 U.S. at 295.

Mr. Capps acknowledges that *Weaver* also held that when a structural error is raised not on direct review but through an IAC claim, the defendant must still satisfy *Strickland*'s prejudice prong. *Id.* at 298–99. The structural character of the error does not, by itself, satisfy the prejudice showing on collateral review. That showing must be grounded in concrete, non-circular evidence of harm to the proceeding.

That showing is made here through the following independent evidence. First, the jury deliberated approximately three hours in its original twelve-member composition without reaching a verdict on any count — demonstrating genuine disagreement that precluded conviction. On the reconstituted jury's first full day of deliberation, it returned convictions on

twelve counts after approximately seven additional hours. The transition from impasse to conviction coincided precisely with the substitution of the alternate. Second, the split verdict — twelve convictions and six acquittals — proves that this was a genuinely contested case in which the jury exercised independent judgment count by count. The acquittals on Counts 3, 6, 16, 17, 18, and 19 demonstrate that the jury was discriminating, not rubber-stamping. In a case this closely divided, the composition of the jury materially affected specific outcomes. Third, as cumulative reinforcement of the first two categories rather than as an independent freestanding showing, the forty-hour unsupervised exposure window, combined with the affirmatively misleading instruction directing the jury to brief the alternate on conclusions already reached, created a concrete risk that the alternate either imported extraneous information or was presented with a fait accompli rather than a genuine opportunity to deliberate. Mr. Capps acknowledges that *Weaver* forecloses reliance on the structural error itself as a basis for satisfying the prejudice prong on collateral review. The third category is therefore positioned as additional factual reinforcement for the first two categories, not as a substitute for them. The first two categories — the impasse-to-conviction transition and the split verdict — independently satisfy *Weaver*'s concrete prejudice requirement without any reliance on the absence of safeguards as its own proof of harm. The absence of every required safeguard — no admonition, no voir dire, no confiscation of deliberation materials, no individual assurances — amplifies the harm already demonstrated by the first two categories, but the structural error doctrine's specific concern about outcome-based analysis does not attach to this additional factual showing because it is offered only in corroboration, not as a circular stand-in for a concrete prejudice demonstration.

**D. The Question Is Not Actual Contamination — It Is the Absence of Safeguards**

The government will argue that prejudice is speculative absent proof that the alternate actually accessed news coverage. This argument fundamentally misframes the constitutional question. The inquiry is not whether contamination can be proven after the fact — it is whether the constitutional safeguards designed to prevent contamination were provided. *Phillips*, 664 F.2d at 990–91. The answer here is categorical: no admonition was given at dismissal; no voir dire was conducted at recall; no deliberation materials were confiscated; no individual assurances from sitting jurors were obtained; and no adequate "begin anew" instruction was delivered. The government cannot cure the absence of every required safeguard by speculating that things turned out fine. The safeguards exist precisely because contamination is difficult to detect after the fact; eliminating all of them simultaneously creates a constitutional defect regardless of whether actual contamination can be demonstrated.

## E. The Absence of Published Reversals Does Not Limit Relief — But the Circuit Landscape Must Be Addressed Directly

Comprehensive research confirms that no federal circuit court has reversed a conviction solely for failure to give the Rule 24(c)(3) "begin anew" instruction since the 1999 amendment codified the requirement. Every circuit that has addressed the issue — including the Second, Third, Fourth, Fifth, Sixth, and Eleventh Circuits — has affirmed, applying harmless error or plain error analysis and requiring a showing of actual prejudice. The Eleventh Circuit has specifically held that the begin-anew requirement is not mandated as a matter of constitutional right. Mr. Capps confronts this landscape directly.

The uniform affirmance record does not foreclose relief here, and the Capps fact pattern is analytically distinct from the cases in which circuits affirmed. Those cases involved either a proper begin-anew instruction challenged as inadequate in specific wording, or a brief procedural

irregularity cured by a prompt instruction. The Capps record presents none of those mitigating features and instead presents the most aggravated factual configuration in the published case law: a forty-hour unsupervised exposure window with no media admonition at any point — neither at dismissal nor at recall; a material gap between what the court told counsel it would instruct and what it actually told the jury; a reconstituted jury instruction that affirmatively invited ratification of prior conclusions rather than fresh deliberation; no voir dire of the alternate; no confiscation of deliberation materials; no individual assurances from sitting jurors; and no personal consent from the defendant. No published case affirming under Rule 24(c)(3) has confronted the simultaneous absence of every required safeguard. The cases that affirmed did so because the procedural irregularity was limited — a late or imperfectly worded instruction in a case where the alternate was otherwise properly supervised. Here, the irregularity was total. The mandatory rule was not imperfectly followed; it was functionally disregarded.

The absence of a prior circuit reversal means one additional thing: no prior defendant's attorney has objected to and pressed this specific claim through appeal. That is evidence supporting the appellate IAC claim in Claim Four rather than evidence limiting the merits of this one. The legal basis for the objection was firmly established at the time counsel failed to act. The mandatory text of Rule 24(c)(3), combined with the specific aggravating facts of this substitution, provided a plainly meritorious basis for objection even in the absence of prior circuit reversals. The absence of a prior reversal means only that no prior defendant's attorney has pressed this specific claim through appeal — which is evidence supporting the appellate IAC claim in Claim Four rather than a limitation on the merits of the underlying objection.

Three post-1999 Tenth Circuit cases touch alternate juror substitution; none addresses the subsection (3) begin-anew requirement. *United States v. Capps*, 112 F.4th 887 (10th Cir. 2024)

— the direct appeal in this very case — involved a substitution during deliberations and a deficient "at least reexamine" instruction, but the Tenth Circuit analyzed only Rule 30(c) and never reached Rule 24(c)(3). *United States v. Varnedore*, 73 Fed. Appx. 356 (10th Cir. 2003), involved a pre-deliberation substitution and never analyzed begin-anew compliance. *United States v. Capehart*, No. 22-2076, 2023 WL 4286725, at *3–4 (10th Cir. June 30, 2023) (unpublished), addressed only the procedural prerequisites under subsections (1) and (2) — not the substantive "begin anew" instruction under subsection (3).

*Capehart* requires affirmative distinction. There, the Tenth Circuit applied plain error review on *direct appeal* to a Rule 24(c) violation involving the procedural prerequisites for substitution under subsections (1) and (2) only, and found no prejudice because the alternate was "qualified, instructed, and sworn like all other deliberating jurors." 2023 WL 4286725, at *4. That analysis is inapplicable here for three independent reasons: the subsection at issue is different; the governing standard is* Strickland* IAC prejudice, not *Olano* plain error; and the factual record here — forty hours of unsupervised exposure with no media admonition, no voir dire, and an affirmatively misleading instruction directing the jury to brief the alternate on conclusions already reached — is categorically more aggravated than anything *Capehart* addressed.

## F. Prejudice Is Also Independently Established — and Under Harmless Error, the Government Cannot Prevail

Even under a non-structural analysis, prejudice is established. The alternate juror had approximately forty hours of unsupervised exposure to a media environment the court itself characterized as generating heavy coverage, with no admonition at dismissal and no voir dire upon recall. The jury had already deliberated approximately three hours and formed preliminary views before the alternate joined. Rather than beginning anew, the jury was affirmatively

instructed to brief the new member on existing conclusions and obtain his consent to them. The jury then deliberated approximately seven hours before convicting on twelve counts — a timeline more consistent with an alternate being briefed on conclusions already reached than with genuine re-deliberation from scratch.

Should the Court apply harmless error rather than structural error analysis, the government bears the burden of proving harmlessness beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24 (1967). It cannot carry that burden. No published post-*Olano* federal decision has found a Rule 24(c) violation harmless under circumstances this aggravated.

At the outset, the harmlessness framework applicable to violations of the current rule must be identified carefully. Federal Rule of Criminal Procedure 24(c) was substantially amended effective December 1, 2002. The pre-2002 rule prohibited substitution of alternate jurors after deliberations had commenced as a categorical matter. The 2002 amendment changed the rule to permit such substitution, expressly conditioning it on the court's instruction to begin deliberations anew. The harmlessness reasoning in pre-2002 cases like *United States v. Quiroz-Cortez*, 960 F.2d 418 (5th Cir. 1992), was developed against the backdrop of an absolute prohibition; under the current rule, the violation is not the act of substitution itself but the failure to comply with the substitution's mandatory conditions. Post-2002 courts applying harmlessness analysis to begin-anew violations assess the concrete risk of prejudice created by the specific procedural failures. *See United States v. Capehart*, No. 22-2076, 2023 WL 4286725, at *3–4 (10th Cir. June 30, 2023) (unpublished) (analyzing harmlessness under current Rule 24(c) by assessing whether alternate was qualified, instructed, and supervised).* Quiroz-Cortez*'s analytical approach — which examined the length of prior deliberation, the instructions given upon substitution, and the circumstances of the alternate's exposure — provides a useful

structural framework for the post-2002 harmlessness inquiry, but it must be applied through the lens of the current rule's specific requirements.

Applying that analytical approach to these facts, every consideration cuts against harmlessness. The forty-hour unsupervised exposure gap, combined with the total absence of safeguards, exceeds any configuration found harmless in published post-2002 authority. The instructions upon substitution affirmatively directed the jury to brief the alternate on existing conclusions rather than to begin deliberating anew — the inverse of what the rule requires. Three hours of prior deliberation was sufficient for the original twelve jurors to have formed and retained views. And the split verdict — the most powerful indicator available — demonstrates that jury composition materially affected specific count-by-count outcomes in a genuinely contested case. The court in *Quiroz-Cortez* identified each of these considerations as relevant to whether the irregularity created a risk of prejudice, 960 F.2d at 419–20, and each one here points toward, rather than away from, a finding of harm. Under *Chapman*, where the verdict itself is in grave doubt, the error is not harmless. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

## CLAIM THREE: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL — FAILURE TO PRESERVE THE RULE 30 JURY INSTRUCTION OBJECTION

### A. Deficient Performance

Federal Rule of Criminal Procedure 30(c) provides that "[t]he court must give the instructions after the closing arguments are completed, or may give them before closing arguments, or both." The phrase "or both" makes plain that when a court elects to give preliminary instructions, it is not absolved of its obligation to instruct the jury again at the close of evidence. The Tenth Circuit recognized the force of this interpretation in *United States v. Starks*, 34 F.4th 1142, 1162–65 (10th Cir. 2022), collecting authority from multiple circuits criticizing pre-evidence-only

instruction and identifying the governing principles: jurors have limited capacity to retain complex legal concepts over a multi-day trial; recency bias ensures jurors better retain instructions delivered close to deliberations; and oral reinstruction conveys the court's authority in a manner written copies cannot replicate.

This Court's own conduct at trial confirmed the problem. In the same December 19 session in which the court denied the reinstruction motion, the court acknowledged it could not provide a transcript of Mr. Capps's testimony — testimony the jury had heard that same day — and told the jury to rely instead on "collective memory" and notes. R.3.1165–1166. The court simultaneously acknowledged the limitations of juror memory while refusing to do anything to address those limitations with respect to forty legal instructions delivered a week earlier. The court's scheduling-driven refusal — "I'm in Oklahoma Tuesday" — was its acknowledged motivation. R.3.949.

Mr. Capps acknowledges that the Tenth Circuit cited and engaged *Starks* on direct appeal in this case — but used it to hold that the Rule 30 error was not "plain," because *Starks* itself explicitly declined to opine on the propriety of pre-evidence-only instructions and reserved the question. *Capps*, No. 23-3095, slip op. at 7–8. That engagement under plain error review does not answer the de novo deficiency question under *Strickland*. The core of this IAC claim is that trial counsel's failure to invoke *Starks* and Rule 30(c) with a proper legal objection prevented the issue from being presented under abuse-of-discretion review, where the burden would have been on the government to justify the departure from Rule 30's default. Instead, the appellate court reviewed under the most defendant-hostile standard available — plain error — and predictably found that *Starks*'s reservation of the question meant the error was not "plain." That outcome was the direct and foreseeable consequence of defense counsel's failure to preserve.

The structural difference between the two standards resolves the apparent tension. Plain error review, as applied by the Tenth Circuit on direct appeal, asks whether the applicable law was so clearly established at the time of the trial court's ruling that the court's deviation was obvious — a backward-looking inquiry that gives courts of appeals the benefit of hindsight while demanding that any "plain" error be measurable against established doctrine. The Tenth Circuit in *Capps* found that the error was not "plain" because *Starks* had reserved the question of whether pre-evidence-only instruction violates Rule 30(c). On that reasoning, the trial court's ruling was not obviously erroneous under established doctrine. Plain error review's standard was not met.

De novo *Strickland* deficiency analysis is entirely different. It asks not what was obvious to an appellate court reviewing after the fact, but what a reasonably competent attorney, exercising professional judgment in December 2022, would have identified as worth preserving. *Starks* was decided in May 2022 — six months before trial. A competent attorney who read *Starks* in the months before trial would have encountered a Tenth Circuit panel expressing concern about pre-evidence instructions, collecting multi-circuit authority criticizing the practice, reciting Rule 30(c)'s "or both" requirement, and then explicitly reserving the question of whether pre-evidence-only instruction violates the rule. That reservation is not a signal to disregard the issue; it is an invitation to preserve it. A circuit court that says "we find support for this argument but need not resolve it today" is, to a competent appellate practitioner, saying: "object at trial, and we will reach the merits."

Far from defeating the deficiency claim, *Starks*'s explicit reservation is the very thing that made the objection worth preserving. A competent attorney reading *Starks* in mid-2022 would have understood that the Tenth Circuit had signaled receptivity to the argument, that preservation would yield abuse-of-discretion review with the burden on the government, and that failure to

preserve would doom the issue to plain error review under the very standard *Starks*'s reservation created. Defense counsel did none of these things. He filed a motion citing no rule and no legal authority, said "I understand," and sat down. The failure is not that counsel should have predicted how the Tenth Circuit would rule; it is that a competent attorney aware of *Starks* would have understood that preservation was essential and legally straightforward.

## B. Prejudice — And Preemptive Response to the Written Instructions Defense

Had counsel properly preserved the Rule 30 objection, the Tenth Circuit would have reviewed the district court's refusal under abuse of discretion, with the government bearing the burden of proving harmless error. Instead, the court applied plain error review and affirmed. Critically, the appellate court expressly acknowledged: "we find support for Mr. Capps's argument." *Capps*, No. 23-3095, slip op. at 8. The court held he could not prevail only because the error was not "plain." Under abuse of discretion review with the burden reversed, the result would have been different. That is the precise definition of prejudice under *Strickland*.

The government's anticipated response — that the written instruction binders and defense counsel's references to three instructions during closing argument provided an adequate substitute for reinstruction — fails for four independent reasons. First, *Starks* itself forecloses the written-instructions cure argument. The Tenth Circuit expressly stated: "Many jurors may not adequately comprehend written instructions. It is no secret that jury instructions are often written in language more suitable for lawyers than laypersons." 34 F.4th at 1166. Second, the jury's own conduct refutes the binder argument. A jury given physical copies of all forty instructions in notebooks from the first day of trial nevertheless found it necessary to ask for a transcript of testimony heard that same day. R.3.1162. If these jurors could not adequately recall same-day oral testimony, the premise that they fully retained and correctly applied 53 pages of written

legal instructions from a week prior defies logic and the court's own acknowledgment that "I'm sure they don't remember" instructions given at the outset of trial. R.3.1163. Third, the closing argument cure is dramatically overstated. Defense counsel referenced three of forty instructions during closing: Instructions 6, 7, and a brief mention of the good faith defense. R.3.1144–1147. Three mentions during closing argument as persuasion tools do not substitute for the court's reinstruction of the legal framework. Fourth, and most importantly: the Tenth Circuit's *Capps* analysis was conducted under plain error review. Under the correct standard — abuse of discretion with the government bearing the burden of proving harmlessness — the partial cures offered by the binder and three closing-argument references would be evaluated against an evidentiary record showing forty instructions, a non-consecutive seven-day trial, and a jury that demonstrably could not retain same-day oral testimony. The government cannot carry that burden.

## CLAIM FOUR: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL — FAILURE TO RAISE STRUCTURAL ERROR, PROSECUTORIAL MISCONDUCT, AND SENTENCING PREDETERMINATION ON DIRECT APPEAL

### A. The Governing Framework — Dead-Bang Winners and Documented Notice

Appellate counsel Jacob Rasch-Chabot raised one issue on direct appeal: the Rule 30 jury instruction timing question, reviewed under plain error because trial counsel had failed to preserve it. He omitted entirely three categories of substantially stronger claims: the Rule 24(c) structural error from Claim Two, the prosecutorial misconduct from Exchange One and Exchange Two documented in Claim One, and the judicial predetermination of sentence from Claim Five. Each of these omissions is independently deficient performance under *Strickland*. Together, they present a pattern of systematic abandonment that the First Circuit aptly described

as choosing "to reject a lifeboat in favor of two lily pads" — "fecklessness is not a strategy."
*Flores-Rivera v. United States*, 16 F.4th 963, 970 (1st Cir. 2021).

The dead-bang winner doctrine under *Cook*, 45 F.3d at 394–95, *Cargle*, 317 F.3d at 1202–05, and *Neill*, 278 F.3d at 1057, protects counsel's legitimate winnowing of weak claims. It does not protect the abandonment of strong ones in favor of weak ones. *Banks v. Reynolds*, 54 F.3d 1508, 1515–16 (10th Cir. 1995) (deficient performance where counsel had "all information necessary to raise" omitted claims and failed to do so). *Smith v. Robbins*, 528 U.S. 259, 285–88 (2000). *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983), protects winnowing of weak claims — not abandonment of plainly meritorious ones. The dead-bang winner inquiry examines whether the legal basis for the omitted claim was firmly established — not whether it had previously resulted in a reversal.

Of the three omitted claims, the prosecutorial misconduct claim from Claim One most squarely satisfies the dead-bang winner standard: the trial judge's own sua sponte interventions constitute objective, on-the-record documentation that the error was obvious without any argument from defense counsel. For the Rule 24(c) structural error and the predetermination claim, the appropriate characterization is that each rested on a firmly established legal basis whose omission constituted plainly unreasonable professional judgment — particularly given that counsel had documentary evidence of the predetermination and the alternate juror facts squarely in hand.

## B. First Omission: Rule 24(c) Structural Error

The Rule 24(c) alternate juror substitution issue was the strongest claim available on direct appeal. It was a structural error apparent on the face of the transcript, and supported by Tenth Circuit precedent recognizing the constitutional dimension of jury composition changes. *Baccari*,

489 F.2d at 275 (recognizing, in a waiver context, the impropriety of substitution without personal consent); *Beasley*, 464 F.2d at 470; *Ashby*, 864 F.2d at 694. Had appellate counsel raised it, the Tenth Circuit would have confronted a record showing an alternate who had forty hours of unsupervised media exposure, no voir dire upon recall, and an affirmatively deficient "begin anew" instruction that told the jury to brief the alternate on existing conclusions. By contrast, the only issue actually raised — the Rule 30 issue — was reviewed under plain error precisely because trial counsel failed to preserve it, and the Tenth Circuit predictably affirmed. What makes this omission particularly indefensible is that Rasch-Chabot did not simply miss the alternate juror issue. He built the *entire appeal* around it. In the Opening Brief, Rasch-Chabot specifically identified the alternate juror's late addition as one of three aggravating circumstances demonstrating that the district court abused its discretion in refusing to reinstruct, citing the "late-arriving alternate juror" and the risk it created for meaningful comprehension of the legal instructions. He had the factual predicate for the stronger claim — the alternate's arrival, the inadequate instruction at R.3.1174–1175, the forty-hour unsupervised gap — squarely in his sights and deployed those same facts in service of the weaker, unpreserved Rule 30(c) argument. He then failed to raise the standalone Rule 24(c)(3) mandatory-rule claim that the same facts independently supported, even though that claim required no preservation and carried the structural error label. *United States v. Capps*, 112 F.4th 887 (10th Cir. 2024), is the Tenth Circuit's direct appeal decision in this case. It affirmed solely on the Rule 30(c) issue Rasch-Chabot raised and never analyzed Rule 24(c)(3). That silence is not precedent against this claim; it is evidence of Rasch-Chabot's deficient performance.

**C. Second Omission: Prosecutorial Misconduct (Claim One) — Documented Written Notice Six Months Before Briefing**

On May 31, 2023 — six months and thirteen days before the Opening Brief was filed on

December 13, 2023 — Mr. Capps forwarded to Rasch-Chabot a complete memorandum setting

out the prosecutorial misconduct theory from Exchange One and Exchange Two, with specific

transcript page and line citations. This is not a case where counsel failed to discover an issue

buried in a voluminous record. He received the complete theory, with a record roadmap, and had

more than six months to investigate and incorporate it.

This omission is independently deficient performance for two separate reasons. First, the claim

was plainly meritorious: the trial judge's sua sponte interventions established the error's

obviousness, and the juror questions provided documentary proof of jury impact. Counsel traded

this documented, substantive claim for a procedural Rule 30 timing issue. Second, Rasch-Chabot

could have framed the claim as layered IAC — arguing that Kerns was constitutionally deficient

for failing to object — which would have invoked de novo *Strickland* review rather than the

highly deferential plain error standard that controlled the Rule 30 claim.

### D. Third Omission: Judicial Predetermination — Documented Written Notice Also Six Months Before Briefing

On June 12, 2023 — also six months before the Opening Brief was filed — Mr. Capps

forwarded to Rasch-Chabot the Melgren email chain and specifically flagged in writing his

concern that the email demonstrated judicial predetermination of a custodial sentence. Appellate

counsel's stated position — that the email could not be raised because it was not in the trial

transcripts — conflates "not in the transcripts" with "unraiseable on appeal." A competent

appellate attorney, in possession of documentary evidence of sentencing predetermination for

over six months before filing the opening brief, had an obligation to find some procedural

pathway to preserve the issue and present it to the Tenth Circuit. Mr. Capps identifies the most

natural vehicle — a limited remand to the district court for an evidentiary hearing under Fed. R. App. P. 12.1, which authorizes the court of appeals to permit the district court to rule on a motion during the pendency of an appeal. Whether or not that specific procedural vehicle had been used in analogous contexts, the underlying obligation — to pursue some available mechanism to develop and preserve a documented constitutional issue — is a fundamental professional norm. An appellate attorney who holds documentary evidence of sentencing predetermination for over six months, receives a specific written communication from the client flagging that evidence, and then files an opening brief that does not mention the predetermination at all — through any vehicle, through any theory, in any form — has not made a reasonable strategic judgment to omit a weak claim. He has failed to engage with a documented constitutional claim entirely. Even setting aside the specific limited remand mechanism, appellate counsel could have raised the predetermination as a due process challenge on direct appeal in the appellate brief itself, presented through Exhibit B as newly discovered evidence of judicial bias, or sought recusal in the district court before the notice of appeal was filed. The complete failure to engage with the Melgren email in any procedural posture, across any of these available vehicles, fell below the objective standard of reasonableness. Rasch-Chabot did not seek a limited remand. He did not raise the predetermination claim. He did not raise any sentencing claim despite a direct written communication from his own client identifying the issue and its legal significance.

## E. Prejudice — Three Stronger Claims Abandoned for One Weaker One

The prejudice analysis for each omitted claim follows from the analysis above. Had Rule 24(c) been raised, the Tenth Circuit would have confronted the structural error doctrine and the most aggravated factual record in the published case law. Had the prosecutorial misconduct been raised as layered IAC, the Tenth Circuit would have applied de novo *Strickland* review to a

record containing the judge's own interventions and the jurors' own written documentation of

the taint — an extremely strong record for deficiency and prejudice. Had the predetermination

claim been raised on direct appeal, the Tenth Circuit's framework under *Bustamante-Conchas*

and its precedent of vacating Chief Judge Melgren's sentences for procedural irregularity, *Cozad*,

21 F.4th at 1259, would have provided a viable pathway to vacatur of the sentence. Rasch-

Chabot chose instead to pursue one unpreserved, procedural Rule 30 claim under the most

deferential standard available, obtaining a predictable affirmance.

## CLAIM FIVE: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AND DUE PROCESS VIOLATION — JUDICIAL PREDETERMINATION OF SENTENCE AND DENIAL OF MEANINGFUL ALLOCUTION

### A. The Hill Framework and Its Exceptions

In *Hill v. United States*, 368 U.S. 424, 428 (1962), the Supreme Court held that a bare violation

of Rule 32's allocution requirement does not by itself support § 2255 relief. But *Hill* explicitly

reserved two exceptions: cases where a defendant was "affirmatively denied an opportunity to

speak," and cases where the violation occurred "in the context of other aggravating

circumstances." *Id.* at 429. The Tenth Circuit acknowledged this reservation in *Martin v. United

States*, 309 F.2d 81, 82–83 (10th Cir. 1962); *Johnston v. United States*, 303 F.2d 343, 344 (10th

Cir. 1962). Mr. Capps's allocution claim does not rest on a bare Rule 32 violation; it rests on

three independent legal theories, each sufficient to support § 2255 relief.

### B. Theory One: Ineffective Assistance of Trial Counsel (Strongest Pathway)

When trial counsel received the May 10, 2023 email from Chief Judge Melgren directing

changes to the PSR with specific reference to the Bureau of Prisons, he received documentary

evidence that the sentencing judge had predetermined a custodial sentence before the sentencing

hearing. A competent attorney, upon receiving this evidence on the eve of sentencing, would have: moved for the judge's recusal based on evidence of prejudgment; objected at the sentencing hearing to the predetermination; challenged the meaningful nature of allocution under *United States v. Landeros-Lopez*, 615 F.3d 1260, 1264 (10th Cir. 2010); and ensured Mr. Capps had a genuine opportunity to speak before a judge who remained open to persuasion. Trial counsel instead forwarded the email with the note "Just in from Judge" and proceeded to sentencing without raising any objection.

The Tenth Circuit's en banc decision in *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1139 (10th Cir. 2017), establishes the prejudice standard for allocution claims: "without some exceptionally good reason to doubt that allocution would have mattered, the complete denial of a defendant's right to allocute raises a reasonable probability of a lesser sentence." Three independent reasons establish that allocution would have mattered here. First, the PSR established a guideline range of 41 to 51 months imprisonment based on a total offense level of 22 and criminal history category I. The sentencing judge imposed 27 months — a downward variance of 14 to 24 months below the guideline range. Second, defense counsel was arguing for a non-custodial sentence; the Tenth Circuit's decision in *United States v. Elliott*, 971 F.2d 620, 621 (10th Cir. 1992), holds that a court may impose a sentence of zero months imprisonment on a Class B felony conviction without that constituting an impermissible sentence of probation, and that argument was legally viable. Third, and most powerfully, the predetermination email demonstrates the allocution opportunity was constitutionally hollow.

The Court must address directly the apparent tension between the first and third reasons. If the judge exercised genuine discretion by varying downward 14 to 24 months, how can it be said that the custodial outcome was predetermined? The answer lies in the distinction between the

binary custody/no-custody determination and the specific term within the custodial range. What the Melgren email establishes is that the judge had predetermined that Mr. Capps would be incarcerated — that BOP would receive him as an inmate — before allocution began. The email says nothing about the length of that sentence. The downward variance, on this account, reflects real discretion exercised within an already-fixed custodial band: the judge genuinely deliberated about how many months to impose, and concluded that 27 months was appropriate rather than 41 to 51. What was not genuinely open to allocution was the binary question — imprisonment or not — because the predetermination email establishes the judge had already answered that question in favor of incarceration.

This framing is consistent with *Bustamante-Conchas*'s core concern. The allocution right exists to give a defendant a genuine opportunity to persuade the judge that a lesser sentence — including, here, a non-custodial sentence — is appropriate. Where the judge has already decided that incarceration will occur, allocution on the imprisonment question is constitutionally hollow regardless of whether the judge remained genuinely open to the specific term within the custodial range. The government's anticipated argument — that the guidelines themselves presumed a custodial sentence — fails on its own terms: the judge varied downward substantially, demonstrating that the sentencing range effectively extended from zero (under *Elliott*) to at least 51 months. Predetermination of the custodial binary before allocution, in the face of a legally viable non-custodial argument and a record of genuine downward discretion, is exactly what *Bustamante-Conchas* prohibits.

## C. Theory Two: Ineffective Assistance of Appellate Counsel

The Melgren email chain was in appellate counsel's actual possession before the Opening Brief was filed. On June 12, 2023, Mr. Capps forwarded the email chain to Rasch-Chabot and

specifically flagged his concern that the email demonstrated judicial predetermination. The Opening Brief was filed on December 13, 2023 — six months after Rasch-Chabot received that communication. Appellate counsel's stated position — that the email could not be raised because it was not in the trial transcripts — reflects a failure to pursue available procedural mechanisms. A competent appellate attorney would have sought a limited remand to the district court for an evidentiary hearing on the sentencing predetermination issue, a recognized procedural vehicle that would have allowed the development of a record in the district court and preserved the issue for meaningful appellate review. Rasch-Chabot did not seek a limited remand. Had the issue been raised on direct appeal through that mechanism, the Tenth Circuit's framework under *Bustamante-Conchas* would have required vacatur of the sentence, consistent with the Tenth Circuit's demonstrated willingness to vacate sentences imposed by Chief Judge Melgren where the sentencing process was procedurally deficient. *Cozad*, 21 F.4th at 1259.

**D. Theory Three: Due Process — Predetermination as an Aggravating Circumstance**

Independent of the IAC claims, the judicial predetermination of sentence constitutes a violation of Mr. Capps's Fifth Amendment due process right to be sentenced by an impartial judge. Under *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), due process is violated when circumstances create "such a risk of actual bias or prejudgment that the practice must be forbidden." *Liteky v. United States*, 510 U.S. 540, 555 (1994), addresses recusal standards under 28 U.S.C. § 455(a), not sentencing predetermination directly. This motion acknowledges that doctrinal distinction. The government will contend that *Liteky*'s recusal framework does not translate to a due process sentencing predetermination claim, and that a judge who makes a routine PSR correction before sentencing has not thereby disqualified himself from exercising judgment at the hearing. Those

arguments are not without force, but they address a different legal theory than Theory Three presents.

The due process argument does not depend on *Liteky*'s specific recusal standard. It depends on *Withrow*, 421 U.S. at 47, which asks whether the circumstances created "such a risk of actual bias or prejudgment that the practice must be forbidden." The extrajudicial source principle that *Liteky* articulates — that bias arising from outside the proceeding itself is particularly significant — reflects a broader due process concern about impartiality that *Withrow* recognizes in the sentencing context equally. The Melgren email is an extrajudicial communication: it was not generated by anything that occurred in the courtroom, and it occurred the day before the sentencing hearing. Its content — directing changes to the official court document that BOP would use to classify Mr. Capps — reflects a presupposition about BOP's custodial relationship with the defendant that could only be operative if a custodial sentence were already determined. Whether this specific fact pattern reaches the threshold *Withrow* sets is a question appropriate for evidentiary hearing. At minimum, it raises a genuine factual dispute about the impartiality of the sentencing process that the record alone — which does not include any explanation from the judge about his intent in writing the email — cannot conclusively resolve. Chief Judge Melgren's May 10 email is an extrajudicial communication directing substantive changes to an official court document based on the judge's concern for BOP classification — a concern that presupposes the defendant's incarceration. This is precisely the "aggravating circumstance" that *Hill* reserved for § 2255 relief. The Seventh Circuit reached the same conclusion in *United States v. Luepke*, 495 F.3d 443, 446 (7th Cir. 2007), where language used before allocution rendered that allocution constitutionally hollow.

**E. The Mechanism for Resentencing Before a Different Judge**

The relief requested includes resentencing before a different judge. The legal authority for this remedy derives from the court's equitable power under § 2255, the due process principles articulated in *Withrow* and *Bustamante-Conchas*, and the Tenth Circuit's reassignment framework. The appropriate threshold step is an evidentiary hearing at which the Court may assess the full context of the May 10 email. Mr. Capps acknowledges that the email was copied to both counsel, which the government may argue demonstrates the judge treated it as entirely routine and administrative. That transparency, however, does not negate the email's evidentiary significance. A judge who openly communicates a predetermined outcome has demonstrated a fixed conclusion, not open-mindedness. The copying of counsel makes the predetermination a matter of record rather than a secret — it does not eliminate the constitutional concern. Whether the email constitutes predetermination or routine administration is a factual question appropriate for evidentiary hearing, after which the Court may determine whether reassignment is warranted under the equitable principles articulated in *Santobello v. New York*, 404 U.S. 257, 263 (1971). The Tenth Circuit has directed resentencing before a different judge where circumstances make impartiality a legitimate concern. *Cudjoe*, 534 F.3d at 1356–57. In exercising that equitable authority under *Santobello*, the relevant considerations are whether the original judge would have difficulty setting aside prior conclusions in a resentencing, whether reassignment would entail undue waste of judicial resources, and whether the appearance of justice would be served. On this record, reassignment is strongly indicated: a sentencing judge who communicated a predetermined custodial outcome to the probation office the day before sentencing would necessarily have substantial difficulty approaching resentencing without the prior conclusion; the resources required for resentencing before a new judge are not disproportionate to the length and complexity of the original proceedings; and the appearance of justice is better served by a

resentencing before a judge who has not previously expressed — in writing — a fixed view of the appropriate outcome.

## CLAIM SIX: CUMULATIVE ERROR — SYSTEMIC DENIAL OF A FAIR TRIAL AND SENTENCING PROCEEDING

The Tenth Circuit recognizes cumulative error doctrine. *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) ("the cumulative effect of individually harmless errors may prejudice a defendant to the same extent as a single reversible error"). A cumulative error analysis "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cargle*, 317 F.3d at 1207; *Grant v. Royal*, 886 F.3d 874 (10th Cir. 2018); *Smith v. Sharp*, 935 F.3d 1064 (10th Cir. 2019); *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003). This claim is explicitly raised as required by Tenth Circuit precedent.

The errors established in this motion span three independent categories — defense counsel failures, prosecutorial misconduct, and judicial error — which is precisely the configuration that cumulative error doctrine addresses. *Cargle*, 317 F.3d at 1207 (legally diverse errors may be aggregated). The critical analytical question is not whether each category of error, standing alone, is individually reversible. It is whether the compounding effect of judicial scheduling error, prosecutorial misconduct, and defense counsel failure operated simultaneously and reinforcingly, such that any one of the three categories might have been survivable in isolation but the combination was not.

Consider the cross-category interaction. The court's scheduling-driven refusal to reinstruct created a jury deliberating with week-old instructions on forty complex legal standards. That same scheduling pressure necessitated the non-consecutive trial format that the court itself called

"insane" and that created the conditions for the alternate juror substitution. The prosecution's improper cross-examination technique embedded inadmissible content into the jury's analytical framework — content that defense counsel was in the best position to exclude and failed to. The reconstituted jury — joined by an alternate who had forty unsupervised hours in a high-coverage media environment and was instructed to receive a briefing from existing jurors rather than begin anew — then deliberated on charges that included the Krivacy counts tainted by the unadmitted dissolution allegation. And the sentence that resulted was imposed by a judge who had, by documentary evidence, determined the custodial outcome before allocution. Each error amplified the others. The unreinstruction left the jury without refreshed guidance on the burden of proof and good faith defense. The tainted cross-examination embedded inadmissible factual premises into that same unguided deliberation. The defective substitution introduced an alternate into deliberations already compromised by both the stale instructions and the embedded inadmissible content. And the sentencing predetermination ensured that even if the jury's verdict had been properly reached, the sentence would have been constitutionally infirm. No published Tenth Circuit decision has confronted a record combining all three categories of error to this degree.

## VI. CUMULATIVE PREJUDICE ANALYSIS

The evidence was not overwhelming. The jury acquitted on six of eighteen submitted counts. It deliberated approximately three hours without reaching a verdict before being reconstituted, and then needed approximately seven more hours to convict — in a deliberation room with an alternate who had been unsupervised for forty hours in a high-profile media environment and who was, by the court's own instruction, being told of "where things are going" rather than beginning fresh. The good faith defense found purchase on a substantial portion of the charges. Complex financial transactions on eighteen separate counts required precise understanding of the

burden of proof — burden-of-proof instructions delivered a week before deliberations and never refreshed.

The government's anticipated responses on each claim fail cumulatively for the reasons set out above. On Rule 30: *Starks* forecloses the written-binder cure; the jury's own transcript request proves the memory limitation; and the entire appellate analysis was conducted under plain error, the most defendant-hostile standard available. On Rule 24(c): even under harmless error, the government cannot carry the *Chapman* burden against a forty-hour gap, absent safeguards, three hours prior deliberation, and a split verdict. On prosecutorial misconduct: the juror questions convert speculative prejudice into documented prejudice, and the government cannot identify what properly admitted evidence would have independently generated those precise inquiries — particularly the "closing" characterization, which required the unadmitted Cybertron transcript content to advance from Exchange One's temporally ambiguous financial deterioration evidence to the specific contemporaneous dissolution premise that Juror Question 1 reflects. The government cannot explain why Juror Question 1 posed the closing of Krivacy as a present-tense accusatory fact rather than as an open inquiry, without reference to Exchange Two's embedded proposition about dissolution papers filed "in August of that year." On sentencing: the judge's own email supplies the evidence of predetermination, and *Bustamante-Conchas* creates a presumption of prejudice that the government cannot rebut by pointing to the guideline range when the judge varied downward by 14 to 24 months and when the email's concern was classification, not the binary custody question.

Individually, each of these failures would be sufficient to support relief. Cumulatively, they establish a proceeding so fundamentally compromised across its trial, deliberation, and

sentencing phases that the constitutional guarantee of a fair trial was honored in form but denied in substance.

## VII. REQUEST FOR EVIDENTIARY HEARING

Under 28 U.S.C. § 2255(b), this Court must grant an evidentiary hearing unless the motion and record "conclusively show that the prisoner is entitled to no relief." The transcript record on its face establishes the Rule 24(c) and Rule 30 violations, the two exchanges and the judicial interventions, and the juror questions. The Melgren email establishes the predetermination. These facts, standing alone, demonstrate entitlement to relief or at minimum to a hearing. Facts requiring further development outside the existing record include: (1) whether and to what extent the alternate juror was exposed to media coverage during the approximately forty-hour unsupervised gap; (2) trial counsel's actual reasoning for failing to make Rule 30, Rule 24(c), and prosecutorial misconduct objections, and for failing to seek Mr. Capps's personal consent to the substitution; (3) appellate counsel's reasoning for omitting the Rule 24(c) structural error, the prosecutorial misconduct claim, and any sentencing challenge, despite holding documentary evidence for six months before filing; (4) what Mr. Capps would have said in allocution had he been given a meaningful opportunity to do so before a genuinely open-minded sentencing judge; and (5) whether a resentencing before a different judge would produce a different outcome with respect to the length and conditions of supervised release.

## VIII. RELIEF REQUESTED

For the foregoing reasons, Defendant Michael R. Capps respectfully requests that this Court:

**1.** Vacate Mr. Capps's conviction and order a new trial based on the ineffective assistance of trial counsel Kurt P. Kerns, including: (a) failure to preserve the Rule 30 jury instruction objection; (b) failure to object to the alternate juror substitution without voir dire, individual juror

assurances, or a legally sufficient "begin anew" instruction; (c) failure to obtain Mr. Capps's personal consent to the non-standard jury composition; (d) failure to object to Exchange One and Exchange Two during cross-examination, and failure to request curative instructions; and (e) the cumulative prejudice of all such failures. *This relief is supported by Claims One (Prosecutorial Misconduct), Two (Rule 24(c)), Three (Rule 30), and Six (Cumulative Error).*

**2.** Alternatively, vacate Mr. Capps's conviction on the Krivacy-related counts (Counts 4, 7, 10, 12, 13, 14, and 15) on the basis of prosecutorial misconduct documented by the juror questions and count-specific verdict pattern, where the inadmissible content from Exchange Two — resting on the unadmitted Cybertron civil deposition transcript — embedded the "closing" characterization that Juror Question 1 confirms the jury adopted as a factual premise. *This relief is supported by Claim One, Section E, and the freestanding due process claim in Claim One, Section F. The Rule 24(c) structural error in Claim Two, which affected all deliberations, could independently support full reversal on all counts.*

**3.** Alternatively, vacate Mr. Capps's sentence and order resentencing before a different judge, based on: (a) the pre-sentencing judicial predetermination of sentence documented in Exhibit B; (b) the failure of trial counsel to raise any challenge to that predetermination; and (c) the failure of appellate counsel to raise the predetermination claim despite holding documentary evidence for six months before filing; and specifically, in the context of resentencing, order modification or reduction of the twenty-four month supervised release term and its conditions, pursuant to this Court's equitable authority under § 2255 and the Tenth Circuit's reassignment framework. *This relief is supported by Claim Five.*

**4.** Alternatively, order an evidentiary hearing to develop the record on all issues raised herein;

**5.** Grant a certificate of appealability on all claims, as reasonable jurists could debate whether this Court is correct in its assessment of the constitutional claims presented herein, including the prosecutorial misconduct, Rule 24(c) structural error, Rule 30 preservation failure, and judicial sentencing predetermination claims; and

**6.** Grant any further relief that the Court deems just and proper.

Respectfully submitted,

Date: February 24, 2026

**Michael R. Capps**

Register Number: 66142-509

*Defendant Pro Se*


**VERIFICATION**

I, Michael R. Capps, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Motion to Vacate, Set Aside, or Correct Sentence and Memorandum of Law in Support are true and correct to the best of my knowledge and belief. Executed on February 24, 2026.

**Michael R. Capps**

Register Number: 66142-509

*Defendant Pro Se*


**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2026, I filed the foregoing Motion to Vacate, Set Aside, or Correct Sentence with the Clerk of the Court through the CM/ECF electronic filing system, which will send electronic notification of such filing to all registered participants, including counsel for the United States of America, United States Attorney's Office for the District of Kansas, 1200 Epic Center, 301 N. Main Street, Wichita, Kansas 67202.

**Michael R. Capps**

Register Number: 66142-509

*Defendant Pro Se*

**EXHIBIT LIST**

**Exhibit A:** Sample of Trial Media Coverage — Wichita, Kansas, December 13–21, 2022

**Exhibit B:** Email Chain, Eric F. Melgren to Jeffrey Blessant, U.S. Probation Officer, May 10, 2023, forwarded by Kurt P. Kerns to Michael Capps, then forwarded by Michael Capps to Jacob Rasch-Chabot on June 12, 2023 (Evidence of Judicial Predetermination of Custodial Sentence and of Appellate Counsel's Actual Knowledge)

**Exhibit C:** Memorandum from Michael Capps to Jacob Rasch-Chabot, May 31, 2023, transmitting complete prosecutorial misconduct theory with specific transcript citations (Evidence of Appellate Counsel's Documented Notice of Exchange One and Exchange Two)